occurred at a cooking temperature of 170° F. and that trials at 150° F., 160° F. and 170° F. should be conducted at page B46.

Pages C2, C5, C8, C11, C14 of Exhibit C disclose a cook temperature of 170° F. Pages C17, C20 and C23 disclose a cook temperature of 160° F. Page C26 discloses a cook temperature of 150° F.

Pages D2, D5, D7, D17 and D20 of Exhibit D disclose a cook temperature of 170° F. Page D14 discloses a cook temperature of 164° F. Pages D11 and D23 of Exhibit D discloses cook temperature of 160° F. Page D26 discloses a trial evaluation with a cook temperature of 150° F.

Page E2 of Exhibit E discloses summaries of the results from Exhibits C and D and states that trials were run at 150° F. and 160° F. as well at 170° F.

Page F3 of Exhibit F discloses a trial evaluation with a cook temperature of 160° F. Each of the remaining trials were also heated to 160° F. to properly evaluate the effect of adding different hydrocolloids.

Exhibit G, at pages G1 and G2, discloses that the curd and other ingredients were cooked at 150° F. and 160° F. for each experiment.

Exhibit I includes references to heating the ingredients to 150° F. and 160° F. at pages I1, I4, I7, I10 and I13. Pages I16, I19 and I22 disclose heating the ingredients to 160° F.

Exhibit J copied the experimental trials recorded in Exhibit F where the only difference was that the sodium citrate concentration was elevated to 1.2 weight percent in the trials of Exhibit J from 0.61 weight percent in the trials of Exhibit F. Therefore, all trials where heated to 160° F.

Q118

01/29/2010

| | Exhibit M disclosed a plant trial run where the ingredients were heated to 165° F. at page M2. |
|---|---|
| | Exhibit N disclosed a plant trial run where the ingredients were heated to 165° F. at page N2. |
| | Exhibit P discloses references to heating the ingredients to 165° F. and 170° F. at pages P15, P27 and P30. |
| adding a cheese emulsifying salt or a dairy ingredient or both or a non-dairy ingredient via a starter culture medium prior to mechanical working; | Page A2 of Exhibit A discloses adding a preground salted mozzarella curd to the mozzarella curd from recombined milk where the salt in the preground salted mozzarella curd is a cheese emulsifying salt and the preground mozzarella curd is a dairy ingredient. |
| | Pages B1, B6, B11, B13, B15, B20, B25, B27, B29, B34, B39, B41 and B45 of Exhibit B disclose that salt (sodium chloride) and sodium citrate are added to the fresh curd prior to mechanical working where the sodium citrate is added at 0.8 weight percent with the adjunct starter. Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are also added to the curd prior to mechanical working in the formulations on pages B1, B6, B11, B13, B15, B20, B25, B27, B29, B34, B39, B41 and B45 of Exhibit B. |
| | Pages C2, C5, C8, C11, C14, C17, C20, C23 and C26 of Exhibit C disclose that salt (sodium chloride) and sodium citrate are added to the fresh curd prior to mechanical working where the sodium citrate is added at differing weight percents with the adjunct starter. Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are also added to the curd prior to mechanical working in the formulations on pages C2, C5, C8, C11,C14, C17, C20, C23 and C26 of Exhibit C. |
| | Pages D2, D5, D8, D11, D14, D17, D20, D23, D26 and D29 of Exhibit D disclose that salt (sodium chloride) and sodium citrate are added to the fresh curd prior to mechanical working where the sodium citrate is added at differing |

Q119

01/29/2010

weight percents with the adjunct starter. Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are also added to the curd prior to mechanical working in the formulations on pages D2, D5, D8, D11, D14, D17, D20, D23, D26 and D29.

Page E2 of Exhibit E summarizes the results of testing of formulations in Exhibits D and E including the effects of varying the levels of sodium citrate in the mozzarella cheese.

Page F2 of Exhibit F provides a summary of the adjunct starter that was utilized in the hydrocolloid testing where the sodium citrate levels in the adjunct starter were varied. Pages F6, F9, F12, F15, F18, F21, F24, F27, F30, F33, F36 and F39 of Exhibit F disclose that salt (sodium chloride) and sodium citrate are added to the fresh curd prior to mechanical working where the sodium citrate is added at differing weight percents with the adjunct starter. Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are also added to the curd prior to mechanical working in the formulations on pages F6, F9, F12, F15, F18, F21, F24, F27, F30, F33, F36 and F39 of Exhibit F.

Sodium citrate is added to each of the experimental trials A, B and C as evidenced and discussed at pages G2. Pages G6, G9 and G12 of Exhibit G disclose that salt (sodium chloride) and sodium citrate are added to the fresh curd prior to mechanical working where the sodium citrate is added at differing weight percents with the adjunct starter. Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are also added to the curd prior to mechanical working in the formulations on pages G6, G9 and G12 of Exhibit G.

Different concentrations of sodium citrate within the same formula for producing mozzarella cheese were tested and the resulting

Q120

01/29/2010

mozzarella cheese was evaluated as provided in Exhibit I. The weight percent of sodium citrate in the final cheese product included 0.6 at page I1, 0.8 weight percent at page I4, 1.0 weight percent at I7, 1.23 weight percent at page I10, 1.5 weight percent at page I13, 1.725 weight percent at page I16, 2.0 weight percent at page I19 and 2.25 weight percent at page I22. Salt (sodium chloride) was also added as an ingredient at pages I1, I4, I7, I10, I13, I16, I19 and I22 of Exhibit I. Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are also added to the curd prior to mechanical working in the formulations at pages I1, I4, I7, I10, I13, I16, I19 and I22 of Exhibit I.

Exhibit J provides numerous trial trials where the sodium citrate concentration was 1.2 weight percent of the cheese. Salt (sodium chloride) was also added as an ingredient for all trial trials.

Exhibit K discloses that sodium citrate and salt (sodium chloride) are added as ingredients at pages K4, K7, K10, K13 and K16. Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are also added to the curd prior to mechanical working in the formulations on pages K4, K7, K10, K13 and K16 of Exhibit K.

Exhibit L discloses that sodium citrate and salt (sodium chloride) are added as ingredients at pages L1, L3, L6, L9, L12, L15, L18, L21, L 24 and L27. Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are also added to the curd prior to mechanical working in the formulations on pages L3, L6, L9, L12, L15, L18, L21, L 24 and L27 of Exhibit L.

Exhibit M discloses that 8.25 pounds of salt (sodium chloride) and 5.5 pounds of sodium citrate are added to the cheese cooker prior to mechanical working at pages M2 and M4.

Q121

01/29/2010

Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are also added to the curd prior to mechanical working in the formulations on pages M2 and M4 of Exhibit M.

Exhibit N discloses that 8.25 pounds of salt (sodium chloride) and 4.25 pounds of sodium citrate are added to the cheese cooker prior to mechanical working at pages N2 and N5. Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are also added to the curd prior to mechanical working in the formulations on pages N2 and N5 of Exhibit N.

Pages O1, O4, O7, O10 and O13 of Exhibit O disclose that salt (sodium chloride) and sodium citrate are added to the fresh curd prior to mechanical working. Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are also added to the curd prior to mechanical working in the formulations on pages O1, O4, O7, O10 and O13 of Exhibit O.

Pages P3, P6, P9, P12, P15, P18, P21, P24, P27, P30, P33, P36, and P39 of Exhibit P disclose that salt (sodium chloride) and sodium citrate are added to the fresh curd prior to mechanical working. Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are also added to the curd prior to mechanical working in the formulations on pages P3, P6, P9, P12, P15, P18, P21, P24, P27, P30, P33, P36, and P39 of Exhibit P.

Pages B1, B6, B11, B13, B15, B20, B25, B27, B29, B34, B39, B41 and B45 of Exhibit B disclose adding sorbic acid and Solka-Floc (a powdered cellulose) to the curd and where the Solka-Floc has differing concentrations in the formulations.

Pages C2, C5, C8, C14, C17, C20, C23 and

C26 of Exhibit C disclose adding sorbic acid and Solka-Floc (a powdered cellulose) to the curd.

Pages D2, D5, D8, D11, D14, D17, D20, D23, D26 and D29 disclose adding sorbic acid and Solka-Floc (a powdered cellulose) to the curd.

Pages F1, F6, F9, F12, F15, F18, F21, F24, F27, F30, F33, F36 and F39 of Exhibit F disclose adding non-dairy ingredients including hydrocolloids such as powdered cellulose, pectin, carrageenan and carboxymethylcellulose to the curd prior to mechanical working.

Page G6 of Exhibit G discloses that a cellulose powder is added as an ingredient.

Solka-Floc, a cellulose powder, is an ingredient in each of the trials as found on pages I1, I4, I7, I10, I13, I16, I19 and I22 of Exhibit I.

Exhibit F discloses adding non-dairy ingredients including hydrocolloids such as cellulose powder, pectin, carrageenan and carboxymethylcellulose to the curd prior to mechanical working. Page J1 indicates that the same amount and type of hydrocolloid was added for each of the trials as the only ingredient that was changed was the concentration of sodium citrate in Exhibit J.

Page K4, K7, K10, K13 and K16 of Exhibit K disclose that hydrocolloids including pectin, carrageenan and carboxymethylcellulose and combinations thereof are added prior to mechanically working the curd.

Pages L3, L7, L9, L12, L15, L18, L21, L24 and L27 of Exhibit L disclose that pectin (Slendid 200), carboxymethylcellulose (CMC 7HF), sorbic acid and acetic acid are added prior to mechanical working.

Q123

01/29/2010

| | Pages M2 and M4 of Exhibit M discloses that pectin (Slendid 200), carboxymethylcellulose (CMC 7HF), sorbic acid and acetic acid are added prior to mechanical working. |
| | Pages N2 and N5 of Exhibit N discloses that pectin (Slendid 200), carboxymethylcellulose (CMC 7HF), sorbic acid and acetic acid are added prior to mechanical working. |
| | Pages O1, O4, O7, O10 and O13 of Exhibit O disclose that pectin (Slendid 200), carboxymethylcellulose (CMC 7HF), sorbic acid and acetic acid are added prior to mechanical working. Pages O4, O7, O10 and O13 of Exhibit O disclose the addition of rennet casein to the formulations. |
| | Pages P3, P6, P9, P12, P15, P18, P21, P24, P27, P30, P33, P36, and P39 of Exhibit P disclose that pectin (Slendid 200), carboxymethylcellulose (CMC 7HF), sorbic acid, acetic acid and rennet casein are added prior to mechanical working. |
| | Pages P2, P6, P9, P12, P15, P18, P21, P24, P27, P30, P33, P36, and P39 of Exhibit P disclose the addition of monosodium phosphate (MSP), Sodium hexametaphosphate (SHMP), sodium tripolyphosphate (STPP) and sodium trimetaphosphate (STMP) at different weight percents and combinations. |
| mechanically working the curd and into a fibrous mass; and | Pages A1 and A2 of Exhibit A disclose utilizing a process cheese cooker to form mozzarella cheese which is a fibrous mass. |
| | Exhibit B discloses numerous trials where mozzarella cheese was formed having differing characteristics at pages B43 and B44. |
| | Exhibit C discloses numerous trials where fibrous mass was not formed at page C29. |
| | Pages D2, D5, D8, D11, D14, D17, D20, D23, D26 and D29 of Exhibit D disclose evaluations of the curds that were formed. |

Q124

Page E3 of Exhibit E discloses that temperature and hold time of the temperature during mechanical working have an effect on the characteristics of the developed fibrous mass.

Pages F3, F6, F9, F21, F24 and F26 provide comments on the texture of the resulting fibrous mass.

Pages G1 and G2 comment on the characteristics of the fibrous mass in Exhibit G.

Exhibit H includes a series of tests designed to test the effect on the cheese properties based upon changing the time period during which the curd is mechanically worked.

Exhibit I includes a series of tests where fibrous masses were produced including at pages I1, I4, I7, I10, I13, I16, I19 and I22. Page I25 comments on the characteristics of the cheese including stretch. Therefore a fibrous mass was formed for each trial run.

Pages J2 and J3 of Exhibit J comment on the characteristics of the cheese including stretch. Therefore a fibrous mass was formed for each trial run.

Page K19 of Exhibit K comments on the characteristics of the cheese including stretch. Therefore a fibrous mass was formed for each recorded trial run.

Pages L30 and L31 of Exhibit L comment on the characteristics of the cheese including stretch. Therefore a fibrous mass was formed for each recorded trial run.

Exhibit M indicates that the ingredients are mechanically worked for two minutes and form a fibrous mass at page M2. The cheese had the same or similar characteristics as a

Q125

01/29/2010

A3187

| | traditionally made mozzarella as indicated at page M12. Also stretch tests were performed on some of the samples at page M20 indicating that a fibrous mass was formed.<br><br>Exhibit N indicates that the ingredients are mechanically worked for one minute and form a fibrous mass at page N2. Also stretch tests were performed on some of the samples at page N14 indicating that a fibrous mass was formed.<br><br>Page O17 of Exhibit O comments on the characteristics of the cheese including stretch. Therefore a fibrous mass was formed for each recorded trial run. |
|---|---|
| forming the cheese into a selected shape. | Pages A1 and A2 of Exhibit A disclose that the mozzarella cheese is packaged into chubs on page A1, 40 pound blocks or 10, 15 or 20 pound chubs on page A2.<br><br>Pages M2 and M3 of Exhibit M indicates that the cheese was packaged into 4" diameter, 14" length, 6 pound chubs and also a 40 pound bulk box.<br><br>Page N2 of Exhibit N indicates that the cheese was packaged into 4" diameter, 14" length, 6 pound chubs. |

| Claim 116 | Evidence of Reduction to Practice Prior to October 29, 1997 |
|---|---|
| The process of claim 114 wherein the milk composition is fresh milk. | Page A1 of Exhibit A discloses that fresh mozzarella cheese is formed from a pasteurized whole milk in the upper left block. |

| Claim 117 | Evidence of Reduction to Practice Prior to October 29, 1997 |
|---|---|
| The process of claim 114 wherein the milk composition is recombined milk. | Page A1 of Exhibit A discloses the milk composition is recombined milk in the upper right block. |

| Claim 118 | Evidence of Reduction to Practice Prior to October 29, 1997 |
|---|---|

Q126

01/29/2010

| The process of claim 117 wherein the recombined milk is prepared from either protein concentrate, acid casein, rennet casein, caseinates, nonfat dry milk, whey, whey protein concentrate, whey protein isolate, cream, or condensed milk or any combination thereof. | Page A1 of Exhibit A discloses the milk composition is recombined milk in the upper right block. The recombined milk is formed from milk protein concentrate (MPC) including ultrafiltered/diafiltered skim milk along with a culture and rennet; rennet casein including skim milk and rennet; heavy cream including cream with 80% milk fat, food grade gums, sodium citrate and natural cultured butter flavor; acetic acid and sorbic acid. |
| --- | --- |
| | Page A2 of Exhibit A discloses another formulation of recombined milk including powdered milk protein concentrate, water milk fat, 40% total solid whey based starter including sodium citrate, salt and an anti-sticking extrusion aid. |

| Claim 119 | Evidence of Reduction to Practice Prior to October 29, 1997 |
| --- | --- |
| The process of claim 114 wherein the salt composition includes an alkaline earth salt of simple or complex chlorides, sulfates, phosphates or citrates used in the manufacture of process cheese, cheese food, cheese spread, cheese sauce or imitation or analog cheeses. | Pages B1, B6, B11, B13, B15, B20, B25, B27, B29, B34, B39, B41 and B45 of Exhibit B disclose that salt (sodium chloride) and sodium citrate within the adjunct starter are added to the curd. |
| | Pages C2, C5, C8, C14, C17, C20, C23 and C26 of Exhibit C disclose that salt (sodium chloride) and sodium citrate are added to the fresh curd prior to mechanical working where the sodium citrate is added at differing weight percents with the adjunct starter. |
| | Pages D2, D5, D8, D11, D14, D17, D20, D23, D26 and D29 disclose that salt (sodium chloride) and sodium citrate are added to the fresh curd prior to mechanical working where the sodium citrate is added at differing weight percents with the adjunct starter. |
| | Pages F6, F9, F12, F15, F18, F21, F24, F27, F30, F33, F36 and F39 of Exhibit F disclose that salt (sodium chloride) and sodium citrate are added to the fresh curd prior to mechanical working where the sodium citrate is added at |

Q127

differing weight percents with the adjunct starter.

Sodium citrate is added to each of the experimental trials A, B and C as evidenced and discussed at pages G2 and as provided in the adjunct starter in the formulations on pages G6, G9 and G12 of Exhibit G. Salt (sodium chloride) is an ingredient in each of the trials as found on pages G6, G9 and G12 of Exhibit G.

Salt (sodium chloride) and sodium citrate are ingredients in each of the trials as found on pages I1, I4, I7, I10, I13, I16, I19 and I22 of Exhibit I.

Exhibit F indicates that salt (sodium chloride) is added as an ingredient. Page J1 indicates that the same amount of salt was added for each of the trials as the only ingredient that was changed was the concentration of sodium citrate in Exhibit J.

Exhibit K discloses that sodium citrate and salt (sodium chloride) are added as ingredients at pages K4, K7, K10, K13 and K16.

Exhibit L discloses that sodium citrate and salt (sodium chloride) are added as ingredients at pages L1, L3, L6, L9, L12, L15, L18, L21, L 24 and L27.

Page M2 and M4 of Exhibit M disclose that salt (sodium chloride) and sodium citrate are added as ingredients.

Page N2 and N5 of Exhibit N disclose that salt (sodium chloride) and sodium citrate are added as ingredients.

Pages O1, O4, O7, O10 and O13 of Exhibit O disclose that salt (sodium chloride) and sodium citrate are added to the fresh curd prior to mechanical working.

Pages P3, P6, P9, P12, P15, P18, P21, P24,

Q128

| | P27, P30, P33, P36, and P39 of Exhibit P disclose that salt (sodium chloride) and sodium citrate are added to the fresh curd prior to mechanical working. |
| | |
| | Pages P2, P6, P9, P12, P15, P18, P21, P24, P27, P30, P33, P36, and P39 of Exhibit P disclose the addition of monosodium phosphate (MSP), Sodium hexametaphosphate (SHMP), sodium tripolyphosphate (STPP) and sodium trimetaphosphate (STMP) at different weight percents and combinations. |

| Claim 120 | Evidence of Reduction to Practice Prior to October 29, 1997 |
| --- | --- |
| The process of claim 114 wherein the alkaline earth salt contains sodium, potassium, calcium, magnesium or combination thereof. | Pages B1, B6, B11, B13, B15, B20, B25, B27, B29, B34, B39, B41 and B45 of Exhibit B disclose that salt (sodium chloride) and sodium citrate within the adjunct starter are added to the curd. |
| | |
| | Pages C2, C5, C8, C14, C17, C20, C23 and C26 of Exhibit C disclose that salt (sodium chloride) and sodium citrate are added to the fresh curd prior to mechanical working where the sodium citrate is added at differing weight percents with the adjunct starter. |
| | |
| | Pages D2, D5, D8, D11, D14, D17, D20, D23, D26 and D29 disclose that salt (sodium chloride) and sodium citrate are added to the fresh curd prior to mechanical working where the sodium citrate is added at differing weight percents with the adjunct starter. |
| | |
| | Pages F6, F9, F12, F15, F18, F21, F24, F27, F30, F33, F36 and F39 of Exhibit F disclose that salt (sodium chloride) and sodium citrate are added to the fresh curd prior to mechanical working where the sodium citrate is added at differing weight percents with the adjunct starter. |
| | |
| | Sodium citrate is added to each of the experimental trials A, B and C as evidenced |

Q129

29

01/29/2010

A3191

|  | and discussed at pages G2 and as provided in the adjunct starter in the formulations on pages G6, G9 and G12 of Exhibit G. Salt (sodium chloride) is an ingredient in each of the trials as found on pages G6, G9 and G12 of Exhibit G.<br><br>Salt (sodium chloride) and sodium citrate are ingredients in each of the trials as found on pages I1, I4, I7, I10, I13, I16, I19 and I22 of Exhibit I.<br><br>Exhibit F indicates that salt (sodium chloride) is added as an ingredient. Page J1 indicates that the same amount of salt was added for each of the trials as the only ingredient that was changed was the concentration of sodium citrate in Exhibit J.<br><br>Exhibit K discloses that sodium citrate and salt (sodium chloride) are added as ingredients at pages K4, K7, K10, K13 and K16.<br><br>Exhibit L discloses that sodium citrate and salt (sodium chloride) are added as ingredients at pages L1, L3, L6, L9, L12, L15, L18, L21, L24 and L27.<br><br>Pages M2 and M4 of Exhibit M disclose that salt (sodium chloride) and sodium citrate are added as ingredients.<br><br>Pages N2 and N5 of Exhibit N disclose that salt (sodium chloride) and sodium citrate are added as ingredients.<br><br>Pages O1, O4, O7, O10 and O13 of Exhibit O disclose that salt (sodium chloride) and sodium citrate are added to the fresh curd prior to mechanical working.<br><br>Pages P3, P6, P9, P12, P15, P18, P21, P24, P27, P30, P33, P36, and P39 of Exhibit P disclose that salt (sodium chloride) and sodium citrate are added to the fresh curd prior to mechanical working. |
|---|---|

Q130

01/29/2010

A3192

| | Pages P2, P6, P9, P12, P15, P18, P21, P24, P27, P30, P33, P36, and P39 of Exhibit P disclose the addition of monosodium phosphate (MSP), Sodium hexametaphosphate (SHMP), sodium tripolyphosphate (STPP) and sodium trimetaphosphate (STMP) at different weight percents and combinations. |
|---|---|

| Claim 122 | Evidence of Reduction to Practice Prior to October 29, 1997 |
|---|---|
| The process of claim 114 wherein a non dairy ingredient is added to the curd prior to mechanical working. | Pages B1, B6, B11, B13, B15, B20, B25, B27, B29, B34, B39, B41 and B45 of Exhibit B disclose adding sorbic acid and Solka-Floc (a powdered cellulose) to the curd and where the Solka-Floc has differing concentrations in the formulations. |
| | Pages C2, C5, C8, C14, C17, C20, C23 and C26 of Exhibit C disclose adding sorbic acid and Solka-Floc (a powdered cellulose) to the curd. |
| | Pages D2, D5, D8, D11, D14, D17, D20, D23, D26 and D29 disclose adding sorbic acid and Solka-Floc (a powdered cellulose) to the curd. |
| | Pages F1, F6, F9, F12, F15, F18, F21, F24, F27, F30, F33, F36 and F39 of Exhibit F disclose adding non-dairy ingredients including hydrocolloids such as powdered cellulose, pectin, carrageenan and carboxymethylcellulose to the curd prior to mechanical working. |
| | Page G6 of Exhibit G discloses that a cellulose powder is added as an ingredient. |
| | Solka-Floc, a cellulose powder, is an ingredient in each of the trials as found on pages I1, I4, I7, I10, I13, I16, I19 and I22 of Exhibit I. |
| | Exhibit F discloses adding non-dairy ingredients including hydrocolloids such as cellulose powder, pectin, carrageenan and |

Q131

carboxymethylcellulose to the curd prior to mechanical working. Page J1 indicates that the same amount and type of hydrocolloid was added for each of the trials as the only ingredient that was changed was the concentration of sodium citrate in Exhibit J.

Pages K4, K7, K10, K13 and K16 of Exhibit K disclose that hydrocolloids including pectin, carrageenan and carboxymethylcellulose and combinations thereof are added prior to mechanically working the curd.

Pages L3, L7, L9, L12, L15, L18, L21, L24 and L27 of Exhibit L disclose that pectin (Slendid 200), carboxymethylcellulose (CMC 7HF), sorbic acid and acetic acid are added prior to mechanical working.

Pages M2 and M4 of Exhibit M disclose that pectin (Slendid 200), carboxymethylcellulose (CMC 7HF), sorbic acid and acetic acid are added prior to mechanical working.

Pages N2 and N5 of Exhibit N disclose that pectin (Slendid 200), carboxymethylcellulose (CMC 7HF), sorbic acid and acetic acid are added prior to mechanical working.

Pages O1, O4, O7, O10 and O13 of Exhibit O disclose that pectin (Slendid 200), carboxymethylcellulose (CMC 7HF), sorbic acid and acetic acid are added prior to mechanical working. Pages O4, O7, O10 and O13 of Exhibit O disclose the addition of rennet casein to the formulations.

Pages P3, P6, P9, P12, P15, P18, P21, P24, P27, P30, P33, P36, and P39 of Exhibit P disclose that pectin (Slendid 200), carboxymethylcellulose (CMC 7HF), sorbic acid, acetic acid and rennet casein are added prior to mechanical working.

Pages P2, P6, P9, P12, P15, P18, P21, P24, P27, P30, P33, P36, and P39 of Exhibit P

Q132

A3194

| | disclose the addition of monosodium phosphate (MSP), Sodium hexametaphosphate (SHMP), sodium tripolyphosphate (STPP) and sodium trimetaphosphate (STMP) at different weight percents and combinations. |
|---|---|

| Claim 123 | Evidence of Reduction to Practice Prior to October 29, 1997 |
|---|---|
| The process of claim 114 where the non-dairy ingredient is a functional carbohydrate, a lipase, a protease, a mineral acid, an organic acid, a structural protein, or an antimicrobial agent or a combination thereof. | Pages B1, B6, B11, B13, B15, B20, B25, B27, B29, B34, B39, B41 and B45 of Exhibit B disclose adding sorbic acid and Solka-Floc (a powdered cellulose) to the curd and where the Solka-Floc has differing concentrations in the formulations.<br><br>Pages C2, C5, C8, C14, C17, C20, C23 and C26 of Exhibit C disclose adding sorbic acid and Solka-Floc (a powdered cellulose) to the curd.<br><br>Pages D2, D5, D8, D11, D14, D17, D20, D23, D26 and D29 disclose adding sorbic acid and Solka-Floc (a powdered cellulose) to the curd.<br><br>Pages F1, F6, F9, F12, F15, F18, F21, F24, F27, F30, F33, F36 and F39 of Exhibit F disclose adding non-dairy ingredients including hydrocolloids such as powdered cellulose, pectin, carrageenan and carboxymethylcellulose to the curd prior to mechanical working.<br><br>Page G6 of Exhibit G discloses that a cellulose powder is added as an ingredient.<br><br>Solka-Floc, a cellulose powder, is an ingredient in each of the trials as found on pages I1, I4, I7, I10, I13, I16, I19 and I22 of Exhibit I.<br><br>Exhibit F discloses adding non-dairy ingredients including hydrocolloids such as cellulose powder, pectin, carrageenan and carboxymethylcellulose to the curd prior to mechanical working. Page J1 indicates that the |

Q133

A3195

same amount and type of hydrocolloid was added for each of the trials as the only ingredient that was changed was the concentration of sodium citrate in Exhibit J.

Pages K4, K7, K10, K13 and K16 of Exhibit K disclose that hydrocolloids including pectin, carrageenan and carboxymethylcellulose and combinations thereof are added prior to mechanically working the curd.

Pages L3, L7, L9, L12, L15, L18, L21, L24 and L27 of Exhibit L disclose that pectin (Slendid 200), carboxymethylcellulose (CMC 7HF), sorbic acid and acetic acid are added prior to mechanical working.

Pages M2 and M4 of Exhibit M disclose that pectin (Slendid 200), carboxymethylcellulose (CMC 7HF), sorbic acid and acetic acid are added prior to mechanical working.

Pages N2 and N5 of Exhibit N disclose that pectin (Slendid 200), carboxymethylcellulose (CMC 7HF), sorbic acid and acetic acid are added prior to mechanical working.

Pages O1, O4, O7, O10 and O13 of Exhibit O disclose that pectin (Slendid 200), carboxymethylcellulose (CMC 7HF), sorbic acid and acetic acid are added prior to mechanical working. Pages O4, O7, O10 and O13 of Exhibit O disclose the addition of rennet casein to the formulations.

Pages P3, P6, P9, P12, P15, P18, P21, P24, P27, P30, P33, P36, and P39 of Exhibit P disclose that pectin (Slendid 200), carboxymethylcellulose (CMC 7HF), sorbic acid, acetic acid and rennet casein are added prior to mechanical working.

Pages P2, P6, P9, P12, P15, P18, P21, P24, P27, P30, P33, P36, and P39 of Exhibit P disclose the addition of monosodium phosphate (MSP), Sodium hexametaphosphate

Q134

01/29/2010

| | (SHMP), sodium tripolyphosphate (STPP) and sodium trimetaphosphate (STMP) at different weight percents and combinations. |
|---|---|

| Claim 125 | Evidence of Reduction to Practice Prior to October 29, 1997 |
|---|---|
| The process of claim 114 wherein the dairy ingredient is either a milk, cream, yogurt, skim solids, or cheese that is dry, condensed, fluid, unripened, fermented or pH reduced or any combination thereof. | Page A2 of Exhibit A discloses adding a preground salted mozzarella curd to the mozzarella curd from recombined milk where the salt in the preground salted mozzarella curd is a cheese emulsifying salt and the preground mozzarella curd is a dairy ingredient.

Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are added to the curd prior to mechanical working in the formulations on pages B1, B6, B11, B13, B15, B20, B25, B27, B29, B34, B39, B41 and B45 of Exhibit B.

Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are added to the curd prior to mechanical working in the formulations on pages C2, C5, C8, C11, C14, C17, C20, C23 and C26 of Exhibit C.

Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are added to the curd prior to mechanical working in the formulations on pages D2, D5, D8, D11, D14, D17, D20, D23, D26 and D29.

Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are added to the curd prior to mechanical working in the formulations on pages F6, F9, F12, F15, F18, F21, F24, F27, F30, F33, F36 and F39 of Exhibit F.

Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are added to the curd prior to mechanical working in the formulations on pages G6, G9 and G12 of Exhibit G. |

Q135

01/29/2010

| | |
|---|---|
| | Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are added to the curd prior to mechanical working in the formulations at pages I1, I4, I7, I10, I13, I16, I19 and I22 of Exhibit I.

Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are added to the curd prior to mechanical working in the formulations on pages K4, K7, K10, K13 and K16 of Exhibit K.

Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are added to the curd prior to mechanical working in the formulations on pages L3, L6, L9, L12, L15, L18, L21, L 24 and L27 of Exhibit L.

Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are added to the curd prior to mechanical working in the formulations on pages M2 and M4 of Exhibit M.

Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are added to the curd prior to mechanical working in the formulations on pages N2 and N5 of Exhibit N.

Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are added to the curd prior to mechanical working in the formulations on pages Pages O1, O4, O7, O10 and O13 of Exhibit O.

Kerry Meloskim 9300 (milk protein concentrate) and Grade B concentrated milkfat are added to the curd prior to mechanical working in the formulations on pages Pages P3, P6, P9, P12, P15, P18, P21, P24, P27, P30, P33, P36, and P39 of Exhibit P. |

| Claim 127 | Evidence of Reduction to Practice Prior to |

Q136

|  | October 29, 1997 |
|---|---|
| The process of claim 114 wherein the cheese has a final moisture content in the range of about 20 to about 90 weight percent. | Exhibit B at page B48 discloses cheese having a moisture content in weight percent of 49.53, 50.94, 50.92, 50.78, 51.37, 51.25, 51.47 and 51.35. |
| | Exhibit D discloses cheese having a moisture content of 35.80 at page D33. |
| | Exhibit F discloses cheese having a moisture content of 34.76 at page F43. |
| | Exhibit G discloses cheese having a moisture content of 36.05, 36.51 and 36.33 at page G19. |
| | Exhibit I discloses cheese having a moisture content of 35.89 weight percent at page I55. |
| | Exhibit J discloses a cheese having a moisture content of 34.92 weight percent at page J5. |
| | Exhibit K discloses a cheese having a moisture content of 35.34 weight percent at page L33. |
| | Exhibit M discloses cheese samples having moisture contents of 50.82 weight percent and 51.39 weight percent at page M15. |
| | Exhibit O discloses at page O19 that cheese samples from the different trial trials had a moisture content of 51.28, 50.98, 50.97, 51.45, 51.18 and 50.79. |

| Claim 128 | Evidence of Reduction to Practice Prior to October 29, 1997 |
|---|---|
| The process of claim 127 wherein the cheese has a final moisture content in the range of about 30 to 60 weight percent. | Exhibit B at page B48 discloses cheese having a moisture content in weight percent of 49.53, 50.94, 50.92, 50.78, 51.37, 51.25, 51.47 and 51.35. |
| | Exhibit D discloses cheese having a moisture content of about 35.80 at page D33. |
| | Exhibit F discloses cheese having a moisture content of 34.76 at page F43. |

Q137

01/29/2010

A3199

Exhibit G discloses cheese having a moisture content of 36.05, 36.51 and 36.33 at page G19.

Exhibit I discloses cheese having a moisture content of 35.89 weight percent at page I55.

Exhibit J discloses a cheese having a moisture content of 34.92 weight percent at page J5.

Exhibit K discloses a cheese having a moisture content of 35.34 weight percent at page L33.

Exhibit M discloses cheese samples having moisture contents of 50.82 weight percent and 51.39 weight percent at page M15.

Exhibit O discloses at page O19 that cheese samples from the different trial trials had a moisture content of 51.28, 50.98, 50.97, 51.45, 51.18 and 50.79.

| Claim 129 | Evidence of Reduction to Practice Prior to October 29, 1997 |
|---|---|
| The process of claim 127 wherein the cheese final moisture content is adjustable by the addition of inert ingredients. | Page F1, F6, F9, F12, F15, F18, F21, F24, F27, F30, F33, F36 and F39 of Exhibit F disclose adding non-dairy ingredients including hydrocolloids such as powdered cellulose, pectin, carrageenan and carboxymethylcellulose to the curd prior to mechanical working.

Exhibit F discloses adding non-dairy ingredients including hydrocolloids such as powdered cellulose, pectin, carrageenan and carboxymethylcellulose to the curd prior to mechanical working. Page J1 indicates that the same amount and type of hydrocolloid was added for each of the trials as the only ingredient that was changed was the concentration of sodium citrate in Exhibit J.

Exhibit K discloses that different hydrocolloids including pectin, carrageenan and carboxymethylcellulose will be added to |

Q138

01/29/2010

|  | measure the change in shredding, melt and stretch characteristics. Page K1 of Exhibit K indicates that pectin (Slendid 200) is an ingredient in all five recorded trial trials. Carrageenan (Genu J) is included in trials 2 and 3 and carboxymethylcellulose is included in trial trials 4 and 5. The weight percentages of the hydrocolloids are found at pages K4, K7, K10, K13 and K16.

Pages L3, L7, L9, L12, L15, L18, L21, L24 and L27 of Exhibit L disclose that pectin (Slendid 200) and carboxymethylcellulose (CMC 7HF) are ingredients in the test trials.

Pages M2 and M4 in Exhibit M disclose that pectin (Slendid 200) and carboxymethylcellulose (CMC 7HF) are ingredients in the trial plant run.

Pages N2 and N5 in Exhibit N disclose that pectin (Slendid 200) and carboxymethylcellulose (CMC 7HF) are ingredients in the trial plant run.

Pages O1, O4, O7, O10 and O13 of Exhibit O disclose that pectin (Slendid 200) and carboxymethylcellulose (CMC 7HF) are added prior to mechanical working.

Pages P3, P6, P9, P12, P15, P18, P21, P24, P27, P30, P33, P36, and P39 of Exhibit P disclose that pectin (Slendid 200) and carboxymethylcellulose (CMC 7HF) are added prior to mechanical working. |

| Claim 130 | Evidence of Reduction to Practice Prior to October 29, 1997 |
|---|---|
| The process of claim 129 wherein the inert ingredients are either structural carbohydrates or silicates or a combination thereof. | Pages B1, B6, B11, B13, B15, B20, B25, B27, B29, B34, B39, B41 and B45 of Exhibit B disclose adding Solka-Floc (a powdered cellulose) to the curd, where the Solka-Floc has differing concentrations in the formulations. |

Q139

Pages C2, C5, C8, C14, C17, C20, C23 and C26 of Exhibit C disclose adding Solka-Floc (a powdered cellulose) to the curd.

Pages D2, D5, D8, D11, D14, D17, D20, D23, D26 and D29 disclose adding Solka-Floc (a powdered cellulose) to the curd.

Page F1, F6, F9, F12, F15, F18, F21, F24, F27, F30, F33, F36 and F39 of Exhibit F discloseadding non-dairy ingredients including hydrocolloids such as powdered cellulose, pectin, carrageenan and carboxymethylcellulose to the curd prior to mechanical working.

Exhibit F discloses adding non-dairy ingredients including hydrocolloids such as pectin, carrageenan and carboxymethylcellulose to the curd prior to mechanical working. Page J1 indicates that the same amount and type of hydrocolloid was added for each of the trials as the only ingredient that was changed was the concentration of sodium citrate in Exhibit J.

Exhibit K discloses that different hydrocolloids including pectin, carrageenan and carboxymethylcellulose will be added to measure the change in shredding, melt and stretch characteristics. Page K1 of Exhibit K indicates that pectin (Slendid 200) is an ingredient in all five recorded trial trials. Carrageenan (Genu J) is included in trials 2 and 3 and carboxymethylcellulose is included in trial trials 4 and 5. The weight percentages of the hydrocolloids are found at pages K4, K7, K10, K13 and K16.

Pages L3, L7, L9, L12, L15, L18, L21, L24 and L27 of Exhibit L disclose that pectin (Slendid 200) and carboxymethylcellulose (CMC 7HF) are ingredients in the test trials.

Pages M2 and M4 in Exhibit M disclose that pectin (Slendid 200) and

Q140

01/29/2010

A3202

|  | carboxymethylcellulose (CMC 7HF) are ingredients in the trial plant run.<br><br>Pages N2 and N5 in Exhibit N disclose that pectin (Slendid 200) and carboxymethylcellulose (CMC 7HF) are ingredients in the trial plant run.<br><br>Pages O1, O4, O7, O10 and O13 of Exhibit O disclose that pectin (Slendid 200) and carboxymethylcellulose (CMC 7HF) are added prior to mechanical working.<br><br>Pages P3, P6, P9, P12, P15, P18, P21, P24, P27, P30, P33, P36, and P39 of Exhibit P disclose pectin (Slendid 200) and carboxymethylcellulose (CMC 7HF) are added prior to mechanical working. |
|---|---|

| Claim 131 | Evidence of Reduction to Practice Prior to October 29, 1997 |
|---|---|
| The process of claim 114 wherein the mechanical working of the curd is done in a waterless cooker. | Exhibit A at pages 1 and 2 disclose utilizing a process cheese cooker that replaces the conventional or traditional cooker/stretecher.<br><br>Exhibit M at page M2 discloses that a cheese blender is being simulated so no steam is added at the time ingredients are added.<br><br>Exhibit N at page N2 discloses that a cheese blender is being simulated so no steam is added at the time ingredients are added. |

| Claim 132 | Evidence of Reduction to Practice Prior to October 29, 1997 |
|---|---|
| The process of claim 114 and further including: |  |
| cooling the cheese after the cheese is formed into the selected shape. | Pages A2 and A3 of Exhibit A disclose that the mozzarella cheese is packaged into 40 pound blocks or 10, 15 or 20 pound chubs on page 2 and then subsequently cooled on page 3. |

Q141

01/29/2010

| | Page M3 of Exhibit M discloses that the 4" diameter, 14" length, 6 pound chubs and 40 pound bulk box containing hot cheese are either cooled in a cooler or in an ice water bath.<br><br>Page N2 of Exhibit N discloses that the 4" diameter, 14" length, 6 pound chubs containing hot cheese are either cooled in a cooler or in an ice water bath. |
|---|---|

| Claim 133 | Evidence of Reduction to Practice Prior to October 29, 1997 |
|---|---|
| The process of claim 132 and further packaging the cooled cheese. | Pages A2 and A3 of Exhibit A disclose that the mozzarella cheese is packaged into 40 pound blocks or 10, 15 or 20 pound chubs on page 2 and then subsequently cooled on page 3.<br><br>Page M3 of Exhibit M discloses that the 4" diameter, 14" length, 6 pound chubs and 40 pound bulk box containing hot cheese are either cooled in a cooler or in an ice water bath.<br><br>Page N2 of Exhibit N discloses that the 4" diameter, 14" length, 6 pound chubs containing hot cheese are either cooled in a cooler or in an ice water bath. |

| Claim 134 | Evidence of Reduction to Practice Prior to October 29, 1997 |
|---|---|
| The process of claim 132 wherein the cheese is formed into either a circular, oval or rectangular cross-sectional shape between 0.25 inch to 1.5 inches in diameter or width or both in a horizontal or vertical plane. | Pages A2 and A3 of Exhibit A disclose that the mozzarella cheese is packaged into 40 pound blocks or 10, 15 or 20 pound chubs on page 2 and then subsequently cooled on page 3.<br><br>Page M3 of Exhibit M discloses that the 4" diameter, 14" length, 6 pound chubs and 40 pound bulk box containing hot cheese are either cooled in a cooler or in an ice water bath.<br><br>Page N2 of Exhibit N discloses that the 4" diameter, 14" length, 6 pound chubs containing hot cheese are either cooled in a cooler or in an |

Q142

01/29/2010

| | ice water bath. |

| Claim 135 | Evidence of Reduction to Practice Prior to October 29, 1997 |
|---|---|
| The process of claim 114 wherein the cheese is formed into shape by being extruded directly into packaging. | Pages A2 and A3 of Exhibit A disclose that the mozzarella cheese is packaged into 40 pound blocks or 10, 15 or 20 pound chubs on page 2 and then subsequently cooled on page 3.<br><br>Page M3 of Exhibit M discloses that the 4" diameter, 14" length, 6 pound chubs and 40 pound bulk box containing hot cheese are either cooled in a cooler or in an ice water bath.<br><br>Page N2 of Exhibit N discloses that the 4" diameter, 14" length, 6 pound chubs containing hot cheese are either cooled in a cooler or in an ice water bath. |

| Claim 136 | Evidence of Reduction to Practice Prior to October 29, 1997 |
|---|---|
| The process of claim 114 wherein curd acidity is adjusted to a pH range of approximately 5.0 to 5.4. | Exhibit B discloses cheese samples having pHs of 5.57, 5.60, 5.63, 5.60, 5.65, 5.65, 5.63 and 5.65 at page B48.<br><br>Exhibit D discloses cheese having a pH of 5.12 on page D33.<br><br>Exhibit F discloses cheese having a pH of 5.23 on page F43 and a pH in sample 1 of 5.11 on page F45.<br><br>Exhibit G discloses cheese having a pH of 5.26, 5.51 and 5.16 at page G19, cheese having a pH of 5.07, 5.37 and 5.12 at page G22 and cheese having a pH of 5.28, 5,47 and 5.10 on page G24.<br><br>Exhibit I discloses cheese having a pH of 5.23 at I55.<br><br>Exhibit J discloses cheese having a pH of 5.19 at page J5. |

Q143

01/29/2010

| | Exhibit L discloses cheeses having pHs of 5.23 and 5.33 at page L33. |
| --- | --- |
| | Exhibit M discloses cheese samples having pHs of 5.46, 5.48, 5.47, 5.48 and 5.50 at page M15. |
| | Exhibit O discloses at page O19 cheese samples having pHs of 5.65, 5.73, 5.73, 5.70, 5.76 and 5.58. |

Q144

01/29/2010

PATENT
Attorney Docket No. 040179-001800US

I hereby certify that this correspondence is being facsimile transmitted to
the United States Patent and Trademark Office, Fax No. 1-571-273-9900
on _____February 25, 2010_____.

TOWNSEND and TOWNSEND and CREW LLP

By:_____/Nina L. McNeill/_____
              Nina L. McNeill

FAX RECEIVED

FEB 25 2010

CENTRAL REEXAMINATION UNIT

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Inventor:

    Donald G. Dahlstrom et al.

Inter Partes and Ex Parte Reexamination
Control Nos: 95/000,003 and 90/006,317

Patent No.: 6,319,526

Title: PASTA FILATA CHEESE

Examiner: Gary L. Kunz

Technology Center/Art Unit: 3991

COMMENTS BY THIRD PARTY
REQUESTER

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

These comments are submitted in response to the submission of the Patent Owner on January 29,
2010 that was prompted by the Action Closing Prosecution (ACP) mailed December 19, 2009.
These comments address why the Patent Owner's newly submitted Declaration under 37 C.F.R.
§ 1.131 filed January 29, 2010 (the "Second Declaration") should not be entered as contrary to
the procedural requirements of an *inter partes* reexamination, and, without waiving any
procedural rights, address the inadequate substance of the Second Declaration.

(I)    THE PATENT OWNER HAS FAILED TO SHOW GOOD AND SUFFICIENT
    REASONS WHY THE SECOND 131 DECLARATION SHOULD BE ENTERED
    AFTER THE ACTION CLOSING PROSECUTION

    The Patent Owner's request for entry and consideration of a Second Declaration
under 37 C.F.R. § 1.131 after the Action Closing Prosecution should be denied. MPEP § 2672,
Part II, makes clear that the presentation of evidence under 37 C.F.R. 1.131 and 1.132 should be
done prior to the issuance of the ACP. Once the ACP has issued, the Patent Owner is held to the
strict standard in 37 C.F.R. § 1.116(e) which only permits the entry of an affidavit or other
evidence upon good and sufficient reasons why the affidavit or other evidence was not earlier
presented. The Patent Owner has not shown sufficient reasons why the evidence presented in the
Second Declaration could not have been presented in the previous Garoutte Declaration that was
considered by the Examiner.

Page 1 of 8

Control No: 95/000,003 and
Control No: 90/006,317
Comments by Third Party Requester
Page 2

In the November 4, 2009 Decision Granting Petition Under 37 C.F.R. 1.183, the Office granted the Patent Owner's extraordinary petition to have the Garoutte Declaration considered well after the issuance of the Right of Appeal Notice of April 1, 2008, and even after an Appeal was fully briefed by all the parties and ready for consideration by the Board of Patent Appeals and Interferences. The petition was granted in contravention of 37 C.F.R. 1.116(f), which unambiguously states:

> Notwithstanding the provisions of paragraph (e) of this section, no affidavit or other evidence can be made in an *inter partes* reexamination proceeding after the right of appeal notice under § 1.953 except as provided in § 1.981 or as permitted by §41.77(b)(1) of this title.

The Decision Granting Petition further required the Third Party Requester file comments on the Garoutte Declaration within a shortened 15 day period, and prohibited the Third Party Requester from addressing the propriety of entering the Declaration in view of Rule 1.116(f) because any comments that went beyond the Garoutte Declaration and its accompanying exhibits would be returned or expunged:

> In order to address the equities of the present situation, the requirements of 37 C.F.R. 41.66(e) and 37 C.F.R. 41.63(c) are *sua sponte* waived to the extent that third party requester is provided with one opportunity to file a response to the newly entered evidence – the Garaoutte declaration and accompanied exhibits – which is granted entry by the present petition. Any such requester response must be filed within <u>fifteen (15) days</u> from the mailing date of the present decision. **If a response to the Garoutte declaration and accompanied exhibits is filed and goes beyond this limitation, the response will be returned, or expunged if entered before the discovery of such defect.**

November 4, 2009 Decision Granting Petition Under 37 C.F.R. 1.183, pp. 6-7 (emphasis added).

The Third Party Requester complied with these requirements by filing the November 17, 2009 Communication describing several fatally defective flaws in the Garoutte Declaration's attempt to show evidence of prior invention with respect to prior art that was used to reject the pending claims. In the subsequent ACP, the Examiner also found the Garoutte Declaration to be defective in demonstrating evidence of prior invention and maintained all the claim rejections of record.

In the January 29, 2010 Response to the ACP, the Patent Owner requested another opportunity to submit a Second Declaration in hopes of correcting the many deficiencies with the Garoutte Declaration. Entry of the Second Declaration is not a matter of right, and should only be admitted upon a showing of good and sufficient reasons why it was not earlier presented (see 37 C.F.R. § 1.116(e)). The Patent Owner's Response fails to provide any such reasons and the Second Declaration should be denied entry and consideration.

Control No: 95/000,003 and
Control No: 90/006,317
Comments by Third Party Requester
Page 3

The Patent Owner first argues that the Second Declaration differs only slightly from the Garoutte Declaration and merely addressed the deficiencies in that Declaration (see Patent Owner's Response, pages 22-23). Even if these statements are true, they are irrelevant to a showing of good and sufficient reasons why the Patent Owner did not earlier present them in the Garoutte Declaration.

The Patent Owner next cites MPEP § 2673.01 and argues that the Examiner cannot issue a Right of Appeal Notice (RAN) until the Patent Owner has had an opportunity to address each and every rejection prior to the appeal stage (see Patent Owner's Response, page 24). Even if this were a valid interpretation of MPEP § 2673.01, it does not support the entry of the Second Declaration as a matter of right in contravention of 37 C.F.R. § 1.116(e). The Patent Owner has had many opportunities to address each and every rejection prior to the issuance of the RAN, and was afforded the extraordinary opportunity to have the Garoutte Declaration considered more than a year after a first RAN was issued. MPEP § 2673.01 does not prohibit the issuance of a RAN in this case if the Second Declaration is denied entry and consideration by the Examiner.

Finally, the Patent Owner argues that entry and consideration of the Second Declaration is equitable and appropriate because the Patent Owner cannot continue the proceeding by refiling under 37 C.F.R. § 1.53(b) or 1.53(d), nor by filing a Request for Continued Examination under 37 C.F.R. § 1.114 (see Patent Owner's Response, page 25). This argument ignores the many opportunities the Patent Owner has been afforded to present evidence of prior invention to overcome the claim rejections. In this *inter partes* reexamination proceeding, claim rejections based on U.S. Pat. No. 6,120,809 to Rhodes were presented in the first, non-final office action mailed April 4, 2002, *more than seven years ago*. In the *seven years* between April 2002 and August 2009, the Patent Owner made no attempt to present any evidence of prior invention with respect to the Rhodes '809 Patent. Only well after the first RAN was issued and all the appeal briefs had been filed did the Patent Owner attempt to present evidence of prior invention.

Despite the statutory mandate that *inter partes* reexaminations be conducted with special dispatch and strict standards of 37 C.F.R. §1.116(f), the Office nonetheless permitted the Patent Owner to present such evidence with the Garoutte Declaration and its accompanying exhibits. The Patent Owner failed to demonstrate evidence of prior invention with the Garoutte Declaration and now wants a second bite at the apple with the Second Declaration.

In conclusion, the Patent Owner has not demonstrated any good and sufficient reason why the evidence being introduced in the Second Declaration was not presented in the Garoutte Declaration, and has failed to show why a RAN should not be issued immediately in view of the exceptional circumstances surrounding the entry and consideration of the Garoutte Declaration in the eight year of this *inter partes* proceeding.

The only equitable and appropriate action for the Examiner in light of the statutory mandate for special dispatch and the history of this proceeding is to deny entry of the Second Declaration so the Appeal may proceed immediately to the BPAI.

Page 3 of 8

PAGE 4/10 * RCVD AT 2/25/2010 2:15:26 PM [Eastern Standard Time] * SVR:USPTO-EFXRF-5/28 * DNIS:2739900 * CSID: * DURATION (mm-ss):01-56

Control No: 95/000,003 and
Control No: 90/006,317
Comments by Third Party Requester
Page 4

PATENT
Attorney Docket No. 040179-001800US

(II)    THE SECOND 131 DECLARATION STILL FAILS TO EXPLAIN WHERE THE
SUBMITTED EVIDENCE DEMONSTRATES THE CLAIMED METHODS WERE
CONCEIVED AND REDUCED TO PRACTICE PRIOR TO THE EFFECTIVE DATE
OF THE RHODES '809 PATENT

The Second Declaration provides no explanation of where the submitted evidence
in Exhibits A-P demonstrates conception and reduction to practice of the claims of the '526
Patent. Instead the Declaration refers to the claim charts in Exhibit Q as allegedly showing
evidence of documentary support provided from Exhibits A-P for each element of each claim in
the claim charts (see Second Declaration, paragraph #21, p. 6). However, the claim charts in
Exhibit Q fail to provide adequate explanation of how the submitted evidence demonstrates prior
invention for the two most contested claim limitations in this *inter partes* reexamination
proceeding: (1) the "without aqueous immersion limitation," and (2) the "prior to mechanical
working limitation."

(A)    Exhibit Q Fails to Show Where the "Without Aqueous Immersion" Claim
Limitation Was Conceived and Reduced to Practice in the Submitted Evidence

The claim charts in Exhibit Q fail to provide adequate evidence of prior invention
for the "without aqueous immersion" limitation. This limitation is found, among other claims, in
independent claims 1, 70, 89, and 114. In Exhibit Q's claim chart for claim 1, the "without
aqueous immersion" limitation is included in the step of "heating the curd without aqueous
immersion to an approximate temperature range of 130° F. to 160° F" (see Exhibit Q, pages Q1-
Q2). The right-hand column of the claim chart, titled "Evidence of Reduction to Practice Prior to
October 28, 1997", cites sections of Exhibits A, B, C, D, E, F, G, I, J, M, N, M, and P as
allegedly showing curd being heated to a temperature in the rage of 130° F. to 160° F. However,
nothing is stated in the right-hand column of the claim chart about where the exhibits show the
curd being heated without aqueous immersion.

At most, Exhibit Q invites to USPTO to search the exhibits for evidence that the
curd is heated without aqueous immersion. As the Patent Owner was reminded in the last ACP,
simply inviting the USPTO to identify where a claim limitation might be found in a collection of
documents is not an adequate demonstration of conception and reduction to practice for that
claim limitation (see ACP, p. 9). Accordingly, the Patent Owner has failed to demonstrate in the
Second Declaration and the accompanying exhibits where the without aqueous immersion
limitation was conceived and reduced to practice prior to the effective date of the Rhodes '809
Patent.

Exhibit Q essentially repeats the same inadequate explanation and analysis of the
without aqueous immersion limitation for independent claims 70, 89, and 114. This is also true
for the "heating the curd in an aqueous free environment" limitation found in independent claim
62 and discussed in Exhibit Q on pages Q66-Q74. For at least this reason, Patent Owner has
failed to demonstrate in the Second Declaration and the accompanying exhibits where the

Control No: 95/000,003 and
Control No: 90/006,317
Comments by Third Party Requester
Page 5

PATENT
Attorney Docket No. 040179-001800US

without aqueous immersion limitation was conceived and reduced to practice prior to the effective date of the Rhodes '809 Patent for claims 1, 62, 70, 89, 114. Because dependent claims include all the limitations of the claims from which they depend, the Patent Owner has also failed to demonstrate prior invention for claims 2-14, 16-25, 63-69, 71-88, 90-103, and 115-136.

(B)    Exhibit Q Fails to Show Where the "Prior to Mechanical Working" Claim
       Limitation Was Conceived and Reduced to Practice in the Submitted Evidence

       The claim charts in Exhibit Q fail to provide adequate evidence of prior invention for the "prior to mechanical working" limitation found in several claims of the '526 Patent. The interpretation of this limitation has been highly contested throughout this inter partes reexamination with the Patent Owner taking the position that any intended physical movement of the curd constitute mechanical working, and the Third Party Requester arguing that the term "mechanical working" as used in the context of the '526 Patent require conversion of the curd into a fibrous mass (see, e.g., Resubmitted Respondent's Brief of August 20, 2009, pp. 3-7). Under the Patent Owner's definition of mechanical working, curds that are tumbling in a rotating mixer without forming fibrous strands are being mechanically worked. Thus, ingredients added to the tumbling curds are added after—not prior to—mechanical working.

       The claim charts in Exhibit Q fail to provide a definition of mechanical working to allow a determination of whether the cited evidence shows ingredients being added prior to or after the mechanical working of the curd. Moreover, the claim charts simply cite to passages in the exhibits that show ingredients and curds added together, or merely recite a list of ingredients that includes curds. Citing a passage in an exhibit that indicates ingredients are mixed with curd does not adequately demonstrate the addition of those ingredients to the curd prior to mechanical working. Citing a passage in an exhibit that simply includes a list of ingredients, one of which is curd, fails to show that the other ingredients are even mixed with the curd.

       The lack of proper analysis for the "prior to mechanical working" limitation in claim 26 is typical for the claim charts in Exhibit Q. Claim 26 includes the limitation of "adding phosphate or citrate emulsifying salts or a combination thereof to the curd prior to mechanical working." The claim chart cites Exhibits B, C, D, E, F, G, I, J, K, L, M, N, O, and P as all providing evidence of prior invention for this claim limitation (see Exhibit Q, pages Q27-Q29). However, a look at the cited exhibits reveals that they are either silent or ambiguous on whether emulsifying salts were added to the curd prior to mechanical working.

       The claim chart identifies thirteen separate pages in Exhibit B as providing evidence of prior invention. However, the claim chart merely notes that these pages disclose adding sodium citrate to the curd. There is no statement that the sodium citrate is added prior to the mechanical working of the curd. The 13 cited pages of Exhibit B are also silent on the mechanical working limitation: They are simply lists of ingredients and their weights.

       The claim chart next identifies 8 separate pages of Exhibit C as disclosing sodium citrate added to fresh curd prior to mechanical working of the curd. However, the cited pages are lists of ingredients similar to the ones cited in Exhibit B. There is no evidence in the cited pages

Page 5 of 8

A3211

Control No: 95/000,003 and
Control No: 90/006,317
Comments by Third Party Requester
Page 6

of Exhibit C that sodium citrate was added to fresh curd prior to the mechanical working of the curd. Similarly, the cited pages from Exhibits D, E, F, G, I, J, K, L, M, N, O, and P simply note that sodium citrate or phosphate emulsifying salts are ingredients in a mixture that also includes curds. No evidence is provided that the ingredients are added to the curd prior to mechanical working except for the occasional conclusory statement to that effect in the claim chart. Thus, even with the addition of the claim charts in Exhibit Q, the Patent Owner has failed to provide adequate evidence of prior invention for the prior to mechanical working limitation in claim 26.

The claim charts in Exhibit Q present a similar analysis of the "prior to mechanical working" limitations in independent claims 36 and 52. In the analysis of these claims as well, the claim charts cite to a large number of pages in the other exhibits as evidence that the claimed ingredient and curd were added together. However, the analysis fails to provide adequate evidence showing where in the exhibits the ingredients were added to the curd prior to mechanical working. Thus, the Patent Owner has failed to provide adequate evidence of prior invention for the prior to mechanical working limitations in claim 36 and 52.

(C)   The Patent Owner's Failure to Explain Where The Submitted Evidence Shows Conception and Reduction to Practice of All The Limitations of the Independent Claims Results In No Claims Swearing Behind the Rhodes '809 Patent

The Patent Owner's failure to provide an adequate explanation of where the submitted evidence shows heating curd without aqueous immersion in independent claims 1, 62, 70, 89, 114 results in the Rhodes '809 Patent still qualifying as prior art to reject these claims. A dependent claim which depend from one of these independent claims includes all the limitations of the independent claim (*see* 35 U.S.C. § 112, 4th Paragraph). Thus, the dependent claims 2-14, 16-25, 63-69, 71-88, 90-103, and 115-136 all include either the "without aqueous immersion" or "aqueous free environment" limitation that allows the Rhodes '809 Patent to qualify as prior art against these claims as well.

Similarly, the Patent Owner's failure to provide an adequate explanation of where the submitted evidence shows adding ingredients to curd "prior to mechanical working" results in the Rhodes '809 Patent still qualifying as prior art to reject these claims. There are three independent claims (claims 26, 36, and 52) that have a "prior to mechanical working" limitation, but lack a "without aqueous immersion" limitation. The Rhodes '809 Patent qualifies as prior art for these independent claims and their dependent claims due to the Patent Owner's failure to provide an adequate explanation of where the submitted evidence shows the "prior to mechanical working" limitation.

Because either the "without aqueous immersion" limitation or "prior to mechanical working" limitation, or both, are present in the independent claims of the '526 Patent, no claim disqualifies the Rhodes '809 Patent as prior art. Thus, all the claim rejections based on the Rhodes '809 Patent (as reiterated in the December 19, 2009 ACP) should be maintained even after consideration of the Second Declaration and its accompanying exhibits.

(III)   THE SECOND 131 DECLARATION CONTAINS INCONSISTENCIES THAT UNDERMINE ITS CONCLUSION THAT THE INVENTORS CONCEIVED AND

Control No: 95/000,003 and
Control No: 90/006,317
Comments by Third Party Requester
Page 7

PATENT
Attorney Docket No. 040179-001800US

## REDUCED TO PRACTICE THE INVENTION CLAIMED PRIOR TO THE EFFECTIVE DATE OF THE RHODES '809 PATENT

The Second Declaration contains a number of inconsistencies that undermine its stated conclusion that the inventors conceived and reduced to practice the invention claimed in the Inter Partes Reexamination proceeding prior to the effective date of the Rhodes '809 Patent. First, the Declaration consistently identifies all three inventors listed on the '526 Patent as making the Declaration when only two of the inventors agreed to review and sign it. One of the inventors, Mr. William Aimutis, was not willing to review or sign the Second Declaration and supporting exhibits (see Declaration of Z. Peter Sawicki in Support of the Petition Under 37 C.F.R. § 1.183). Thus, the Second Declaration is inaccurate in stating that "[w]e Donald Dahlstrom, William Aimutis, and James Wiegand, do declare as follows" when only Donald Dahlstrom and James Wiegand were the declarants. This error is repeated throughout the Second Declaration in statements like: "[w]e have reviewed . . .", and "[w]e conceived and reduced the invention claimed in the *Inter Partes* Reexamination proceeding . . ."

The Second Declaration, like the previous Garoutte Declaration, is also silent on where the claim limitations of the '526 Patent are described in the accompanying exhibits. At the end of the Second Declaration, reference is made to claim charts in added Exhibit Q that the declarants have allegedly reviewed. The declarants then state that claims in the claim charts were invented prior to October 29, 1997, but do not say who invented the claims:

> We have been provided claim charts that correlate the disclosures of Exhibits A-P with the many claims as they are currently presented in the current Inter Partes Reexamination proceeding. We have reviewed the claim charts and we each state that the claims in the claim charts were invented prior to October 29, 1997 as evidenced by the documentary support provided from Exhibits A-P for each element of each claim in the claim charts. True and correct copies of the claim charts are attached hereto as Exhibit Q. (Second Declaration, Paragraph #21, pp. 5-6 (emphasis added)).

Because the only attempt to correlate individual claim limitations with the submitted evidence in Exhibits A-P comes from Exhibit Q, and because the Second Declaration fails to establish it was *the inventors* who invented the claims listed in Exhibit Q, the Second Declaration still fails to explain how the submitted evidence demonstrates that the claimed methods were conceived and reduced to practice *by the inventors*. Thus, all the claim rejections based on the Rhodes '809 Patent (as reiterated in the December 19, 2009 ACP) should be maintained in view of the inconsistencies in Second Declaration and its accompanying exhibits.

PAGE 8/10 * RCVD AT 2/25/2010 2:15:26 PM [Eastern Standard Time] * SVR:USPTO-EFXRF-5/28 * DNIS:2739900 * CSID: * DURATION (mm-ss):01-56

Control No: 95/000,003 and
Control No: 90/006,317
Comments by Third Party Requester
Page 8

PATENT
Attorney Docket No. 040179-001800US

Respectfully submitted,

/Eugene J. Bernard/

Eugene J. Bernard
Reg. No. 42,320

TOWNSEND and TOWNSEND and CREW LLP
Two Embarcadero Center, Eighth Floor
San Francisco, California 94111-3834
Tel: 303-571-4000
Fax: 650-326-2422

Page 8 of 8

A3214

Atty Docket No. 040179-001800US

**FAX RECEIVE~**

PTO FAX NO.:     1-571-273-9900

FED 25 2010

ATTENTION:     Central Reexamination Unit

CENTRAL REEXAMINATION UNIT

# OFFICIAL COMMUNICATION

# FOR THE PERSONAL ATTENTION OF

# Central Reexamination Unit

### CERTIFICATION OF FACSIMILE TRANSMISSION

I hereby certify that the following documents in re Reexamination Proceeding Control Nos. 95/000,003 and 90/006,317, filed January 8, 2002 and July 3, 2002 respectively for U.S. Patent No. 6,319,526 is being facsimile transmitted to the Patent and Trademark Office on the date shown below.

<u>Documents Attached</u>

1.     Comments by Third Party Requester; and
2.     Certificate of Service

Number of pages being transmitted, including this page:  10

Dated: February 25, 2010     *Nina L. McNeill*
                                   Nina L. McNeill

*PLEASE CONFIRM RECEIPT OF THIS PAPER BY
RETURN FACSIMILE AT (415) 576-0300*

TOWNSEND and TOWNSEND and CREW LLP
Two Embarcadero Center, Eighth Floor
San Francisco, CA 94111-3834
Telephone: 303-571-4000
Fax: 303-571-4321

62327865 v1

A3215

**CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of February 2010, a true and correct copy of the foregoing COMMENTS BY THIRD PARTY REQUESTER Before The Board of Patent Appeals and Interferences was served by placing the same in the United States mail, postage prepaid and addressed to the following:

Z. Peter Sawicki
Westman, Champlin & Kelly, P.A.
900 Second Avenue South
Suite 1400 – International Centre
Minneapolis, MN 55402-3319

Nina L. McNeill

62327852 v1

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/000,003 | 01/08/2002 | 6319526 | 01473.302300 | 4575 |

| | | |
|---|---|---|
| 27367        7590        03/25/2010 | | |

| EXAMINER |
|---|
| |

WESTMAN CHAMPLIN & KELLY, P.A.
SUITE 1400
900 SECOND AVENUE SOUTH
MINNEAPOLIS, MN  55402

| ART UNIT | PAPER NUMBER |
|---|---|
| | |

DATE MAILED: 03/25/2010

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patents and Trademark Office
P.O.Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS
EUGENE J. BERNARD
TOWNSEND AND TOWNSEND AND CREW LLP
TWO EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CA 94111

Date:
**MAILED**

**MAR 2 5 2010**

**CENTRAL REEXAMINATION UNIT**

### Transmittal of Communication to Third Party Requester
### Inter Partes Reexamination

REEXAMINATION CONTROL NO. : 95000003
PATENT NO. : 6319526
TECHNOLOGY CENTER : 3999
ART UNIT : 3991

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified Reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the inter partes reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it cannot be extended. See also 37 CFR 1.947.

If an ex parte reexamination has been merged with the inter partes reexamination, no responsive submission by any ex parte third party requester is permitted.

All correspondence relating to this inter partes reexamination proceeding should be directed to the Central Reexamination Unit at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

PTOL-2070(Rev.07-04)

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/006,317 | 07/03/2002 | 6319526 | 01473.302800 | 9581 |

27367      7590      03/25/2010

WESTMAN CHAMPLIN & KELLY, P.A.
SUITE 1400
900 SECOND AVENUE SOUTH
MINNEAPOLIS, MN  55402

| EXAMINER |
|---|

| ART UNIT | PAPER NUMBER |
|---|---|

DATE MAILED: 03/25/2010

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

A3219

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patents and Trademark Office
P.O.Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS

Eugene J. Bernard
Townsend and Townsend and Crew LLP
Two Embarcadero Center, 8th Floor
San Francisco, CA 94111

Date:
**MAILED**

**MAR 2 5 2010**

**CENTRAL REEXAMINATION UNIT**

## EX PARTE REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. : 90006317
PATENT NO. : 6319526
ART UNIT : 3900

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified ex parte reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the ex parte reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

Z. Peter Sawicki                        (For Patent Owner)
Westman, Champlin & Kelly, P.A.
Suite 1400 – International Centre
900 Second Avenue South
Minneapolis, MN 55402-3319

**MAILED**

**MAR 2 5 2010**

CENTRAL REEXAMINATION UNIT

Eugene J. Bernard                       (For Requester)
Townsend & Townsend & Crew LLP
Two Embarcadero Center, 8th Floor
San Francisco, CA 94111

In re Dahlstrom et al.                       :
Merged *Inter Partes* Reexamination          :
    Proceeding 95/000,003 &            :   **DECISION**
    *Ex Parte* Reexamination           :   **DISMISSING**
    Proceeding 90/006,317              :   **PETITION**
Filed:  January 8, 2002 & July 3, 2002        :
For:  U.S. Patent No. 6,319,526              :

This is a decision on the patent owner petition, filed January 12, 2010, denominated "Petition Under 37 CFR § 1.183" requesting waiver of the signature of an unwilling inventor on a declaration under 37 CFR 1.131.

The proceeding and the petition are before the Office of Patent Legal Administration for decision.

The petition fee required under 37 CFR 1.17(f) has been received, but is being refunded for the reasons explained below.

The petition under 37 CFR 1.183 to waive the requirements of 37 CFR 1.131 is **dismissed**.

## REVIEW OF FACTS

1.  U.S. Patent No. 6,319,526 (the '526 patent) issued to Dahlstrom et al. on November 20, 2001.

2.  On January 8, 2002, a request for *inter partes* reexamination of the '526 patent was filed by a third party requester, which proceeding was assigned control no. 95/000,003 (the '003 proceeding).

3.  On April 4, 2002, reexamination was ordered and a non-final Office action was mailed in the '003 proceeding.

4.  On July 3, 2002, a request for *ex parte* reexamination of the '526 patent was filed by the *inter partes* third party requester, which proceeding was assigned control no. 90/006,317 (the '6317 proceeding).

5.  On August 20, 2002 reexamination was ordered in the '6317 proceeding, granting *ex parte* reexamination of the '526 patent.

6.  On January 30, 2003, the '003 and '6317 proceedings were merged.

7.  The merged proceeding progressed to the point of appeal, with the patent owner filing a Notice of Appeal on April 30, 2008.

8.  Following filings of the patent owner's appeal brief, respondent's brief, examiner's answer, and rebuttal brief, patent owner petitioned on August 31, 2009 for the opportunity to file arguments after the issuance of the Right of Appeal Notice and filing the Appeal in order to submit evidence of prior invention in the form of a declaration under 37 CFR 1.131(a).

9.  Patent owner's August 31, 2009 petition was granted on November 4, 2009 to permit entry of the declaration under 37 CFR 1.131 and attached Exhibits A-P for consideration by the examiner.

10. On December 17, 2009, a second Action Closing the Prosecution (ACP) was mailed stating that reexamination was reopened solely for the purpose of entering the declaration under 37 CFR 1.131 and that the rejections set forth in the ACP dated June 26, 2007 and the Right of Appeal Notice dated April 1, 2008 are maintained.  The declaration filed under 37 CFR 1.131 was found by the examiner to fail to demonstrate that any of the inventors of the '526 patent reduced the claimed invention to practice.  The second ACP also stated that the patent owner failed to follow the procedure of MPEP 715.04, Part I, by failing to file a petition to request a waiver to permit entry of a declaration without all of the inventors' signatures.

11. After requesting and receiving an extension of time, patent owner filed comments to the second ACP on January 29, 2010 along with a second declaration under 37 CFR 1.131 executed by two of the three inventors and a petition under 37 CFR 1.183 requesting that the requirement that all the inventors sign the declaration be waived.  The petition is the subject of this decision.

12. The third party requester filed comments following patent owners comments to the second ACP on February 25, 2010.

# DECISION

## STATUTES, REGULATIONS, AND PATENT EXAMINING PROCEDURES

**37 CFR 1.131(a) provides, in pertinent part (emphasis added):**

> When any claim of an application or a patent under reexamination is rejected, the inventor of the subject matter of the rejected claim, **the owner of the patent under reexamination,** or the party qualified under §§ 1.42, 1.43, or 1.47, may submit an appropriate oath or declaration to establish invention of the subject matter of the rejected claim prior to the effective date of the reference or activity on which the rejection is based. [Emphasis added.]

**37 CFR 1.183 provides, in pertinent part:**

> In an extraordinary situation, when justice requires, any requirement of the regulations in this part which is not a requirement of the statutes may be suspended or waived by the Director or the Director's designee, *sua sponte,* or on petition of the interested party, subject to such other requirements as may be imposed. Any petition under this section must be accompanied by the petition fee set forth in § 1.17(f).

**MPEP 715.04 I. provides, in pertinent part (emphasis added):**

> The following parties may make an affidavit or declaration under 37 CFR 1.131:
>
> (A) All the inventors of the subject matter claimed.
>
> (B) An affidavit or declaration by less than all named inventors of an application is accepted where it is shown that less than all named inventors of an application invented the subject matter of the claim or claims under rejection. For example, one of two joint inventors is accepted where it is shown that one of the joint inventors is the sole inventor of the claim or claims under rejection.
>
> (C) If a petition under 37 CFR 1.47 was granted or the application was accepted under 37 CFR 1.42 or 1.43, the affidavit or declaration may be signed by the 37 CFR 1.47 applicant or the legal representative, where appropriate.
>
> (D) The assignee or other party in interest when it is not possible to produce the affidavit or declaration of the inventor. *Ex parte Foster,* 1903 C.D. 213, 105 O.G. 261 (Comm'r Pat. 1903).
>
> Affidavits or declarations to overcome a rejection of a claim or claims must be made by the inventor or inventors of the subject matter of the rejected claim(s), a party qualified under 37 CFR 1.42, 1.43, or 1.47, **or the assignee or other party in interest when it is not possible to produce the affidavit or declaration of the inventor(s).** Thus, where all of the named inventors of a pending application are not inventors of every claim of the application, any affidavit under 37 CFR 1.131 could be signed by only the inventor(s) of the subject matter of the rejected claims. [Emphasis added.]

**37 CFR § 3.73 Establishing right of assignee to take action:**

> (a) The inventor is presumed to be the owner of a patent application, and any patent that may issue therefrom, unless there is an assignment. The original applicant is presumed to be the owner of a trademark application or registration, unless there is an assignment.
>
> (b) (1) In order to request or take action in a patent or trademark matter, the assignee must establish its ownership of the patent or trademark property of paragraph (a) of this section to the satisfaction of the Director. The establishment of ownership by the assignee may be combined with the paper that requests or takes the action. Ownership is established by submitting to the Office a signed statement identifying the assignee, accompanied by either:
>
> (i) Documentary evidence of a chain of title from the original owner to the assignee (*e.g.,* copy of an executed assignment). For trademark matters only, the documents submitted to establish ownership may be required to be recorded pursuant to § 3.11 in the assignment records of the Office as a condition to permitting the assignee to take action in a matter pending before the Office. For patent matters only, the submission of the documentary evidence must be accompanied by a statement affirming that the

documentary evidence of the chain of title from the original owner to the assignee was or concurrently is being submitted for recordation pursuant to § 3.11; or

(ii) A statement specifying where documentary evidence of a chain of title from the original owner to the assignee is recorded in the assignment records of the Office (*e.g.*, reel and frame number).

(2) The submission establishing ownership must show that the person signing the submission is a person authorized to act on behalf of the assignee by:

(i) Including a statement that the person signing the submission is authorized to act on behalf of the assignee; or

(ii) Being signed by a person having apparent authority to sign on behalf of the assignee, *e.g.*, an officer of the assignee.

(c) For patent matters only:

(1) Establishment of ownership by the assignee must be submitted prior to, or at the same time as, the paper requesting or taking action is submitted.

(2) If the submission under this section is by an assignee of less than the entire right, title and interest, such assignee must indicate the extent (by percentage) of its ownership interest, or the Office may refuse to accept the submission as an establishment of ownership.

## ANALYSIS AND FINDINGS

Patent owner requests that the requirement for the signature of one of the inventors, William Aimutis, be waived for a declaration under 37 CFR 1.131, which has been submitted with signatures of the other two inventors, James Wiegand and Donald Dahlstrom. Addressing the substance of the petition, it is pointed out that the extraordinary relief of waiving a rule is not granted if the rules provide an alternative avenue for obtaining the relief sought. See, *Cantello v. Rasmussen*, 220 USPQ 664 (Comr. 1982). In this instance, it would appear that, even if the petition is not granted, an alternative avenue that complies with the rules is available to obtain the requested relief.

37 CFR 1.131 specifically provides that " . . . *the owner of the patent under reexamination. . . may submit an appropriate oath or declaration to establish invention of the subject matter of the rejected claim prior to the effective date of the reference or activity on which the rejection is based*" (emphasis added). As pointed out in MPEP 715.04 I.(D), an assignee, or other party in interest is permitted to make a declaration under 37 CFR 1.131 "when it is not possible to produce the declaration of the inventor," as is asserted in the case here. In accordance with the language of 37 CFR 1.131, the assignee may make the declaration for a patent under reexamination, even if the inventors are available to sign a declaration. In this case, the inventors, rather than the patent owner, have attempted to submit a declaration under 37 CFR 1.131. However, waiver of the rule is not required, since the patent owner (assignee) can sign the declaration.

It is acknowledged that the second Action Closing Prosecution incorrectly stated that the patent owner failed to follow the proper procedure for making a Rule 131 declaration by not petitioning to request waiver. However, the owner of a patent under reexamination has the ability to make the declaration under 37 CFR 1.131(a) without a petition. Due to this inadvertent error that may have led the patent owner to file the subject petition, the petition fee is being refunded to patent owner.

Patent owner is reminded that, in order to file a declaration under 37 CFR 1.131(a), the right of the assignee to take action must be established in the reexamination proceeding by filing a proper statement under 37 CFR 3.73(b). To date, no such paper has been filed establishing the authority of the assignee to act in this proceeding.

In summary, the petitioner has not shown the present situation to be one warranting extraordinary relief. Patent owner has an available remedy in which (1) the right to act in this proceeding may be established and then (2) a declaration under 37 CFR 1.131 signed by patent owner may be filed. For that reason, the petition under 37 CFR 1.183 to waive the requirements of 37 CFR 1.131 is <u>dismissed</u>.

## CONCLUSION

1.  For the reasons set forth above, the petition under 37 CFR 1.183 to waive 37 CFR 1.131 as to its requirement for signature of an oath or declaration is **<u>dismissed</u>**.

2.  The $400.00 petition fee paid under 37 CFR 1.17(f) is being refunded.

3.  This decision does not address the merits of the patent owner's response or the substance of the declaration, which are determinations within the jurisdiction of the examiner of record.

4.  Jurisdiction over the reexamination proceeding is being returned to the Central Reexamination Unit (CRU) for any further examination as appropriate.

5.  Any inquiry concerning this communication should be directed to Caroline D. Dennison, Legal Advisor, at (571) 272-7729.

/Kenneth M. Schor/

_____

Kenneth M. Schor
Senior Legal Advisor
Office of Patent Legal Administration

March 24, 2010

# UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/000,003 | 01/08/2002 | 6319526 | 01473.302300 | 4575 |

27367      7590      04/29/2010
WESTMAN CHAMPLIN & KELLY, P.A.
SUITE 1400
900 SECOND AVENUE SOUTH
MINNEAPOLIS, MN 55402

| EXAMINER |
|---|
| KUNZ, GARY L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3991 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 04/29/2010 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

A3226



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patents and Trademark Office
P.O.Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS
EUGENE J. BERNARD
TOWNSEND AND TOWNSEND AND CREW LLP
TWO EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CA 94111

Date:

**MAILED**

**APR 2 9 2010**

**CENTRAL REEXAMINATION UNIT**

### Transmittal of Communication to Third Party Requester
### Inter Partes Reexamination

REEXAMINATION CONTROL NO. : 95000003
PATENT NO. : 6319526
TECHNOLOGY CENTER : 3999
ART UNIT : 3991

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified Reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the inter partes reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it cannot be extended. See also 37 CFR 1.947.

If an ex parte reexamination has been merged with the inter partes reexamination, no responsive submission by any ex parte third party requester is permitted.

All correspondence relating to this inter partes reexamination proceeding should be directed to the Central Reexamination Unit at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

PTOL-2070(Rev.07-04)

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/006,317 | 07/03/2002 | 6319526 | 01473.302800 | 9581 |

27367        7590        04/29/2010
WESTMAN CHAMPLIN & KELLY, P.A.
SUITE 1400
900 SECOND AVENUE SOUTH
MINNEAPOLIS, MN 55402

| EXAMINER |
|---|
| KUNZ, GARY L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3991 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 04/29/2010 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patents and Trademark Office
P.O.Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS

Eugene J. Bernard
Townsend and Townsend and Crew LLP
Two Embarcadero Center, 8th Floor
San Francisco, CA 94111

Date:

**MAILED**

**APR 2 9 2010**

**CENTRAL REEXAMINATION UNIT**

## EX PARTE REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. : 90006317
PATENT NO. : 6319526
ART UNIT : 3900

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified ex parte reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the ex parte reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

| **Transmittal of Communication to Third Party Requester Inter Partes Reexamination** | Control No. | Patent Under Reexamination |
| | 95/000,003 ; *90/006,317* | 6319526 |
| | Examiner | Art Unit | |
| | GARY L. KUNZ | 3991 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

U.S. Patent and Trademark Office
PTOL-2070 (5/04)

Paper No. 20091210-A

1

| INTER PARTES REEXAMINATION COMMUNICATION | Control No. 95/000,003; *90/006,317* | Patent Under Reexamination 6319526 | |
|---|---|---|---|
| | Examiner GARY L. KUNZ | Art Unit 3991 | . |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address.* --

BELOW/ATTACHED YOU WILL FIND A COMMUNICATION FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE OFFICIAL(S) IN CHARGE OF THE PRESENT REEXAMINATION PROCEEDING.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this communication.

U.S. Patent and Trademark Office
PTOL-2072 (5/04)

Paper No. 20091210-A

1

| *Right of Appeal Notice* (37 CFR 1.953) | Control No. 95/000,003; 90/006317 | Patent Under Reexamination 6319526 | |
|---|---|---|---|
| | Examiner GARY L. KUNZ | Art Unit 3991 | |

-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --

Responsive to the communication(s) filed by:
Patent Owner on <u>29 January 2010</u>
Third Party(ies) on <u>25 February 2010</u>

Patent owner and/or third party requester(s) may file a notice of appeal with respect to any adverse decision with payment of the fee set forth in 37 CFR 41.20(b)(1) within **one-month or thirty-days (whichever is longer)**. See MPEP 2671. In addition, a party may file a notice of **cross** appeal and pay the 37 CFR 41.20(b)(1) fee **within fourteen days of service** of an opposing party's timely filed notice of appeal. See MPEP 2672.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

If no party timely files a notice of appeal, prosecution on the merits of this reexamination proceeding will be concluded, and the Director of the USPTO will proceed to issue and publish a certificate under 37 CFR 1.997 in accordance with this Office action.

The proposed amendment filed _____   ☐ will be entered   ☐ will not be entered*

*Reasons for non-entry are given in the body of this notice.

1a. ☒ Claims <u>1-14,16-103,114-123 and 125-136</u> are subject to reexamination.
1b. ☐ Claims _____ are not subject to reexamination.
2. ☒ Claims <u>15,104-113,124 and 137-163</u> have been cancelled.
3. ☐ Claims _____ are confirmed. [Unamended patent claims].
4. ☐ Claims _____ are patentable. [Amended or new claims].
5. ☐ Claims _____ are rejected.
6. ☐ Claims _____ are objected to.
7. ☐ The drawings filed on _____   ☐ are acceptable.   ☐ are not acceptable.
8. ☐ The drawing correction request filed on _____ is ☐ approved. ☐ disapproved.
9. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119 (a)-(d) or (f). The certified copy has:
   ☐ been received.   ☐ not been received.   ☐ been filed in Application/Control No. _____.
10. ☐ Other _____

**Attachments**
1. ☐ Notice of References Cited by Examiner, PTO-892
2. ☐ Information Disclosure Citation, PTO/SB/08
3. ☐ _____

### Merged Inter Partes Reexamination: Right of Appeal Notice (RAN)

### History of the Proceeding

1.    U.S. Patent No. 6,319,526 issued to Dahlstrom et al. on November 20, 2001.

2.    On January 8, 2002, a request for inter partes reexamination of the '526 patent was filed by a Third Party Requester, which proceeding was assigned control no. 95/000,003.

3.    On April 4, 2002, Reexamination was ordered and a non-final Office action was mailed in the '003 proceeding.

4.    On June 3, 2002, Patent Owner filed a response to the Office action pursuant to 37 C.F.R. §1.945, including an amendment, in the '003 proceeding.

5.    On June 10, 2002, a Notification of Defective paper was mailed, indicating that the amendment of June 3, 2002, was not in compliance with 37 C.F.R. §1.530(d)-(j), and setting a one month response period for the Patent Owner to file a corrected amendment.

6.    On July 3, 2002, Third Party Requester filed comments to Patent Owner's response, pursuant to 37 C.F.R. § 1.947.

7.    Also on July 3, 2002, a request for ex parte reexamination of the '526 patent was filed by the same Third Party Requester that filed the inter partes reexamination request, which proceeding was assigned control no. 90/006,317.

8.    On July 9, 2002, Patent Owner filed a corrected amendment in compliance with 37 C.F.R. § 1.530(d)-(j), in the '003 proceeding.

9.    On August 20, 2002 reexamination was ordered in the '6317 proceeding, granting ex parte reexamination of the '526 patent.

10.    On October 2, 2002, the Patent Owner filed a response to the Order.

11.    On November 27, 2002, the Third Party Requester filed "Comments" to the Patent Owner's response to the Order.

I2.    On January 30, 2003, '003 and '6317 proceedings were merged.

I3.    On February 28, 2003, a housekeeping amendment was filed for the merged Proceedings.

Application/Control Number: 95/000,003; 90/006,317                    Page 3
Art Unit: 3991

14.   On February 16, 2005, a non-final Office action was mailed.

15.   On April 27, 2005, Patent Owner filed a response to the non-final Office action
      which included an amendment in the merged reexamination proceeding.

16.   On May 24, 2005, the Third Party Requester filed comments pursuant to 37
      C.F.R. §1.947, in reply to the Patent Owner response.

17.   On June 3, 2005, a "Notice Re Defective Paper in Inter Partes Reexamination"
      was mailed, notifying the Patent Owner that the amendment of April 27, 2005,
      was not in compliance with 37 C.F.R. § 1.530, and setting a 30 day or 1 month
      time period for response. No Patent Owner response was received.

18.   On July 18, 2005, Patent Owner filed a petition under 37 C.F.R. § 1.137(a),
      for the revival of terminated reexamination proceedings based upon unavoidable
      delay, accompanied by declarations, and a proposed late response (including an
      amendment) to the "Notice Re Defective Paper in Inter Partes Reexamination."

19.   On September 23, 2005, a decision dismissing the petition under 37 C.F.R.
      § 1.137(a) was mailed , which decision noted that the late-filed amendment was
      NOT in compliance with 37 C.F.R. § 1.530.

20.   On August 28, 2006, a Notice of Intent to Issue Reexamination Certificate (NIRC)
      was mailed on , cancelling claims 1 - 14 and 16 - 163.

21.   On September 19, 2006, Patent Owner filed a petition under 37 C.F.R.
      § 1.182, requesting the withdrawal of cancellation of claims 1 - 14 and 16 - 163,
      and requesting entry and consideration of Patent Owner's late response and
      amendment accompanying the instant petition.

22.   October 27, 2006, a decision dismissing the petition was mailed, granting
      *sua sponte* relief in the form of withdrawing the NIRC in the merged reexamina-
      tion proceedings. The proposed amendment accompanying the petition was NOT
      in compliance with 37 C.F.R. § 1.530.

23.   On June 23, 2007, an Action Closing Prosecution was mailed.

24.   On July 26, 2007, Patent Owner filed comments after Action Closing
      Prosecution, accompanied by a proposed amendment.

25.   Also on July 26, 2007, Patent Owner filed a petition under 37 C.F.R.
      §1.183, requesting waiver of 37 C.F.R. § 1.951 as to Patent Owner's one
      opportunity to file comments.

Application/Control Number: 95/000,003; 90/006,317                    Page 4
Art Unit: 3991

26.   On August 24, 2007, Third Party Requester filed comments after ACP pursuant
      to 37 CFR 1.951(b).

28.   On September 27, 2007, a Decision on Petition was mailed dismissing Patent
      Owner's petition under 37 CFR §1.183 as premature, as 37 CFR 1.951(b)
      provided for Patent Owner to present an amendment in response to an ACP.

29.   On January 29, 2008, Patent Owner filed a reissue application of the '526 patent.
      The Office assigned the application U. S. Application Serial number 12,011,746.

30.   On April 1, 2008, the Office issued a Right of Appeal Notice (RAN) in the merged
      proceeding.  The RAN noted that Patent Owner's amendment submitted after
      ACP was not entered due to a failure to comply with amendment entry criteria set
      forth in 37 CFR 1.953 and 1.116.

31.   On April 30, 2008, Patent Owner filed a Notice of Appeal.

32.   On July 23, 2008, Patent Owner filed a petition under 37 CFR 1.137(b), for entry
      of late papers (an appellant brief) based upon unintentional delay.  The petition
      was accompanied by an appeal brief, a certificate of service and payment of
      fees.

33.   Also on July 23, 2008, Patent Owner submitted a petition under 37 CFR 1.183
      requesting entry of an amendment attached to and concurrently filed with the
      petition.

34.   On September 3, 2008, the Office issued a decision granting the revival of the
      merged reexamination proceeding.

35.   On October 3, 2008, the Third Party Requester  filed a respondent brief.

36.   On October 25, 2008, the Office issued a decision dismissing a Patent Owner's
      July 23, 2008 petition.

37.   On February 23, 2009, the Office issued  an Examiner's Answer.

38.   On March 23, 2009, Patent Office filed a rebuttal brief in response to the
      Examiner's Answer.

39.   On April 8, 2009, the Office issued a Notice of Defective Paper stating that the
      July 23, 2008 appellant brief was improper because it was 33 pages in length,
      with no word count provided.  The Notice also stated that the October 3, 2008
      response brief was in response to the improper appellant brief, and thus the
      requester's respondent brief was moot and would not be considered.

Application/Control Number: 95/000,003; 90/006,317                    Page 5
Art Unit: 3991

40.    On April 22, 2009, Patent Owner resubmitted appellant brief.

41.    On May 12, 2009, Third Party Requester resubmitted respondent brief.

42.    On July 8, 2009, the Office issued a Notice of Defective paper stating that the
       April 23, 2009 appellant brief was defective because appellant failed to argue
       the rejections of all of the pending claims 1 - 14 and 16 - 163, which contradicted
       the appellant's statement under "Status of Claims" in the brief that pending
       claims 1 - 14 and 16 - 163 were rejected and were on appeal.

43.    On August 6, 2009, Patent Owner resubmitted appellant brief.

44.    On August 10, 2009, Patent Owner filed an amendment after an appeal pursuant
       to 37 CFR 41.63(a) to cancel claims 104 - 113, 124, and 137 - 163.

45.    On August 20, 2009, Third Party Requester resubmitted a respondent brief.

46.    On August 31, 2009, Patent Owner filed a petition under 37 CFR 1.183 to
       request waiver of 37 CFR §41.63(c) and 41.66(c) to permit entry of a
       concurrently filed declaration under 37 CFR 1.131.

47.    On September 28, 2009, the Office issued an Examiner's Answer in response to
       the August 6, 2009 resubmitted appellant brief and the August 20, 2009
       resubmitted respondent brief.

48.    On October 13, 2009, Patent Owner filed a rebuttal brief.

49.    On October 29, 2009, the Office issues a Notice of Defective rebuttal brief.

50.    On November 3, 2009, the Patent Owner filed a resubmitted rebuttal brief.

51.    On November 11, 2009, the Third Party Requester filed a response to the
       Garoutte declaration.

52.    On November 24, 2009, the Third Party Requester filed a request for an oral
       hearing.

53.    On December 17, 2009, the Office mailed a second Action Closing Prosecution.

54.    On January 29, 2010, the Patent Owner filed a petition under 37 CFR 1.183
       requesting waiver of the requirement that all inventors sign a declaration under
       37 CFR 1.131 pursuant to the requirements provided in MPEP 715.04.

55.    On January 29, 2010, the Patent Owner filed a Response to the second Action
       Closing Prosecution along with an Declaration under 37 CFR 1.131 by Donald
       Dahlstrom, William Aimutis and James Wiegand.

56.    On February 25, 2010, the Third Party Requester filed Comments in response to
       the Action Closing Prosecution and the Patent Owner's Response to said Action
       Closing Prosecution.

57.    On March 25, 2010, the Petition filed January 29, 2010 under 37 CFR 1.183 was
       dismissed.


       **This is a RIGHT OF APPEAL NOTICE (RAN)**; see MPEP § 2673.02 and §

2674. The decision in this Office action as to the patentability or unpatentability of any

original patent claim, any proposed amended claim and any new claim in this

proceeding is a FINAL DECISION.

       No amendment can be made in response to the Right of Appeal Notice in an

*inter partes* reexamination. 37 CFR 1.953(c). Further, no affidavit or other evidence can

be submitted in an *inter partes* reexamination proceeding after the right of appeal

notice, except as provided in  37 CFR 1.981 or as permitted by 37 CFR 41.77(b)(1). 37

CFR 1.116(f).

       Each party has a **thirty-day or one-month time period, whichever is longer,**

to file a notice of appeal. The patent owner may appeal to the Board of Patent Appeals

and Interferences with respect to any decision adverse to the patentability of any

original or proposed amended or new claim of the patent by filing a notice of appeal and

paying the fee set forth in 37 CFR 41.20(b)(1). The third party requester may appeal to

the Board of Patent Appeals and Interferences with respect to any decision favorable to

Application/Control Number: 95/000,003; 90/006,317                                  Page 7
Art Unit: 3991

the patentability of any original or proposed amended or new claim of the patent by filing

a notice of appeal and paying the fee set forth in 37 CFR 41.20(b)(1).

   In addition, a patent owner who has not filed a notice of appeal may file a notice

of cross appeal within **fourteen days of service** of a third party requester's timely filed

notice of appeal and pay the fee set forth in 37 CFR 41.20(b)(1).  A third party requester

who has not filed a notice of appeal may file **a notice of cross appeal within fourteen**

**days of service** of a patent owner's timely filed notice of appeal and pay the fee set

forth in 37 CFR 41.20(b)(1).

   Any appeal in this proceeding must identify the claim(s) appealed, and must be

signed by the patent owner (for a patent owner appeal) or the third party requester (for a

third party requester appeal), or their duly authorized attorney or agent.

   Any party that does not file a timely notice of appeal or a timely notice of cross

appeal will lose the right to appeal from any decision adverse to that party, but will not

lose the right to file a respondent brief and fee where it is appropriate for that party to do

so. If no party files a timely appeal, the reexamination prosecution will be terminated,

and the Director will proceed to issue and publish a certificate under 37 CFR 1.997 in

accordance with this Office action.

   The Action Closing Prosecution dated December 17, 2009, was solely for the

purpose of entering the Garoutte declaration filed August 31, 2009.  There were no

changes in any of the rejections of record from the first Action Closing Prosecution

dated June 26, 2007 and the RAN dated April 1, 2008.  Accordingly, in the second

Action Closing Prosecution all of the rejections set forth in the first ACP dated July 26,

2007 and the RAN dated April 1, 2008 are maintained.  See MPEP 2673 (III).

### Declaration under 37 CFR 1.131 by Donald Dahlstrom, Williams Aimutis and James Wieland

The declaration filed January 29, 2010 submitted by the Patent Owner under 37

CFR 1.131 by Dahlstrom, Aimutis, and Wieland has not been entered into the record

pursuant to 37 CFR 1.116.

An affidavit filed after an Action Closing Prosecution may be entered if it complies

with 37 CFR 1.951 and 1.116.  Such a declaration may be admitted upon a showing of

good and sufficient reasons why the affidavit is necessary and was not earlier

presented.

The Patent Owner requests that the declaration by Dahstrom, Aimutis and

Wieland be entered for a litany of reasons.  1) It is critical to the merits of the patent

under reexamination.  2) The substituted 1.131 declaration only differs slightly from the

entered Gaurotte declaration in the wording of paragraphs 2 - 20 while the substance of

each paragraph remains essentially the same.  3) Paragraph 21 and Exhibt Q are

added to the declaration and correlate conception and reduction to practice of the

elements of the claims in Exhibits A - P as requested in the second ACP.  4) the

substitute 1.131 declaration does not contain any new evidence of conception and

reduction to practice when compared to the entered Gaurotte Declaration, but rather a

correlation of the evidence already of record to elements of the pending claims. 5) the

substitute declaration merely addresses three deficiencies in the entered Gaurotte

declaration as alleged in the second ACP dated December 17, 2009. 6) Consideration

of the declaration would require nothing more than a nominal review to determine if the

deficiencies in the Gaurotte declaration have been remedied. 7) No new search is

required. 8) The Patent Owner was given no opportunity to cure the deficiencies as

stated on pages 9 and 10 of the second ACP.

The Examiner has given all of the Patent Owner's arguments for entry of the

substituted 1.131 declaration into the record full consideration. However, the Examiner

does not find the Patent Owner's reasons for entry of this second declaration under

1.131 to be persuasive. The Examiner finds the arguments presented by the Third

Party Requester the Comments dated February 25, 2010 on pages 1 - 3 against

entering the substituted 1.131 declaration to be persuasive. It is noted that the Patent

Owner was already given a extraordinary opportunity by the entry of the Gaurotte

declaration after the first ACP.   However, the failure of the Patent Owner to provide in

the first declaration the critical correlation between the evidence of record to the

elements of the pending claims suggests a lack of a good faith effort.  Thus the Patent

Owner will not be given yet another extraordinary opportunity to correct an egregious

deficiency.  Furthermore, reviewing the changes in paragraphs 2 - 20, new paragraph

21, and huge Exhibit Q with its 114 pages is a massive undertaking in order to

determine if there is appropriate correlation between the evidence and the claim

limitations. This evaluation of new evidence would require far more that a mere nominal

review.   In summary, the Patent Owner has failed to provide good and sufficient

reasons why the substitute declaration was not presented earlier presented.

Application/Control Number: 95/000,003; 90/006,317                    Page 10
Art Unit: 3991

### Non-entry of the Patent Owner's Response to Second ACP

On January 29, 2010, the Patent Owner filed a Response to the ACP dated

December 17, 2009.  In this Response the Patent Owner introduced new arguments,

especially those presented on page 38, last paragraph, entitled "Infusion Utilizing

Cyclical Process Under Vacuum is Known."  In this new argument the Patent Owner

cites five references which are not of record in this proceeding:  Kolk (4,006,257),

Winkler (4,789,558), Hackl (6,110,513), Guzman (5,439,692), and Giasbarro

(3,928,634).  Additionally, the Patent Owner presents a new argument at pages 39 - 41

entitled, "Cheese Curds Are Hydrophobic."  This is a new argument the Patent Owner

cites to U. S. Patent 7,504,119, which is yet another reference not of record in this

proceeding.  Because the Patent Owner has failed to present good and sufficient

reasons why the evidence provided by the new references were not presented earlier,

the Patent Owner's Response to the second ACP filed January 29, 2010, has not been

entered into the record.  See 37 CFR 1.116(e).

### Entry of Third Party Requester's Response Filed February 25, 2010

The Third Party Requester filed a timely response (2/25/10) to the Patent

Owner's response (1/29/10) to the Action Closing Prosecution dated December 17,

2009.  Therefore, TPR's response of February 25, 2010 is entered into the record.

### Consideration of the Garoutte Declaration Under 37 CFR 1.131

### Third Party Request's Response to Garoutte Declaration

The Declaration under 37 CFR 1.131 of Clint Garoutte  filed August 31, 2009 fails
to demonstrate that any of the inventors named on the U. S. Patent No. 6,319,526 (the

'526 patent) reduced the claimed invention to practice. Furthermore, the Declaration fails to explain how the submitted evidence demonstrates that the claimed methods were practiced prior to the effective date of the Rhodes '809 patent. A Rule 131 declaration is fatally defective if it does not conclusively establish that any of the named inventors conceived and reduced to practice the claimed invention, or provide more than conclusory statements that the Patent Owner developed and utilized the method claimed in the patent prior to the effective date of the prior art.

### 1. The Garoutte Declaration Does Not State That Any Of the Name Inventors Conceived of Or Reduced to Practice the Claimed Invention

Garoutte Declaration only mentions one of the three joint inventors on the '526 patent, Mr. James Weigand. However, Mr. Garoutte concedes that he does not know if Mr. Wiegand prepared the Exhibits A - P which are relied upon to swear behind the Rhodes '809 Patent. The Declaration states that the Exhibits could have been prepared by Mr. Wiegand or Land 'o Lakes (LOL) employees, which means none of the Exhibits may have been prepared by Mr. Wiegand:

> Upon information and belief and to the best of my knowledge, Exhibits A - P submitted herewith were prepared by <u>Mr. James Wiegand or LOL employees</u> who worked closely with Mr. Wiegand On the dates indicated in the documents.

> Garoutte Declaration, page 1, paragraph #3 (emphasis added)

Mr. Garoutte attempts to cure this deficiency by stating his beliefs that Mr. Wiegand had allegedly hand written some notes and initials on the Exhibit documents. (Garoutte Declaration, page 1, paragraph #4). However, there is no attempt to explain how Mr. Weigand's notes and initials demonstrate that he prepared the documents, or how the notes establish that Mr. Weigand and his co-inventors conceived and reduced to practice the claimed invention. Furthermore, no evidence is presented to show which Mr. Weigand wrote the notes.

Perhaps recognizing the failure of the Exhibits to show any of the named inventors inventing the claimed invention, the Garoutte Declaration only states that LOL reduced the invention claimed in Dahlstrom '526 to practice prior to the effective filing date of October 29, 1997. However, Mr. Garoutte does not state that he personally saw the claimed invention reduced to practice nor does he identify anyone who did. Simply declaring that "LOL" reduced the claimed invention to practice fails to meet the general requirements for a Rule 131 declaration to swear behind a prior art reference.

A proper Rule 131 declaration must show that at least one of the inventors conceived of the invention prior to the effective date of the prior art reference. (See MPEP §715.07, Part II). LOL is not an actual person capable of performing the mental act of conception of an invention. Conception of the invention is only done by one or more inventors, and a proper Rule 131 declaration must establish that the inventors--not the assignee or patent owner--conceived of the invention prior to the effective date.

The Garoutte Declaration does not even attempt to show that the inventors conceived of the invention. Instead, the Declaration points to the Exhibits as evidence that "LOL" reduced the claimed invention to practice prior to the effective date. This conclusory statement does not even recognize the step of conception, much less establish that the named inventors conceived of the claimed invention. Furthermore, attributing the claimed invention's reduction to practice to LOL leaves unanswered the question which of the named inventors (if any) reduced the claimed invention to practice. For at least these reasons, the Garoutte Declaration cannot be used to swear behind the effective date of the Rhodes '809 patent.

2.    **The Garoutte Declaration Fails to Explain How the Submitted Evidence Demonstrates the Claimed Methods Were Conceived of Reduced to Practice Prior to the Effective Date of the Rhodes '809 Patent**

The Garoutte Declaration presents Exhibits A - P as demonstrating that the "claimed method" was reduced to practice prior to the effective date of the Rhodes '809 patent. However, the Declaration fails to provide a single detail about the claimed method, or show where in the Exhibits the steps of the claimed methods are described. Instead, the Declaration offers conclusory statements about the claimed invention being reduced to practice before the effective date:

> Based upon my review of the unredacted documents that are being submitted as redacted document [sic] as Exhibits A - P, and upon information and belief, LOL reduced the invention claimed in Dahlstrom '526 to practice prior to the effective filing date of October 29, 1997, the filing date of U. S. Provisional Application Serial No. 60/063,990 of which Rhodes '809 claimed the benefit.

Garoutte Declaration, pages 1 - 2, paragraph #5

These conclusory statements offered throughout the Declaration are nothing more than an invitation to the USPTO to identify where the 162 pending claims might be found in a collection of documents provided by the Patent Owner. They fail to provide any facts or analysis of either the claimed invention or the Exhibits upon which the conclusion rests. Without these facts and analysis it is impossible for the Third Party Requester or the Office to evaluate the merits of the Declaration. For this reason as

well. the Garoutte Declaration cannot be used to swear behind the effective date of the Rhodes '809 patent.

### 3.    Patent Owner Has Failed To Show the Named Inventors Are Unavailable or Unwilling to Make a Rule 131 Declaration

The Third Party Requester also believes the Patent owner has failed to follow the proper procedure for making a Rule 131 declaration by not petitioning to request a waiver for having the named inventors sign the Declaration.  MPEP §715.04, Part I, notes that an assignee may make a Rule 131 declaration when it is not possible to produce the affidavit or declaration of the inventor.  However, the assignee must submit proof that the non-signing inventor is unavailable or cannot be found, similar to the proof required for a petition under 37 CFR 1.47 or in a petition under 37 CFR 1.183.  (See MPEP 715.04, Part I, final paragraph).

The Patent Owner's August 31, 2009, petition under 37 CFR 1.183 only states that "[e]ach of the inventors listed in the Dahlstrom '526 patent had ceased employment with the Patent Owner prior to the institution of the present proceedings." (See Petition, page 2, paragraph #3).  This statement does not establish that the named inventors were either unavailable or unwilling to sign a Rule 131 declaration, and therefore the Patent Owner/Assignee has not properly petitioned to waive the requirement that the inventors sign the declaration.

**Examiner's Position Regarding the Garoutte Declaration**

The Examiner finds the arguments of the Third Party Requester to be persuasive

with respect to the insufficiency of the Garoutte Declaration submitted under 37 CFR

1.131.  The Garoutte Declaration does not even attempt to show that the inventors

conceived of the invention.  Attributing the claimed invention's reduction to practice to

LOL leaves unanswered the question which of the named inventors (if any) reduced the

claimed invention to practice.

The Examiner agrees with the TPR that the conclusionary statements offered

throughout the Declaration are nothing more than an invitation to the USPTO to identify

where the 162 pending claims might be found in a collection of documents provided by

Application/Control Number: 95/000,003; 90/006,317                    Page 14
Art Unit: 3991

the Patent Owner. They fail to provide any facts or analysis of either the claimed

invention or the Exhibits upon which the conclusion rests.

Finally, the Examiner agrees with the TPR that the Patent Owner has failed to

establish that the inventors were unavailable or unwilling to sign a Rule 131 declaration.

See MPEP 715.04(I).

For all of the above reasons, the Garoutte Declaration is defective and cannot be

used to swear behind the effective filing date of the Rhodes '809 patent. Thus, all of the

rejections of record using Rhodes '809 as the primary reference as set forth in the

Examiner's Answer of February 23, 2009 are maintained.


### Status of Claims

In the substitute Appeal Brief filed August 6, 2009, claims 1 - 14 and 16 - 163

were under appeal. Claim 15 was cancelled. On August 19, 2009, Patent Owner filed

an amendment cancelling claims 104 - 113, 124, and 137 - 163. Therefore, claims

1 - 14, 16 - 103, 114 - 123, and 125 - 136 are pending in this merged proceeding.


### Comparison of Independent Claims

Claims 1, 26, 36, 52, 70, 89 and 114 are independent claims. For the purpose of

clarity, each of these independent claims is compared below to claim 1, which

comprises nine steps. The version of the claims presented herein below is that

presented in the housekeeping amendment filed by the Patent Owner on February 28,

2003. The underlined words are those that are not found in claim 1.

**Claim 1** is directed to:

Application/Control Number: 95/000,003; 90/006,317                  Page 15
Art Unit: 3991

A process of manufacturing a pasta filata cheese or a
    mozzarella-like cheese comprising:

    (a)  providing a milk composition having a selected protein and fat
          composition;

    (b)  pasteurizing the milk composition;
    (c)  forming a coagulum from the milk composition;
    (d)  cutting the coagulum to separate curd and whey;
    (e)  draining the whey from the curd;
    (f)  heating the curd without aqueous immersion to an approximate
          temperature range of 130°F to 160°F;
    (g)  adding a cheese emulsifying salt or a dairy ingredient or both prior to
          mechanical working;
    (h)  mechanically working the curd into a fibrous mass;

    (i)  and forming the cheese into a selected shape.


***Claim 26*** differs from claim 1 only in step (g) in which two emulsifying salts are
described and then this step is moved immediately after step (f)

        "adding <u>phosphate or citrate</u> emulsifying salts or a combination
        thereof to the curd prior to mechanical working;"


***Claim 36*** differs from claim 1 by modifying step (g) and moving it immediately after step
    (e), "draining the whey from the curd:"

        <u>adding generally recognized as safe ingredients into</u>
        <u>the curd prior to mechanical working in amounts</u>
        <u>effective to obtain selected compositional or functional</u>
        <u>properties in a final cheese product, the generally</u>
        <u>recognized as safe ingredients</u> including cheese
        emulsifying salt, a non-dairy ingredient, or dairy ingre-
        dient, or any combination thereof.


***Claim 52*** differs from claim 1 by omitting step (c) which reads "forming a coagulum from
    the milk composition" and inserting after step (a):

        "<u>adding an acidifying agent to the milk composition</u>"
    and modifying step (b) to read:

Application/Control Number: 95/000,003; 90/006,317                    Page 16
Art Unit: 3991

> "pasteurizing the milk composition <u>after acidification</u>;"
> and modifying step (f) by deleting "without aqueous immersion:"
> and modifying step (g) to specify two emulsifying
> salts and when these salts are to be added to the curd:
>> "adding <u>phosphate or citrate</u> emulsifying salt or a
>> combination therefore [sic] to the curd <u>prior to</u>
>> <u>mechanically working</u>;"

**Claim 70** differs from claim 1 by the enlargement of step (g) the alternative of
non-dairy ingredients:
> "adding a cheese emulsifying salt composition, <u>a non-dairy</u>
> <u>ingredient,</u> a dairy ingredient or any combination thereof <u>via</u>
> <u>a starter culture medium</u>;"

**Claim 89** differs from claim 1 by replacing step (g) with the following limitation:

> <u>"adjusting pH of the curd to a range of approximately</u>
> <u>5.0 to 5.4 after the whey is drained</u>;"

**Claim 114** differs from claim 1 in the modification of step (g).

Step (g) includes "non-dairy" ingredient as one of the GRAS ingredients along
with dairy ingredients and emulsifying salts that are added to a starter culture:

> "adding a cheese emulsifying salt or a dairy ingredient or both
> <u>or a non-dairy ingredient via a starter culture medium</u> prior to
> mechanical working;"

## Claim Interpretation

### I. Order of the Steps in the Process

All of the claims under reexamination (claims 1-14, 16 - 103, 114 - 123 and 125 -
136) contain the open language "comprising". The examiner interprets this open
language to permit various method steps to be performed in any order that are not
prohibited by chemical or physical constraints. For instance, the cutting of the curds to

drain the whey must occur after the curd is created.  Additionally, this open language

allows for additional steps to be included in the process.

## II.  Adding Ingredients via a Starter Culture

Claim 70 contains the following limitation:

> "adding a cheese emulsifying salt composition, a non-diary
> ingredient, a dairy ingredient or any combination thereof via
> a <u>starter culture medium</u>,"

Claim 114 contains the following limitation:
"adding a cheese ingredient salt or a dairy ingredient
or both or a non-dairy ingredient via a <u>starter culture
medium</u> prior to mechanical working,"

The examiner's position is that the open language of "comprising" permits the

steps of the cheese manufacturing process to occur in any logical order except where a

chemical or physical constraint is apparent.  For instance, the phrase "starter culture

medium" must be added directly to the milk composition prior to the formation of the

curd.  It is the culture medium that creates the curd from the starter milk composition.

Therefore, adding a starter culture medium to the curd is illogical and is thus excluded

from a reasonable interpretation of the process of claims 70 and 114.  This conclusion is

supported by the TPR at pages 2 - 4 of the Comments filed July 3, 2002 of the '003

case.

## III.  Adding Ingredients Prior to Mechanically Working the Curd

Independent claims 1, 26, 36, 52, 89 and 114 contain a limitation regarding

performing some function in the manufacture of mozzarella cheese "prior to

mechanically working the curd."  These claims specify that any one or more of several

compositions, such as emulsifying salts, non-dairy ingredients or dairy ingredients, must

be added to the curd "prior to mechanically working the curd."   Claim 89 indicates that

the pH of the curd is adjusted "prior to the mechanical working of the curd."  Conse-

quently, it is critical to this reexamination proceeding that one determines precisely

when "mechanically working the curd" begins.  The examiner adopts the Requester's

position with respect to the interpretation of "mechanically working the curd" as set forth

at pages 10 - 14 of the TPR's Response to the Statement of the Patent Owner filed

November 27, 2002 and at pages 2- 3 in the TPR's Comments filed May 24, 2005 and

is reiterated below.

        The mechanical working of the curd begins when the temperature of the curd is

raised to 155°C and the speed of the infuser is increased to 8 rpm.  In contrast,

operating the infuser at 4 rpm at a temperature of 115°F, while introducing a variety of

dairy and non-dairy ingredients, is not considered to be "mechanical working of the

curd."

        Dahlstrom '526 defines "working the curd" as heating, kneading, and stretching a

clumped-together mass of curd, so as to make it fibrous (column 5, lines 11 - 14).

Rhodes '809 explains that his curd is in particle form when placed in the infuser, and

that slow turning, at 4 rpm, while the curd temperature is only 115°F, prevents the curd

particles from clumping together (Rhodes '809, column 23, lines 31 - 34).   Before

Rhodes '809 begins working the curd, he wants to allow his "enhancing agent" to be

combined with the curd particles, a process he calls "infusion." (column 26, lines 54 -

64).  The enhancing agent can be any of a variety of possible additives, e.g., whey

protein (column 6, lines 27 - 28); a preserving agent (column 6, lines 62 - 64); a fat

substitute (column 7, lines 9 - 11); flavorings and/or colorings (column 7, lines 22 - 26);

enzymes to accelerate ripening (column 7, lines 9 - 11); hydrocolloids, starch and/or

milk protein to stabilize against syneresis (column 8, lines 5 - 8); table salt (column 15,

lines 18 - 21); and cheese emulsifying salts such as sodium aluminum phosphate and

sodium citrate (column 26, line 65 to column 27, line 6).

       The greater the surface area of the particles, the better the absorption, says

Rhodes '809. Therefore, until the infusion process is complete, Rhodes '809 rotates the

infuser at 4 or 5 rpm, so as to keep the curd particles from clumping together (Rhodes

'809, column 26, line 23 to column 27, line 10). During this stage the "curds and the

enhancing agent are tumbled to form a mixture." Accordingly, no kneading or

stretching of the curd occurs while precautions are being taken to keep the curd

particles from matting or clumping. And without kneading or stretching at a temperature

of 155° F, there can be no "working of the curd."

       In order to "ripen" the tumbling particles of mozzarella curd during the infusion

process, Rhodes circulates enough warm water through the infuser's jacket and flights

to maintain a curd temperature of 115°F (see e.g., at column 26, lines 45 - 53).

       Once the infusion is complete and the ripening has lowered the curd pH to the

desired level (i.e., 5.38), then mechanical working of the curd begins, by raising the

temperature of the jacket water to 155°F and increasing the rpm to 8 (column 27, lines 7

- 10). Due to the higher temperature and more rapid mixing speed, the curd particles

melt and form a congealed mass. As the rising temperature passes through 128°F, the

cheese begins to form the desired fibrous strands (column 24, lines 2 - 12).

Therefore, there are two separate steps in the Rhodes '809 infusion process: (1)

an absorption/ripening step where ingredients are mixed into the curd while the

temperature is raised to 115°F and then followed by (2) the mechanically working of the

curd requiring an elevated temperature of 155° F and the higher speed of 8 rpm.

Accordingly, adding ingredients to the curd while the speed of the infuser is 4-5 rpm and

the temperature is about 115°F means that it is "prior to mechanically working the curd."

Therefore, the phrase "mechanical working of the curd" only occurs at the higher

temperature of 155°F and the higher speed of 8 rpm.

## IV. Heating the Curd Without Aqueous Immersion

Claims 1, 77, 89 and 114 contain the phrase "heating the curd without aqueous

immersion" while claim 62 uses the phrase "heating the curd in an aqueous free

environment."   The TPR's interpretation of these phrases as set forth at pages 4 - 9 of

the TPR's Reply to the Statement of the Patent Owner filed 27 November 2005 and at

page 8 of the Comments filed 24 May 2005 is adopted and summarized below.

Prior to the invention of Dahlstrom '526, mozzarella cheese was typically

manufactured by heating the curd immersed in a water bath (column 1, lines 6 - 7).

This water bath immersion was especially a problem because it resulted in the loss of

cheese solids, a reduced yield of the cheese product, and harm to the environment

upon disposal of the water (column 1, lines 12 - 14).  Thus, Dahlstrom '526 sought to

avoid the use of such a water bath in order to increase the yield of the final cheese

product, reduce product costs, and reduce the harm to the environment (column 1, lines 27 - 30). Dahlstrom '526 obviated the problems associated with water bath heating, by using steam injection (column 7, lines 12 - 14, 51 - 52 and column 8, lines 23 - 25).

The Dahlstrom '526 patent fails to expressly define the claim language "without aqueous immersion" or "in an aqueous free environment," but it clearly indicates that it means "without liquid immersion" or "liquid-free environment" (Abstract, column 3, lines 1 - 15 and column 5, lines 28 - 38).

Dahlstrom '526 goes on to explain that "[b]y liquid-free is meant that the curd is not immersed in a liquid such as water or whey. The curd does have water entrapped within and may have some surface wetness, but such moisture content is insufficient to be considered immersion" (column 3, lines 8 - 15).

Consistent with Dahlstrom's '526 statement that some water may be present, so long as it does not immerse the curd, the specification states that "[w]hether the ingredients [blended into the curd] are salt mixtures, non-dairy or dairy ingredients, they may be added in aqueous form anywhere from 5 to 50% on a weight basis" (column 4, lines 65 - 67). And, as mentioned above, the specification also acknowledges that live steam can be "injected directly into the cheese" in order to help heat it (column 5, lines 17 - 23). The steam will, of course, condense. This fact is shown in all three of Dahlstrom's examples, in which the curd weights are given before and after steam injection. In Example II, for instance, 53.7 lbs. of water is added to 600 lb. of curd by 60 seconds of "direct culinary steam injection." A total added water of 53.7 lbs. represents 9% of the total 600 lbs. of curd. (See the footnote on page 5 of the TPR's Reply to the

Application/Control Number: 95/000,003; 90/006,317                    Page 22
Art Unit: 3991

Statement of the Patent Owner filed November 27, 2002 for an explanation about the

calculation of the amount of water in the cheese described in Dahlstrom's Example II.)

Therefore, the phrases "heating the curd without aqueous immersion" and

"heating the curd in an aqueous free environment" in instant claims 1, 62, 77, 89, and

114 is interpreted to mean that there is not so much aqueous liquid in the heating vessel

as to immerse the curd.  This interpretation is further supported by the following

Dahlstrom '526 citation from which one can infer that the inventor uses the words

"immersed" and "submerged" in an interchangeable manner.  See Dahlstrom '526 at

column 3, lines 1 - 7:

> Traditional manufacturing processes for making such cheese
> varieties [as mozzarella and provolone] are characterized by
> the fact that after the whey is drained off, the curd is **immersed**
> in hot water or hot whey and the **submerged** curd is worked
> and stretched while it is in a plastic condition to impart into
> the curd, the fibrous texture that characterizes such cheese
> varieties.  (Emphasis added.)

### Claim Rejections

I.     **Claims 1 - 4, 7 - 14, 16 - 22, 25 - 29, 31, 32, 35, 36, 38, 40 - 48, 51, 62 -**

**69, 89 - 92, and 95 - 101 are rejected under 35 USC §102(e) as being anticipated by**

**Rhodes '809.**

Regarding claim 1, the TPR's position defined at pages 16 - 17 of the '003

Request of 08 January 2002 is adopted as proposed and is reiterated below.

**Claim 1.  A process of manufacturing, a pasta filata cheese
or a mozzarella-like cheese comprising:**

Rhodes '809 discloses an improved system for making mozzarella cheese

at column 6, lines 12 -14.

> **. . . providing a milk composition having a selected protein and fat composition: . .**

Rhodes '809 provides a milk composition having a fat content of 4.67% and a

protein content of 4.99% (column 23, lines 2 - 3).

> **. . . pasteurizing the milk composition; . .**

Rhodes '809 discloses pasteurizing the milk (column 10, lines 50 - 51).

> **. . . forming a coagulum from the milk composition; . .**

Rhodes '809 discloses that the milk is renneted and allowed to coagulate

(column 10, lines 58 - 59).

> **. . . cutting the coagulum to separate curd and whey; . .**

Rhodes '809 discloses that the coagulated curd was "cut with a ¼ inch
knifes [sic] (column 23, lines 20 - 22).

> **. . . draining the whey from the curd; . .**

Rhodes '809 discloses that the whey is drained from the cut curd (column

23, lines 27 - 29).

> **. . . heating the curd without aqueous immersion to an approximate temperature range of 130°F to 160°F; . . .**

Rhodes '809 heats the mozzarella curd in the "infuser" (part number 186 as

shown in Figure 2) without aqueous immersion (see column 25, lines 45 - 49; "the

cooker water was eliminated" to a temperature of 130°F (column 24, lines 10 - 11) or

132°F (column 15, lines 2 - 4).

> **. . . adding a cheese emulsifying salt or a dairy ingredient or both prior to mechanical working; . .**

Rhodes '809 first loads the infuser with (a) a mixture of one or more probiotic

preserving agents and water, (b) a mixture of whey protein (a dairy ingredient) and

water, and (c) mozzarella curd, and then starts turning the infuser (column 14, lines

61 - 66).   Rhodes specifically discloses adding the emulsifying salts of sodium

aluminum phosphate and sodium citrate at column 26, lines 65 - 67.   See Section I

of the Response to Argument of this Action Closing Prosecution.

**. . . mechanically working the curd into a fibrous mass; . .**

Rhodes '809 discloses that the infuser, which "resembles the mixer on a

concrete truck" (column 22, lines 1 - 4), is "repeatedly turned" (column 14, lines

64 - 66) to tumble the cheese curd and "form fibrous strands that stretched from

the bottom to the top on each of the internal flight" (column 24, lines 2 - 9).

**. . . and forming the cheese into a selected shape.**

Rhodes '809 discloses forming the cheese into blocks (Fig. 10 and column

20, line 63 through column 21, line 4).

No amendments have been made to original claims 2 - 4, 7 - 14, or 16 - 22.

Therefore, the previous rejections found in the non-final Office action of April 4, 2002

which were maintained in the non-final Office action of February 16, 2005 are again

maintained as indicated below.

> **Claim 2.    The process of claim 1 wherein the curd is comminuted
> to a selected size.**

The TPR's position <u>is adopted</u> as found on pages 16 - 17 of the '003 Request,

which is reiterated below.  Rhodes '809 discloses dicing the curd "to reduce the size to

approximately 1/4 inch by 1/4 inch long" at column 34, lines 22 - 25.


**Claim 3.     The process of claim 1 wherein the coagulum is heated
after being cut to facilitate moisture removal from the curd.**

The TPR's position is adopted as found on page 18 of the '003 Request and is

reiterated below.  Rhodes '809 discloses heating the cut curd to 116°F at column 23,

lines 20 - 25.


**Claim 4.     The process of claim 1 wherein the milk composition is
fresh milk.**
The TPR's position is adopted as found on page 18 of the '003 Request.

below.  Rhodes '809 discloses using "standardized Jersey milk" direct form the

pasteurizer at column 22, line 66 through column 23, line 1.

**Claim 7.     The process of claim 1 wherein the salt composition
includes an alkaline earth salt of simple or complex chlorides,
sulfates, phosphates or citrates used in the manufacture of process
cheese, cheese food, cheese spread, or imitation or analog cheeses.**

The TPR's position is adopted as found on page 19 of the '003 Request, which

is reiterated below.

This claim does not require the addition of a cheese emulsifying salt, but even if it

did Rhodes '809 discloses the addition of sodium aluminum phosphate and sodium

citrate, both of which are cheese emulsifying salts (col. 26, line 65 through col. 27, line

6)  The present patent indicates that sodium citrate is one example of what is meant by

an emulsifying salt that is "an alkaline earth salt." (Dahlstrom '526, col. 4, lines 32 - 38.)

>       **Claim 8.    The process of claim 7 wherein the alkaline earth salt
>       contains sodium, potassium, calcium, magnesium, or combination
>       thereof.**

The TPR's position is adopted as found on page 19 of the '003 Request and

is reiterated below.  The above comments regarding claim 7 are equally applicable to

claim 8.

>       **Claim 9.    The process of claim 7 wherein the salt composition if in
>       dry form is mixed in an aqueous solution containing about five to
>       fifty percent by weight of the salt composition.**

The TPR's position is adopted as found on page 19 of the '003 Request and

is reiterated below.  Rhodes '809 mixes the sodium aluminum phosphate and sodium

citrate with water to yield an aqueous solution containing 6 lbs. of salts and 1.5 lbs. of

water (which gives a concentration of 40 wt.%) (col. 26, line 65 through col. 27, line 6).

>       **Claim 10.    The process of claim 1 wherein a non-dairy ingredient is
>       added to the curd prior to mechanical working.**

The TPR's position is adopted essentially as proposed as found on page 20 of

the '003 Request and is reiterated below.  The teachings of Barz '543 and Rizvi '398

are not required for this 102(e) rejection.

Rhodes '809 first loads the infuser with (a) mixture of one or more probiotic

preserving agents (non-dairy ingredients) and water, (b) a mixture of whey protein and

water, and 9c) mozzarella curd, and then starts turning the infuser (col. 14, lines 61 -

66.), i.e., prior to mechanical working.

>       **Claim 11.    The process of claim 1 wherein the non-dairy ingredient
>       is a functional carbohydrate, a lipase, a protease, a mineral acid, an**

> **organic acid, a structural protein, or an antimicrobial agent or a combination thereof.**

The TPR's position is adopted as found on page 20 of the '003 Request and is reiterated below.

Claim 1 does not mention a "non-dairy" ingredient," so it is unclear what this claim requires.  In any case, however, the probiotic preserving agents that Rhodes '809 mixes with the curd prior to mechanical working are antimicrobial agents.

> **Claim 12.    The process of claim 1 wherein the non-diary ingredient if in dry form is mixed in an aqueous solution containing about five to fifty percent by weight of the dairy ingredient.**

The TPR's position is adopted as found on page 21 of the '003 Request and is reiterated below.

Rhodes '809 discloses that, instead of preserving agents and yield-enhancing agents, "other combinations" of "enhancing agent" can be added to the curd prior to working (col. 14, lines 5 - 28).   Specifically mentioned are "melt and string enhancing agents (col. 21, lines 59 - 61) such as sodium citrate and sodium aluminum phosphate, which are non-dairy ingredients that improve the "meltability of cheese" (col. 27, lines 64 - 67), and these can be first dissolved in water at a combined concentration of 6 lbs. per 15 lbs. of water, i.e., a 40 wt.% solution (col. 26, line 65 through col. 27, line 1).

> **Claim 13.    The process of claim 1 wherein the dairy ingredient is either milk, cream, yogurt, skim solids, or cheese that is dry, condensed, fluid, unripened, fermented or pH reduced or any combination thereof.**

The TPR's position is adopted essentially as proposed with respect to the

teaching of Rhodes '809, as found at page 21 of the '003 Request and summarized

below.

The examiner does not concur with the need for the teaching of Barz '625 as

proposed by the Requester because this is an anticipation rejection in which Rhodes

'809 discloses all of the limitations of the claim.  Thus, the teaching of Barz '625 is

not required.   The Requester states that "This claim does not require the addition of

a dairy ingredient, but even if it did, Rhodes '809 discloses that numerous other

enhancing agents can be used (column 59, lines 63 - 66)."   Claim 13 requires the

addition of either an emulsifying salt or a dairy ingredient or both.  Thus, the teaching

by Rhodes '809 of the addition of the sodium citrate emulsifying ingredient prior to

mechanical working of the curd (column 26, lines 65 - 68 and column 27, lines 1 - 6)

anticipates claim 13.  *( See the TPR's arguments in the "Response to Arguments"*

*section concerning claim 1 for an explanation of the meaning of the phrase "prior to*

*mechanically working the curd.")*

**Claim 14.  The process of claim 13 wherein if the dairy ingredient is in
dry form is mixed in an aqueous solution containing about five to fifty
weight percent of the dairy ingredient.**

The TPR's position is adopted essentially as proposed as explained at page 22

of the '003 Request with regard only to the statement which says "[s]till the claim does

not require the addition of the dairy ingredient."  This means that Rhodes '809 still

anticipates claim 14 because of the disclosure of the addition of emulsifying salts at

column 59, lines 63 - 69.  But even if claim 14 did require the addition of a dairy product

prior to mechanical working of the curd, Rhodes '809 would still anticipate this

limitation because Rhodes '809 discloses adding whey protein isolate to the curd prior

to mechanically working the curd (column 26, lines 33 - 54).  (The teachings of the Barz

'625 patent as set forth in the Requester's proposal are not required for this anticipatory

rejection over Rhodes '809.)

**Claim 16.     The process of claim 1 wherein the cheese has a final
moisture content in the range of about 20 to about 90 weight percent.**

The TPR's position is adopted as found at page 22 of the '003 request and is

reiterated below.

Rhodes '809 discloses a mozzarella cheese product with a moisture content of

50.04% at column 24, lines 23 - 26.

**Claim 17.     The process of claim 16 wherein the cheese has a final
moisture content in the range of about 30 to about 60 weight percent.**

The TPR's position is adopted as found at page 22 of the '003 request and is

reiterated below.

Rhodes '809 discloses a mozzarella cheese product with a moisture content of

50.04% at column 24, lines 23 - 26.

**Claim 18.     The process of claim 1 wherein the cheese final
moisture content is adjustable by the addition of inert ingredient.**

The TPR's position is adopted as found at page 23 of the '003 request and is

reiterated below.

Application/Control Number: 95/000,003; 90/006,317                    Page 30
Art Unit: 3991

Claim 18 does not *require* the addition of a moisture-adjusting ingredient, but

even if it did, Rhodes '809 discloses that "[t]he addition of hydrocolloids or proteins

allows for the incorporation of greater moisture in the cheese at column 21, lines 44 -

45.

> **Claim 19.    The process of claim 18 wherein the inert ingredients**
> **are either structural carbohydrates or silicates or a combination**
> **thereof.**

The TPR's position is adopted as found at page 23 of the '003 request and is

reiterated below.

Claim 19 does not *require* the addition of an inert ingredient, but even if it did,

Rhodes '809 discloses that, in addition to hydrocolloids and proteins, "any other water

controlling agents (i.e. starch) can be infused into the curd to present syneresis" at

column 21, lines 26 - 41.  (Starch is a carbohydrate.)

> **Claim 20.    The process of claim 1 wherein the mechanical working**
> **of the curd is done in a waterless cooker.**

The TPR's position is adopted as found at page 23 of the '003 request and is

reiterated below.

Rhodes '809 discloses that, by working the mozzarella curd in infuser 186 in the

manner described, "cooker water was eliminated" at column 28, lines 63 - 67.

> **Claim 21.    The process of claim 1 and further including: cooling**
> **the cheese after the cheese is formed into the selected shape.**

The TPR's position is adopted as found at page 23 of the '003 request and is

reiterated below.

Rhodes '809 discloses that the cheese that is shaped in molding tube 320 is

cooled in stages to cause it to solidify at column 20, line 63 through column 21, line 4.

> ### Claim 22.    The process of claim 21 and further packaging the
> ### cooled cheese.

The TPR's position <u>is adopted</u> as found at page 24 of the '003 request and is

reiterated below.

Rhodes '809 discloses that it is conventional for cooled cheese to be sent to a

"wrapper."   See Fig. 1 and column 10, lines 25 - 27.

> ### Claim 25.    The process of claim 1 wherein curd acidity is adjusted
> ### to a pH range of approximately 5.0 to 5.4.

The TPR's position <u>is adopted essentially as proposed</u> at page 25 of the '003

Request with regard to the teachings of Rhodes '809 and is reiterated below. *(The*

*teachings of Yun '92 and Barbano '91 are not required for this anticipation rejection.)*

Claim 25 requires that the process of claim 1 includes adjusting the pH of the curd to a

range of approximately 5.0 to 5.4.  Rhodes '809 also anticipates claim 25 because

Rhodes '809 teaches that 20 minutes after the addition of sodium aluminum phosphate

and sodium citrate to the curd, the pH is 5.38 (column 26, line 65 to column 27, line 8).

**Claims 26 - 29, and 36** have been amended (amendment filed 02 October 2002)

to require that the phosphate and/or citrate emulsifying salts are added to this curd

"prior to mechanical working."  Rhodes '809 discloses the addition of sodium citrate

emulsifying salts to the curd prior to mechanical working (column 26, lines 65 - 68, and

column 27, lines 1 - 6).

Independent claim 26 differs from claim 1 only in step (g) in which two

emulsifying salts are described and then this step is moved immediately after step (f).

> **(g) adding phosphate or citrate emulsifying salts or a combination
> thereof to the curd prior to mechanical working.**

The TPR's position as set forth at pages 25 - 27 of the '003 Request and pages 10 - 14

of the Requester's Reply of 27 November 2002 is adopted.  The only difference

between the rejection of claim 1 and claim 26 is the explanation regarding this

modified step (g).  However, Rhodes '809 also discloses the addition of sodium citrate

emulsifying salts to the curd prior to mechanical working (column 26, lines 65 - 68, and

column 27, lines 1 - 6).

> **Claim 27.      The process of claim 26 wherein the emulsifying salt is
> alkaline earth salt.**

Again, Rhodes '809 discloses the addition of sodium aluminum phosphate and

sodium citrate to the curd (col. 26, line 65 - col. 27, line 6).  Note that the present

patent under reexamination indicates that sodium citrate is one example of what is

meant by an emulsifying salt that is "an alkaline earth salt."  See Dahlstrom '526,

column 4, lines 32 - 38.

> **Claim 28.      The process of claim 27 wherein the salt is mixed into
> the curd in the form of an aqueous solution containing about 5 to
> 50% of the salt based on the weight of the solution.**

Again, Rhodes '809 discloses the addition of sodium aluminum phosphate and

sodium citrate to the curd (col. 26, line 65 - col. 27, line 6).  Note that the present

patent under reexamination indicates that sodium citrate is one example of what is

meant by an emulsifying salt that is "an alkaline earth salt." See Dahlstrom '526,

column 4, lines 32 - 38.

**Claim 29.     The process of claim 26 wherein the salt is mixed into the curd in the form of an aqueous solution containing about 5 to 50% of the salt based on the weight of the solution.**

Rhodes '809 pre-dissolves 4 lbs. of the sodium aluminum phosphate and 2 lbs.

of the sodium citrate in 15 lbs. of water (yielding a 40 wt.% solution) as described at

column 26, line 65 through column 26, line 6.

**Independent claim 36 differs from claim 1 in that step (g) is modified and moved immediately after step (e), "draining the whey from the curd"**

**Claim 36** requires that "generally recognized as safe" (GRAS) ingredients are

added to the curd prior to mechanical working and that these may be emulsifying salts,

a non-dairy ingredient or a dairy ingredient.  Rhodes '809 also discloses the addition of

whey protein (a dairy ingredient) prior to the mechanical working of the curd (column 14,

lines 61 - 66).   (For an explanation of the meaning of "adding ingredients prior to the

mechanical working of the curd," see pages  14 - 16 of this Office action under the

section entitled "Claim Interpretation.")

The rejection of claims 31, 32, 35, 38, 40 - 48, 51, 62 - 69, 90 - 92, 95 - 101

under 35 USC 102(e) as being anticipated by Rhodes '809 is maintained because no

amendments with regard to these claims have been entered into the record. *(The*

*amendment filed April 27, 2005 and resubmitted on July 18, 2005 and again on*

*September 19, 2006 failed to comply with 37 CFR 1.530(f)-(j) and thus has not been*

*entered into the record as directed by the Decision on Petition mailed October 27,*

*2006.)*

> **Claim 31.    The process of claim 29 wherein the cheese has a
> finished moisture content in the range of 40 to 60% after being
> formed into the selected shape.**

The TPR's position is adopted as found at page 28 of the '003 request and is

reiterated below.

Rhodes '809 discloses a final mozzarella cheese with a moisture content of

50.04% at column 54, lines 23 - 26.

> **Claim 32.    The process of claim 26 wherein the temperature of the
> curd is in the approximate range of 20 to 160° F. when adding the
> emulsifying salts.**

The TPR's position is adopted as found at page 28 of the '003 request and is

reiterated below.

Rhodes '809 discloses maintaining "a curd temperature of 115° F." when adding

the emulsifying salts at column 26, line 48 through column 26, line 10.

> **Claim 35.    The process of claim 26 wherein the cheese produced
> by the process of claim 30 is characterized by a shelf life of up to six
> months.**

The TPR's position is adopted as found at pages 29 of the '003 request and is

reiterated below.

Because claim 35 refers to two prior claims, it is unclear what this claim covers.

In any case, Rhodes '809 discloses that its cheese continued to perform well on pizzas

after 60 days of storage at column 28, lines 46 - 51.

**Claim 38.    The process of claim 36 wherein the cheese is formed into a selected shape by cooling.**

The TPR's position is adopted as found at page 31 of the '003 request and is reiterated below.

Rhodes '809 discloses that the cheese that is shaped in molding tube 320 is cooled in stages to cause it to solidify at column 20, line 63 through column 21, line 4.

**Claim 40.  The process of claim 36 wherein the cheese emulsifying salt comprises simple or complex chlorides or both, sulfates, phosphates or citrate cheese emulsifying salts or combination thereof.**

The TPR's position is adopted as set forth at page 32 of the '003 request and is reiterated below.

Claim 40 does not *require* the addition of a cheese emulsifying salt, but even if it did, Rhodes '809 discloses the addition of sodium aluminum phosphate and sodium aluminum phosphate and sodium citrate, both of which are cheese emulsifying salts at column 26, line 65 through column 27, line 6.

**Claim 41.    The process of claim 40 wherein the emulsifying salt is an alkaline earth salt.**

The TPR's position is adopted as found at page 32 of the '003 request and is reiterated below.

Again, Rhodes '809 discloses the addition of sodium aluminum phosphate and sodium citrate to the curd at column 26, line 65 through column 27, line 6.   Note that

the current patent under reexamination ('526) indicates that sodium citrate is one

example of what is meant by an emulsifying salt that is "alkaline earth salt."  See

Dahlstrom '526 at column 4, lines 32 - 38.

**Claim 42.    The process of claim 41 wherein the alkaline earth salt is
sodium, potassium, calcium, magnesium or combination thereof.**

The TPR's position is adopted as found at page 32 of the '003 request and is

reiterated below.

Again, Rhodes '809 discloses the addition of sodium aluminum phosphate and

sodium citrate to the curd at column 26, line 65 through column 27, line 6.   Note that

the current patent under reexamination ('526) indicates that sodium citrate is one

example of what is meant by an emulsifying salt that is "alkaline earth salt."  See

Dahlstrom '526 at column 4, lines 32 - 38.

**Claim 43.    The process of claim 41 wherein the salt composition
is in a dry form and is mixed in an aqueous solution containing
about 5 to 50 weight percent of the salt composition.**

The TPR's position is adopted as found at page 33 of the '003 request and is

reiterated below.

Rhodes '809 combines the sodium aluminum phosphate and sodium citrate in

aqueous solution containing 6 lbs. of the salts and 15 lbs. of water, which give a

concentration of 40 wt.%.  See column 26, line 65 through column 27, line 6.

**Claim 44.    The process of claim 36 where in the non-dairy
ingredients comprises either functional carbohydrates, lipase,
protease, mineral acid, organic acid, structural protein, or anti-
microbial agents, or any combination thereof.**

The TPR's position at page 33 of the '003 request is <u>adopted as essentially proposed</u>, summarizing only the teaching of Rhodes '809.  *(The TPR's position with respect to the disclosure of Barz '625 is not necessary because this anticipation rejection only requires the Rhodes '809 patent.)* The Requester states "This claim does not require the addition of a non-diary ingredient, but even if it did, Rhodes '809 discloses adding "OptaGrade® modified starch texturizer" to the curd (column 26, lines 54 - 58).   Dahlstrom '526, the patent under reexamination, acknowledges that starch qualifies as functional carbohydrates (column 4, lines 15 - 21).

> **Claim 45.      The process of claim 44 wherein the non-dairy ingredients are in dry form and are mixed in an aqueous solution containing about 5 to about 50 percent of the non-dairy ingredient.**

The TPR's position at page 33 of the '003 request <u>is adopted essentially as proposed,</u> incorporating only the teaching of Rhodes '809 with regard to the addition of either an emulsifying salt or a dairy ingredient as detailed in the above explanation for the anticipation of claim 44.  *(The teachings of Barz '625 are not required for this anticipation rejection <u>nor</u> is the teaching of Rhodes concerning the addition of a proteolytic enzyme necessary because the concentration of the enzyme (a non-dairy ingredient) is less than the 5 to 50 weight percent specified in claim 45.  However, the teachings of Barz '625 are adopted for the subsequent obviousness rejection of* claim 45 over *Rhodes '809 in view of Barz '625).*   Claim 45 does not require the addition of a non-dairy ingredient, because it depends from claim 36 which contains the limitation that the process requires the addition of an "emulsifying salt, a non-dairy ingredient, a

Application/Control Number: 95/000,003; 90/006,317                    Page 38
Art Unit: 3991

dairy ingredient, or any combination thereof." Therefore, Rhodes '809 fully meets the

claimed limitation by disclosing the addition of sodium citrate emulsifying salts (column

14, lines 61 - 66) and/or the addition of a non-dairy ingredient, modified starch texturizer

(column 26, lines 54 - 58).

> **Claim 46.     The process of claim 36 wherein the dairy ingredients
> comprise either a milk cream, yogurt, skim solids, or cheese that is
> dried, condensed, fluid, unripened, fermented or pH reduced to any
> combination thereof.**

   The TPR's position at page 34 of the '003 request is adopted essentially as

proposed and is summarized below.

   Claim 46 is anticipated by Rhodes '809 since, as the Requester states, "This

claim does not require the addition of a dairy ingredient, but even if it did, Rhodes '809

discloses that "numerous other enhancing agents" can be used (column 59, lines 63 -

66). Furthermore, claim 46 permits the addition of an "emulsifying salt, a non-dairy

ingredient, a dairy ingredient or a combination therefor" from its dependency upon claim

36. Accordingly, the addition of an emulsifying salt fully meets this limitation as taught

by Rhodes '809 at column 26, lines 65 - 68 and column 27, lines 1 - 6.

> **Claim 47.     The process of claim 46 wherein the dairy ingredient
> [sic] are in a dry form and are [sic] mixed in an aqueous solution
> containing about 5 to 50 weight percent of the dairy ingredient.**

   The TPR's position at page 34 of the '003 request is adopted essentially as

proposed and is summarized below.

   The TPR observes that this claim does not require the addition of a dairy

ingredient, but permits the addition of emulsifying salts and non-dairy products.  As

explained above, Rhodes '809 teaches the limitation of adding emulsifying salts (column

26, lines 65 - 66 and column 27, lines 1 - 6).

**Claim 48.    The process of claim 36 wherein the cheese has a
finished moisture content in the range of about 40 to about 60 weight
percent.**

The TPR's position is adopted as found at page 34 of the '003 request and is

reiterated below.

Rhodes '809 discloses a mozzarella cheese product with a moisture content of

50.04% at column 24, lines 23 - 26, which falls within the required range.

**Claim 51.    The process of claim 36 wherein the cheese is
characterized by a shelf life up to six months.**

The TPR's position is adopted as set forth at page 35 of the '003 request and is

reiterated below.

Rhodes '809 discloses that its cheese continued to perform well on pizzas after

60 days of storage at column 28, lines 46 - 51.  Note that no minimum shelf life is called

for by the claim language "up to six months."

**Claim 62.    An improved process of manufacturing a pasta filata
cheese or a mozzarella-like cheese, the improvement comprising**

The TPR's position is adopted as set forth at pages 39 - 40 of the '003 request

and is reiterated below.

Rhodes '809 discloses an improved system for making mozzarella cheese at

column 6, lines 12 - 14.

> **. . . after a coagulum is formed from a milk composition and the
> coagulum cut to separate the curd and whey and the whey drained
> from the curd. . .**

Rhodes '809 discloses that the milk is renneted and allowed to coagulate, the

coagulum is cut, and the whey is drained from the curd at column 23, lines 8 - 29.

> **. . .heating the curd in an aqueous free environment to an
> approximate temperature range of 130° F. to 160° F. . .**

Rhodes '809 heats the mozzarella curd in the infuser 186 without water.  See

column 25, lines 45 - 49: "the cooker water was eliminated."  The curd is heated to 130°

F (col. 24, lines 10 - 11) or 132° F (col. 15, lines 2 - 4).

> **. . . and adding either a cheese emulsifying salt, a non-dairy
> ingredient or a dairy ingredient or any combination thereof.**

Rhodes '809 discloses mixing the curd with "an enhancing agent" (col. 11, lines

16 - 19) which can be "whey protein" (a dairy ingredient) or "other enhancing agents or

combinations of enhancers" (col. 12, lines 5 - 9).  Examples of such include probiotics,

insulin, corn starch, chicory extract, flavorings, colorings, and ripening enzymes (col. 12,

line 9 through col. 13, line 37), all of which are non-dairy ingredients, as well as sodium

aluminum phosphate and sodium citrate (col. 26, line 65 - col. 27, line 6), both of which

are cheese emulsifying salts.

> **. . . and mechanically working the curd in the aqueous free
> environment until a mozzarella-type texture is achieved.**

Rhodes '809 discloses working the enhanced curd in a waterless cooker (infuser

186) until "[t]he entire curd is formed into a single mass of pasta filata mozzarella at

130° F. (col. 24, lines 9 - 18).

**Claim 63.    The process of claim 62 wherein the curd is comminuted to a selected size prior to heating.**

The TPR's position is adopted as found at page 40 of the '003 request and

is reiterated below.

Rhodes '809 discloses dicing the curd "to reduce the size to approximately ¼ inch by ¼ inch by ¼ inch long" prior to heating it in infuser 186 (col. 34, lines 22 - 25.)

**Claim 64.    The process of claim 62 wherein the coagulum is heated after being cut to facilitate further moisture removal from the curd.**

The TPR's position is adopted as found at page 41 of the '003 request and

is reiterated below.

Rhodes '809 discloses heating the cut curd to 116° F (col. 23, lines 20 - 25).

**Claim 65.    The process of claim 64 wherein the pH of the drained curd is adjusted to a range of 5.2 to 5.4.**

The TPR's position is adopted essentially as proposed with respect to Rhodes

'809 only as found at page 41 of the '003 request because this claim is anticipated by

Rhodes '809.  The TPR also cites the reference to Yun '92 for the teaching that "the

optimal [curd] pH for stretching of Mozzarella cheese (made with starter culture) is

between 5.1 and 5.3" (page 3630, left column, lines 13 - 16).  The TPR additionally

recites the references to Barbano '91 and states in the request "that the pH of the

[mozzarella] curd at salting can be adjusted to achieve a range of desired pH at

stretching" (page 2688, right column, third paragraph).   These TPR's teachings with

respect to Yun '92 and Barbano '91 are not required for this anticipation rejection.

**Claim 66.    The process of claim 62 wherein the emulsifying salt
includes simple or complex chlorides, phosphate or citrates or a
combination thereof.**

The TPR's position is adopted as set forth on page 41 of the '003 request and

is reiterated below.

Claim 66 does not require the addition of a cheese emulsifying salt, but even if it

did, Rhodes '809 discloses the addition of sodium, aluminum phosphate and sodium

citrate, both of which are cheese emulsifying salts (col. 26, line 65 through col. 27, line

6).

**Claim 67.    The process of claim 62 wherein the non-dairy ingredient
includes a functional carbohydrate, a lipase, a protease, a mineral acid,
an organic acid, a structural protein or an antimicrobial agent or a
combination thereof.**

The TPR's position is adopted as set forth at page 42 of the '003 request and is

reiterated below.

Claim 67 does not require the addition of a non-dairy ingredient, but even if it did,

Rhodes '809 discloses that addition of "OptaGrade® modified starch texturizer" to the

curd (col. 26, lines 54 - 58), and the present patent states that starches qualify as

"functional carbohydrates" (Dahlstrom '526, col. 4 lines 50 - 52).  Also, Rhodes '809

discloses the addition of "a proteolytic enzyme termed AD52" to the curd (col. 34, lines

49 - 52).  ("Protease means proteolytic enzyme.)

**Claim 68.    The process of claim 62 wherein the dairy ingredient is either
milk, cream, yogurt, skim solids, or cheese that is dry, condensed, fluid,
unripened, fermented or pH reduced or any combination thereof.**

The TPR's position is adopted essentially as proposed as found at page 42 of the '003 request.  The TPR's teaching about Rhodes '809 is adopted for this anticipation rejection while the teachings of Barz '625 are not required in this rejection.

The Requester states that "This claim does not require the addition of a dairy ingredient, but even if it did, Rhodes '809 discloses 'numerous other enhancing agents' can be used (column 59, lines 63 - 66)."  It is agreed that claim 68 does not positively require the addition of a dairy ingredient.  Thus, the teaching by Rhodes '809 of the addition of the sodium citrate emulsifying ingredient (column 26, lines 65 - 68 and column 27, lines 1 - 6) anticipates claim 68, because claim 62, from which claim 68 depends, requires adding a cheese emulsifying salt, a non-dairy, or a dairy ingredient or any combination thereof prior to mechanical working.

> **Claim 69.      The process of claim 62 wherein the emulsifying salt, the dairy ingredient or the non-diary ingredient if in dry form is mixed in an aqueous solution containing about 5 to 50% by weight of the emulsifying salt, the diary ingredient or the non-diary ingredient.**

The TPR's position at page 43 of the '003 request is adopted and is reiterated below.

Rhodes '809 combines the sodium aluminum phosphate and sodium citrate in an aqueous solution containing 6 lbs. of salt and 15 lbs. of water which gives a concentration of 40 wt% at column 26, line 65 through column 27, line 6.

**Claim 89** differs from claim 1 by replacing step (g) with the following limitation:

> **"adjusting pH of the curd to a range of approximately 5.0 to 5.4 after the whey is drained."**

Application/Control Number: 95/000,003; 90/006,317                    Page 44
Art Unit: 3991

The TPR's position is adopted essentially as proposed as found at page 33 of the
Comments of July 3, 2002 with respect to Rhodes '809 only and is reiterated below.
The other references mentioned by the TPR are not required in this anticipation
rejection over Rhodes '809.

Claim 89 has been amended to require that the pH of the curd be adjusted to
about 5.0 to 5.4 after the whey is drained, but before the curd is mechanically worked.
However, Rhodes '809 anticipates claim 89 in disclosing that before mechanically
working the curd, various ingredients were infused into the curd and a pH of 5.38 is
achieved (column 26, lines 35 - 68, column 27, lines 1 - 10).  The mechanical working of
the curd occurred after the pH was adjusted because the rpm of the infuser was
increased to 8 rpm after the addition of the ingredients, which is considered to be
different than the infusing state because the higher rpm is required to "work the curd"
(column 27, lines 23 - 25).  (See TPR's arguments with regard to the rejection of claim 1
in the "Response to Argument" section of this Action Closing Prosecution for a thorough
discussion of "adding ingredients prior to mechanical working of the curd.")

**Claim 90.      The process of claim 89 wherein the curd is comminuted
to a selected size.**

The TPR's position is adopted as found at page 51 of the '003 request and is
reiterated below.

Rhodes '809 discloses dicing the curd "to reduce the size to approximately ¼
inch by ¼ inch by ¼ inch long."   See column 34, lines 22 - 25.

**Claim 91.    The process of claim 89 wherein the coagulum is heated after being cut to facilitate moisture removal from the curd.**

The TPR's position is adopted as found at page 51 of the '003 request and is reiterated below.

Rhodes '809 discloses heating the cut curd to 116° F at column 23, lines 20 - 25.

**Claim 92.    The process of claim 89 wherein the milk composition is fresh milk.**

The TPR's position is adopted as found at page 51 of the '003 request and is reiterated below.

Rhodes '809 discloses using "standardized Jersey milk" direct from the pasteurizer at column 22, line 66 through column 23, line 1.

**Claim 95.    The process of claim 89 wherein the cheese has a final moisture content in the range of about 20 to about 90 weight percent.**

The TPR's position is adopted as found at page 52 of the '003 request which is reiterated below.

Rhodes '809 discloses a mozzarella cheese with a moisture content of 50.04% at column 24, lines 23 - 26.

**Claim 96.    The process of claim 95 wherein the cheese has a final moisture content in the range of about 30 to 60 weight percent.**

The TPR's position is adopted as found at page 52 of the '003 Request and is which is reiterated below.

Rhodes '809 discloses a mozzarella cheese with a moisture content of 50.04% at column 24, lines 23 - 26.

**Claim 97.    The process of claim 95 wherein the cheese final moisture content is adjustable by the addition of inert ingredients.**

The TPR's position is adopted as found at page 52 of the '003 request and is reiterated below.

Claim 97 does not *require* the addition of a moisture-adjusting ingredient, but even if it did, Rhodes '809 discloses that "[t]he addition of hydrocolloids or proteins allows for the incorporation of greater moisture in the cheese" at column 21, lines 44 - 45.

**Claim 98.    The process of claim 97 wherein the inert ingredients are either structural carbohydrates or silicates or a combination of both.**

The TPR's position is adopted as found at page 53 of the '003 request and is reiterated below.

Claim 98 does not require the addition of an inert ingredient, but even if it did, Rhodes '809 discloses that, in addition to hydrocolloids and proteins, "any other water controlling agents (i.e., starch) can be infused into the curd to prevent syneresis at column 21, lines 26 - 41.  Starch is a carbohydrate.

**Claim 99.    The process of claim 89 wherein the mechanical working of the curd is done in a waterless cooker.**

The TPR's position is adopted as found at page 53 of the '003 request and is which is reiterated below.

Rhodes "809 discloses that, by working the mozzarella curd in infuser 186 in the manner described, "cooker water was eliminated at column 28, lines 63 - 67.

Application/Control Number: 95/000,003; 90/006,317                    Page 47
Art Unit: 3991

**Claim 100.   The process of claim 89 further and including: cooling the cheese after the cheese is formed into the selected shapes.**

The TPR's position is adopted as found at page 53 of the '003 request and is reiterated below.

Rhodes '809 discloses that the cheese that is shaped in molding tube 320 is cooled in stages to cause it to solidify at column 20, lines 63 through column 21, line 4.

**Claim 101.   The process of claim 100 and further packaging the cooled cheese.**

The TPR's position is adopted as found at page 53 of the '003 request and is reiterated below.

Rhodes '809 discloses that it is conventional for cooled cheese to be sent to a "wrapper" (Fig. 1 and column 10, lines 25 - 27.).

**II.     Claims 5, 6, 93, and 94 are rejected under 35 U.S.C. 103(a) as being unpatentable over Rhodes '809 in view of Yee '943.** The TPR's position at pages 18 and 52 of the '003 Request is adopted and summarized below.

Claims 5 and 6 depend from independent claim 1, and claims 93 and 94 depend from independent claim 89.  The processes of claims 1 and 89 are anticipated by Rhodes '809 as explained previously pages 22 - 25 and 44 - 45.   Claims 5 and 93 further require that the milk composition is recombined milk.  Claims 6 and 94 depend from claims 5 and 93, respectively, and additionally require that the "recombined milk is prepared from either protein concentrate, acid casein, rennet casein, caseinates, nonfat

dry milk, whey, whey protein concentrate, whey protein isolate, cream, or condensed

milk or any combination thereof."

Rhodes '809 discloses a process for manufacturing a pasta filata cheese or a

mozzarella-like cheese as defined by independent claims 1 and 89 and set forth at

pages 23 - 25 and 44 - 45 of this Office action.    Rhodes '809 further teaches that this

process may include mixing the cheese curd with enhancing agents using standardized

Jersey milk (abstract and column 22, line 66 - column 23, line 1).

Rhodes '809 does not teach the use of reconstituted milk in the process for

preparing an enhanced cheese product in place of the standardized Jersey milk.

However, Yee '943 discloses that the feedstock for making pasta filata-type cheese can

be reconstituted milk that is "synthesized by combining the necessary . . . reconstituting

ingredients" that includes sodium or calcium caseinate and whey protein (column 5,

lines 40 - 46).   Mozzarella  is a type of pasta-filata cheese (column 1, lines 18 - 30 of

Yee '943).  Therefore, it would have been obvious to the person of ordinary skill in the

art at the time of the invention to substitute recombined milk that is prepared from

caseinate or whey protein as taught by Yee '943 for the "Jersey milk" used by Rhodes

'809 in the process for preparing mozzarella cheese as an acceptable alternative

ingredient that will still produce mozzarella of acceptable quality.

III.    **Claims 13, 14, 23, 45, 46, 47, 49, and 68 are rejected under 35 USC**

**103(a) as being unpatentable over Rhodes '809 in view of Barz '625.**  The TPR's

position at pages 21 - 22, 24, 33 - 35, and 42 of the '003 Request regarding the

obviousness rejection over Rhodes '809 in view of Barz '625 is adopted and

summarized below.

Claims 13 and 14 depend directly from independent claim 1.  Claim 23 depends

from claim 21, which in turn, also depends from independent claim 1.   Claims 46 and

49 depend from independent claim 36.  Claim 45 depends from claim 44, which in turn,

depends from claim 36.  Claim 47 depends from claim 46.    Claim 68 depends from

independent claim 62.

Regarding claims 13, 46, and 68, the TPR's position on pages 21, 34, and 42 of

the '003 Request is adopted and summarized below.  Claims 13, 46, and 68 depend

from independent claims 1, 32, and 62, respectively.  All of the limitations of indepen-

dent claims 1, 32, and 62 are met by Rhodes '809 as set forth previously in the rejection

under 35 USC 102(e) as anticipated by Rhodes '809 at pages 22 - 25, 34 - 35, and 40 -

41of this Office action.  Claims 13, 46, and 68 further require that the dairy ingredient of

the process of independent claims 1, 36 or 62 is "either a milk, cream, yogurt, un-

ripened, fermented or pH reduced or any combination thereof."   Claims 13, 46, and 68

do not require the addition of a dairy ingredient because the independent claims from

which they depend permit the addition of emulsifying salts, non-dairy ingredients as well

as dairy ingredients.

Rhodes '809 fails to teach the various dairy ingredients specified by claims 13,

46, and 68, but does disclose that "numerous other enhancing agents" can be used in

the process (column 59, lines 63 - 66) generally.  Furthermore, Barz '625 discloses that

it is known to add "nonfat dry milk" (another name for "skim solids") to mozzarella

cheese as claimed above for the function of firming the cheese, binding the water,

improving the melt appearance of the cooked cheese and/or increasing the blistering of

the cooked cheese.  Therefore, it would have been obvious to one of ordinary skill in the

art  at the time of the invention to have added known dairy ingredients taught by Barz

'625 to the curds of Rhodes '809 because Rhodes '809 invites the inclusion of

numerous other enhancing agents and Barz '625 discloses the benefits of adding nonfat

dry milk to mozzarella cheese.

Rhodes '809 teaches all of the limitations of claims 21, 22, and 36 as stated supra

in the rejection under 35 USC 102(e) as being anticipated by Rhodes '809.   Rhodes

'809 discloses that it is conventional (prior art) for a cheese-molding device to be

configured to form forty-pound blocks of cheese (column 10, lines 16 - 18).  Rhodes

'809 also discloses a molding device (Fig. 10 and column 21, lines 5 - 21).  Rhodes '809

further teaches that "numerous other enhancing agents" can be used (column 59, lines

63 - 66).  Claims 23 and 49 differ from Rhodes '809 in forming the cheese into either a

circular, oval or rectangular cross-sectional shape of a particular size and width, which

is (1/4 to 15) inches in diameter or width, or both in a horizontal or vertical plane.

Rhodes '809 discloses a block of cheese of unknown size in Fig. 10.

Barz '625 discloses that a continuous ribbon (of mozzarella cheese), which will

preferably be rectangular in cross section, may be cut into loaves, having a width of

about (12 - 36) inches and a height of about (1/2 to 2) inches and length of about (14 -

24) inches (Barz '625, column 7, lines 44 - 48).  These dimensions fall within the

claimed range.  Therefore, it would have been obvious to the person of ordinary skill in

the art to have molded a cheese to a smaller size as taught by Barz '625 in the process

of Rhodes '809 who also uses a molding device.

The TPR's position is adopted with respect to claims 14, 45 and 47 as found in

the '003 Request at pages 22 and 33 - 34 and is summarized below.  Claims 14, 45

and 47 require that the non-dairy or dairy ingredient, respectively, be mixed in an

aqueous solution containing about (5 to 50)% of the non-dairy ingredient.  Claims 14, 45

and 47 differ from Rhodes '809 in mixing the non-dairy or diary ingredient in particular

amounts to the aqueous solution.  These claims do not require the addition of the non-

dairy ingredient, but if they did, Barz '625 discloses adding starch mixed with water to

the mozzarella cheese (column 5, lines 40 - 41).  Although no particular concentration is

mentioned, it would have been obvious to use a concentration within the range of (5 -

50)% because Barz '625 discloses precisely that range when pre-dissolving another

non-dairy ingredient (an emulsifying agent) in water, prior to adding it to the cheese

mass (column 3, lines 23 - 27).  Also, Rhodes '809 premixes the proteolytic enzyme (a

non-dairy ingredient) with water (column 34, lines 49 - 52).  Furthermore, Barz '625

discloses mixing the dairy ingredient with water prior to adding to the curd (column 4,

lines 24 - 25).  Therefore, it would have been within the skill of the ordinary artisan to

have used a particular concentration of the non-dairy or dairy ingredient to achieve a

particular amount of the non-dairy or dairy ingredient in the product.  Additionally it

would have been obvious to add non-dairy ingredients such as the starch or dairy

ingredients or the emulsifying agents as taught by Barz '625 in particular concentrations

to the cheese curd mixture of Rhodes '809 for the purpose of affecting the character-

Application/Control Number: 95/000,003; 90/006,317                    Page 52
Art Unit: 3991

istics of the curd.  Optimizing result effective variables such as concentration is well

within the skill of the artisan (*In re Boesch*, 617,  F2d 272, 205 USPQ 215 (CCPA 1980)

at MPEP 2144.05(II).

     IV.    **Claims 24, 33, 39, and 50 are rejected under 35 USC 103(a) as being**

**unpatentable over Rhodes '809 in view of Rizvi '398.**  The TPR's position at pages

24, 28, 32, and 35 of the '003 Request is <u>adopted</u> and summarized below.  No further

position has been set forth by the Patentee nor the TPR. Therefore, this rejection is

maintained.

     Claims 24, 33, 39, and 50 depend from independent claims 1, 26, and 36,

respectively.  All of the limitations of each of these independent claims is disclosed by

Rhodes '809 as set forth in the rejection under 35 USC 102(e) as anticipated by Rhodes

'809 at pages 22 - 25, 32, and 33 - 34 of this Office action.

     Rhodes '809 further discloses forming impregnated cheese curds into a desired

form (Figs. 4 and 5).  However, Rhodes '809 does not show a forming apparatus, which

extrudes the cheese directly into the packaging as in claims 24, 33, and 50 (column 21,

lines 22 - 29 and column 24, lines 24 - 35).  The TPR ('003 request at page 32) states

that Rizvi '398 does disclose extruding processed mozzarella directly into sterilized

containers (column 6, lines 40 - 42). Therefore, it would have been obvious to one

having ordinary skill in the art at the time of the invention to have extruded a cheese

directly into packaging instead of cutting the cheese after extruding as disclosed by

Rhodes '809 for improved efficiency and sterility.

Claim 39 requires that the cheese is packaged hot and then cooled. Rhodes

'809 discloses extruding the cheese, which is then cut (column 21, lines 25 - 29, Fig. 10,

see cut block of cheese after 330B). The TPR ('003 request at page 32) states that

Rizvi '398 discloses extruding the hot cheese directly into sterilized containers and then

seals and cools the containers (column 6, lines 40 - 45). Therefore, it would have been

obvious to one having ordinary skill in the art at the time of the invention to have

extruded a hot cheese directly into packaging and then cooling said cheese as taught

by Rizvi '398 instead of cutting the cheese after extruding as disclosed by Rhodes '809

for improved efficiency and sterility.

V.    **Claim 30 is rejected under 35 USC 103(a) as being unpatentable over**

**Rhodes '809 in view of Rizvi '398 and Barz '625.**   The TPR's position at page 27 of

the '003 request with regard to claim 30 is adopted and summarized below.

Claim 30 depends from claim 29, which, in turn, depends from claim 26. Rhodes

'809 discloses all of the limitations of claims 26 and 29 as stated supra in the rejection

under 35 USC 102(e) as anticipated by Rhodes '809.

Rhodes '809 further discloses a process of making an enhanced cheese product

by mixing an enhancing agent into the curd and applying negative pressure to the

mixture to draw the enhancing agent into curds (abstract). However, claim 30 requires

the use of an aqueous solution, which is mixed into the curd for a period of time ranging

from (2 - 60) minutes prior to heating the curd. Rhodes '809 does not disclose the

particular time of mixing the aqueous solution into the curd before heating the curd.

However, Rizvi '398 discloses blending the emulsifying salt  (sodium citrate) into the

curd prior to heating the curd (column 6, lines 5 - 10). Barz '625 discloses mixing an

emulsifying salt into mozzarella cheese for approximately two minutes (column 10, lines

26 - 28).   The Rhodes '809 process is directed to infusing ingredients into the curds

while the infuser is turning at 4 - 5 rpm (column 26, lines 24 and 25). It would have

been within the skill of the ordinary worker to mix the solution long enough to blend the

ingredients, otherwise the mixture would not have been blended evenly into the curd

mixture. Therefore, it would have been obvious to blend an aqueous salt mixture in the

curd mixture for a predetermined time to blend the mixture evenly, and for at least 2

minutes, as disclosed by Barz '625. No amendment was made to this claim, and

neither the Patentee nor the TPR sets forth further positions. Thus, this rejection is

maintained.

VI.    **Claim 37 is rejected under 35 USC 103(a) as being unpatentable over**

**Rhodes '809 in view of Pontecorvo '241.** The TPR's position at page 31 of the '003

request is adopted only with regard to the proposed obviousness rejection of claim 37

over Rhodes '809 in view of Pontecorvo '241, which is set forth below.   Claim 37

depends from independent claim 36, which has been rejected under 35 USC §102(e)

over Rhodes '809. Claim 36 requires that the process for preparing a pasta filata

cheese or a mozzarella-like cheese comprise among other steps "heating the curd to a

range of approximately 130 to 160°F" and "mechanically working the cheese curd into a

fibrous mass" without specifying any order for these steps.  (See MPEP 2111.03

regarding transition phrases.)  However, claim 37 further requires that the "heating" and

"mechanically working" steps be separate and distinct.

Rhodes '809 discloses a process of making an enhanced cheese product by mixing a cheese curd with an enhancing agent such as whey protein in an infuser and developing a vacuum to allow the whey protein to be infused into the curd. According to Rhodes '809, the curd is heated to a temperature of 115°F, the infuser is turned on, anda vacuum is drawn thereby infusing the curd with the enhancing agent (abstract and column 26, lines 24 - 54).   Refer to the TPR's arguments with respect to claim 1 in the "Response to Argument" section in this ACP for a complete analysis of "working the curd." Claim 37 differs from Rhodes '809 because the steps of "heating the curd to 130°F to 160°F" and the "mechanically working the cheese into a fibrous mass" are in separate and distinct steps. Pontecorvo '241 discloses a process of making mozzarella cheese in which the curd is first heated to a temperature in the range of (122 - 130) °F, then is kneaded in unheated equipment until it acquires the "completely plasticized, homogeneous consistency which is characteristic of Mozzarella cheese" (column 1, line 70 to column 2, line 3; column 7, line 6 - column 8, line 5).   Therefore, it would have been obvious to one of ordinary skill in the art at the time of the invention to modify the process of Rhodes '809 by heating the cheese and then working it into a fibrous mass in separate and distinct steps as taught by Pontecorvo '241 to improve homogeneity in the cheese product.

No further positions were set forth by Patentee or the TPR and no amendment was made to these claims since February 28, 2003. Thus, this rejection is maintained.

VII.    **Claims 52 - 56, 58 and 61 are rejected under 35 USC 103(a) as being**

**unpatentable over Rhodes '809 in view of Dansco '359.** The TPR's position at

pages 35 - 39 and 55 - 57 of the '003 Request is adopted and summarized below.

Rhodes '809 discloses an improved system for making mozzarella cheese by

providing milk having a fat content of 4.67% and a protein content of 4.99% and the

further, the process steps as outlined at pages 35 - 37 of the '003 request.  Independent

claims 52 and 104 differ from the process of Rhodes '809 in the step of acidifying the

milk composition, and pasteurizing the milk composition after acidification.  Rhodes '809

acidifies the milk composition with lactic acid and rennet and then pasteurizes the milk

(Rhodes '809; column 23, lines 11 - 20 and 46 - 47).

Dansco '359 discloses adding acetic acid/or phosphoric acid to the raw milk

when making mozzarella cheese (pages 17 - 18) and discloses pasteurizing milk after

acidifying it  (page 6, lines 40 - 42; page 17, line 10).    No patentable distinction is

created by adjusting the pH of the curds with acid as defined in the claims, instead of

with acid and rennet as taught by the Rhodes '809 patent, because milk is coagulated

and curds are thus produced by each method.  No evidence has been presented to

demonstrate that a different product will be produced when the milk is coagulated with

acid and rennet instead of acid alone.  Therefore, it would have been obvious to the

person of ordinary skill in the art at the time of the invention to acidify the milk and then

pasteurize the mixture as disclosed by Dansco '359 in the process of Rhodes '809 in

order to make cheese curds.

Claim 52 was amended to require that ingredients were added "prior to mechanically working the curd." The positions of the Patentee, the TPR as in the '6317 Request and the Examiner are set forth under the 102(e) rejection where claims 26 - 29 and 36 are discussed at pages 30 - 32 in this document. *(A full interpretation of the phrase "prior to mechanically working" is presented in this ACP in the "Response to Argument" section with regard to claim 1.)* Therefore, it would have been obvious to add ingredients "prior to mechanical working" in the process of Rhodes '809. The TPR's position is found in the Comments of July 3, 2002, in the '003 request at pages 12 - 15 and is adopted as to claim 52.

Claim 53 further requires that the emulsifying salt is an alkaline earth salt. Rhodes '809 discloses the addition of sodium aluminum phosphate and sodium citrate to the curd (column 26, line 65 - column 27, line 6). The TPR's position is adopted at pages 37 and 56 of the '003 request. Therefore, it would have been obvious to the person of ordinary skill in the art at the time of the invention to add emulsifying salts such as sodium citrate to the composition as disclosed by Rhodes '809 for the purpose of producing a homogenous mixture.

Claim 54 further requires that the alkaline earth salt can be sodium salt. Rhodes '809 discloses adding sodium citrate to the curd (column 26, line 65 to column 27, line 6). The TPR's position at pages 37 - 56 of the '003 Request is adopted. Therefore, it would have been obvious to the person of ordinary skill in the art at the time of the invention to use known emulsifying salts in the claimed process as disclosed by Rhodes '809 for the purpose of preparing a homogenous solution.

Claim 55 requires that the salt is mixed in the form of an aqueous solution in a particular amount, i.e., (5 - 50)%. Rhodes '809 combines the sodium aluminum phosphate and sodium citrate in an aqueous solution containing 6 lbs. of salts (4 lb. of sodium aluminum phosphate and 2 lbs of sodium citrate) and 15 lbs of water (which gives a concentration of 40 wt.%) (column 26, line 65 to column 27, line 6). The TPR's position at pages 38 and 57 of the '003 request is adopted. Therefore, it would have been obvious to the person of ordinary skill in the art at the time of the invention to combine the salts in the claimed amounts as shown by Rhodes '809 for the purpose of preparing a homogenous solution.

Claim 56 further requires that the cheese have a moisture content in the range of 40 - 60% after being formed into the selected shape. Rhodes '809 discloses a mozzarella cheese product with a moisture content of 50.04% (column 24, lines 23 - 26). This position of the TPR in the '003 request (pages 38 and 57) summarize above is adopted. Therefore, it would have been obvious to the person of ordinary skill in the art at the time of the invention to make a mozzarella cheese product within the claimed moisture range of (40 - 60)%, as taught by Rhodes '809.

Claim 58 further requires that the temperature of the curd is about (20 to 160) °F when adding the emulsifying salts. Rhodes '809 discloses that the curd is at a temperature of 115° F when the emulsifying salts are added (column 26, line 48 to column 27, line 1). The TPR's position in the '003 request (pages 38 and 57) is adopted. Therefore, it would have been obvious to the person of ordinary skill in the art

at the time of the invention to add the emulsifying salts at a temperature within the claimed range as taught by Rhodes '809 to promote infusion of the enhancing agent.

Claim 61 further requires that the cheese produced by the process of claim 30 be characterized by a shelf life of up to six months.  Rhodes '809 discloses that its cheese continued to perform well on pizzas after 60 days of storage, which is within the claimed shelf life. (column 28, lines 46 - 51).  The TPR's position at page 39 of the '003 Request is adopted.  Therefore, it would have been obvious to the person of ordinary skill in the art to make a cheese product with the claimed shelf life as disclosed by Rhodes '809.

VIII.    Claim 60 is rejected under 35 USC 103(a) as being unpatentable over Rhodes '809 in view of Dansco '359 as applied to claims 52 - 56, 58 and 61 and further in view of Lindgren '666.

Note that the previous indication of the patentability of claim 60  (paragraph 20 at pages 25 - 26 in the non-final Office action mailed April 4, 2002) was withdrawn in favor of the rejection using Lindgren '666 as set forth below.

The position of the TPR as set forth in the Reply of July 3, 2002, is found on pages 4 and 5, part B, and pages 44 and 45 of the claims chart and is adopted and summarized below.  Claim 60 further requires forming the cheese into selected shapes by forming the cheese onto a chill roll or continuous belt.  Lindgren '666 discloses extruding a ribbon of warm pasta filata cheese onto a continuous belt, following which the cheese is stacked onto similar cheese ribbons and formed into a selected shape (column 10, lines 1 - 51; column 11, lines 15 - 42; and Figs. 4 and 9).  As acknowledged

at column 1, line 6 of the Dahlstrom '526 patent, mozzarella is a pasta filata cheese.

The extrusion of a "ribbon" is deemed to have been a matter of design choice in

extruding a selected shape.   Therefore, it would have been obvious to the person of

ordinary skill in the art at the time of the invention to extrude the pasta filata cheese into

selected shapes as taught by Lindgren '666 in the process of Rhodes '809 in view of

Dansco '359 because Rhodes '809 teaches extrusion, and whether extrusion is used to

make blocks or ribbons is a matter of design choice, as the product is still being

extruded to form a selected shape (column 24, lines 26 - 36 of Rhodes '809).

The rejection of claim 52 was set forth by the examiner adopting the position of the TPR

at pages 15 - 16 in the Comments of July 3, 2002 of the '003 reexam.   A previous

Office action (paragraph 20 of non-final mailed April 4, 2002) contained the statement

that claim 60 was deemed patentable over Rhodes '809 in view of Dansco '359 and

Telford '459. .However, claim 60 depends from claim 52.  The patentability of claim 60

was withdrawn in the previous Office action and claim 60 was included in this rejection

as obvious over Rhodes '809 in view of Dansco '359 and Lindgren '666.

   **IX.   Claim 57 is rejected under 35 USC 103(a) as being unpatentable over**
**Rhodes '809 in view of Dansco '359, Rizvi '398, and Barz '625.**

   Claim 57 depends from claim 52, which has been rejected as obvious over

Rhodes '809 in view of Dansco '359 above.

   Rhodes '809 discloses a process for making an enhanced cheese product by

mixing an enhancing agent into the curd in an infuser-type apparatus and applying

negative pressure to the mixture to draw the enhancing agent into the curds while the

infuser is turning (abstract and column 26, lines 24 - 25).  The reference to Dansco '359

has been added to Rhodes '809 in order to disclose a method of acidifying the milk and

heating the mixture before pasteurization as required in base claim 52.  Claim 57

requires mixing an aqueous solution into the curds for (2 to 60) minutes before heating

the curd.  Rhodes '809 differs from the reference in the particular time of mixing the

aqueous solution into the curd before heating the curd. However, Rizvi '398 discloses

blending the emulsifying salt (sodium citrate) into the curd prior to heating the curd

(column 6, lines 5 - 10).  Barz '625 discloses mixing an emulsifying salt into mozzarella

cheese for approximately two minutes (column 10, lines 26 - 28).  This rejection with

respect to Rizvi '398 and Barz '625 was proposed by the TPR at pages 38 and 58 of the

'003 Request, and it is adopted.  It would have been within the skill of the ordinary

worker at the time of the invention to have mixed the solution long enough to blend the

ingredients, otherwise the mixture would not have been blended evenly into the curd

mixture.  Therefore, it would have been obvious to blend an aqueous salt mixture into

the curd mixture for a predetermined time to blend the ingredients evenly, and for at

least two minutes as disclosed by Barz '625 and to heat the curd after blending in

ingredients as disclosed by Rizvi '398.

**X.    Claims 59 is rejected under 35 USC 103(a) as being unpatentable**

**over Rhodes '809 in view of Dansco '359 and Rizvi '398.**  Rhodes '809 teaches a

process of combining enhancing ingredients with a cheese curd to make an enhanced

cheese product (abstract).  Claim 59 requires that the cheese is formed into the

selected shape by being extruded into packaging.  Claim 59 differs from the reference to Rhodes '809 in view of Dansco '359 in the step of extruding the cheese directly into the packaging.  The TPR's position (at page 49 of Comments of May 24, 2005) is that Rizvi '398 discloses extruding processed mozzarella cheese directly into sterilized containers (column 6, lines 40 - 42).  The TPR's position as to claim 59 at pages 39 and 58 of the '003 request is adopted.  These are essentially the TPR's positions found at pages 39 and 58 in the '003 request and are now adopted.  Therefore, it would have been obvious to the person of ordinary skill in the art at the time of the invention to use an aqueous solution containing an enhancing agent such a whey or emulsifying salts prior to heating the curds and to extruding directly into a package as taught by Rizvi '398 in order to maintain sterile packaging conditions.

The position of the Patentee as set forth in the Patent Owner's Statement of October 2, 2002, in reexam '6317, is that the limitation of claim 52 and 104 have not been shown; therefore, the combination of Rhodes '809 with Dansco '359, Rizvi '398 or Barz '625 cannot render obvious the process described by claims 52 - 60 and 114 - 123 and 125 - 133.  This argument has been fully considered but is not deemed persuasive because the limitations as to claim 52 have been shown as being anticipated in the 102(e) rejection.  The combination of extruding the cheese into the packaging as in claim 59 has been discussed above and is obvious for those reasons.  No further position from the TPR in reexams '003 or '6317 is presented and the previous rejection is maintained for claim 52.

XI.    **Claim 10 is rejected under 35 USC 103(a) as being unpatentable over Rhodes '809 in view of Barz '625 or Rizvi '398.**

Claim 10 depends from claim 1 and further requires that a non-dairy ingredient is added to the curd prior to mechanical working.  The TPR's position at page 20 of the '003 request is adopted and summarized below.

Rhodes '809 loads the infuser with inter alia (a) a mixture of one or more probiotic preserving agents (non-diary products) and water, (b) a mixture of whey protein and water, and (c) mozzarella curd, and then starts turning the infuser (column 14, lines 61 - 66).  Claim 10 differs from the reference, for the sake of argument, by requiring that a non-dairy ingredient is added to the curd prior to mechanical working. Barz '625 discloses the mixing of starch into mozzarella curd either prior to or during the heating, kneading and stretching of the curd (column 3, lines 65 - 66).  Rizvi '398 discloses adding sodium citrate (a non-dairy ingredient) to mozzarella curd prior to stretching and cooking the curd (column 6, lines 5 - 10).  Therefore, it would have been obvious to the person of ordinary skill in the art at the time of the invention to modify the process of Rhodes '809 by adding non-dairy ingredients to the curd before mechanically working the curd as disclosed by Barz '625 and Rizvi '398 for the purpose of achieving thorough mixing of the curd and the additive prior to mechanical working.

XII.    **Claim 12 is rejected under 35 USC 103(a) as being unpatentable over Rhodes '809 in view of Rizvi '398.**  (The Patent Owner omitted this rejection from the listing on page 7 of the amended Appellant's brief.)

Claim 12 depends from claim 10, which in turn depends from claim 1.

Claim 12 adds to claim 10 the further limitation "wherein the non-dairy ingredient if in dry form is mixed in an aqueous solution containing about five to fifty percent by weight of the dairy[sic; nondairy] ingredient."

Rhodes '809 discloses that, instead of preserving agents and yield-enhancing agents, "other combination of enhancing agents" can be added to the curd prior to working it (column 14, lines 5 - 28). Specifically mentioned are "melt and string enhancing agents" (column 21, lines 59 - 61) such as sodium citrate and sodium aluminum phosphate, which are non-dairy ingredients that improve the "meltability of cheese" (column 27, lines 64 - 67) and these agents can be first dissolved in water at a combined concentration of 6 lbs. per 15 lbs. of water, i.e., a 40 wt. % solution (column 26, line 65 - column 27, line 1). The TPR's position is found at page 21 of the '003 request and is adopted and summarized above.

Claim 12 differs from Rhodes '809, for the sake of argument, in the particular amount of non-dairy ingredient, which is in a dry form, which is mixed with an aqueous solution. However, Rhodes '809 discloses 6 lbs (sodium citrate plus sodium aluminum phosphate) per 15 lbs of water or a 40% solution, which amount is within the required range. Moreover, it would have been obvious to the person of ordinary skill in the art at the time of the invention to use a known amount of non-dairy ingredient in the claimed composition for the purpose of gaining the advantage of improved meltability.

The TPR's position with respect to claim 10 at page 20 of the '003 request is adopted and summarized below.  The TPR states, "Rizvi '398 discloses adding citrate (a non-dairy ingredient) to mozzarella curd prior to stretching and cooking the curd" (column 6, lines 5 - 10).  Therefore, it would have been obvious to the person of ordinary skill in the art at the time of the invention to mix a non-dairy ingredient as shown by Rhodes '809 and Rizvi '398 in particular amounts as shown by Rhodes '809 and to add the mixture of emulsifying salts (sodium citrate) to the curds because the above references also disclose adding such ingredients to the mozzarella curd.

XIII.    Claims 70 - 73, 76 - 86, 114 - 116, 119 - 123 are rejected under 35 USC 103(a) as being unpatentable over Rhodes '809 in view of Anderson '158, Bottazzi '76, Hargrove '248, and Mid-America '106.

This ground of rejection was raised by the examiner in the previous Office action of 16 February 2005.  The position of the TPR as set forth at pages 3 - 4, part A, in the Comments of 3 July 2002, of the '003 reexam, is substantially adopted as to Hargrove '248 and Mid-America '106 and page 9 as to Bottazzi '76.  The TPR did not use Bottazzi '76 for claims 70 - 73, 76 - 86.  However, the examiner is citing this reference for the sake of consistency with regard to the other independent claim 114, which does contain the limitation as to "without aqueous immersion."  The reference to Anderson '178 was found in the '003 Request at pages 43 - 44.  The position of the TPR as set forth at pages 3 - 4 of the TPR Comments of  July 3, 2002 of the '003 request and at pages 15 - 19 of the Reply Statement of November 27, 2002 in the '6317 reexam, has also been fully considered and is found persuasive.

The previous indication of patentability of claims 70 - 88 was <u>withdrawn</u> in view of the interpretation of the claim language "via a starter medium" as presented by the TPR, at pages 15 - 19 of the '6317 request, which interpretation is agreed with and <u>is adopted</u>. Claim 15 has been canceled, which claim specifically required that the ingredients could be added "via a starter ingredient" to the curds. Patent claim 70 and new claim 114 now only require adding ingredients "via a starter culture medium prior to mechanical working."

The TPR's position in *inter partes* '003 Request, under "Comments on Issues. . . ," pages 2 - 4, <u>is</u> also <u>adopted</u> as being basically the same as in the Reply Statement of 27 November 2002 of the '6317 reexam, as explained above.

It should be noted that claims 70 and 114 further require that the various ingredients be added to the composition before mechanically working the curd "via a starter culture medium."   Refer to the "Response to Arguments" section with respect to claim 1 of this Office action for an explanation of the interpretation of the phrase "via a starter culture medium."   The Dahlstrom '526 patent discloses that a "microbial" starter" can be added to acidify the milk.   Dahlstrom '526 further discloses that an emulsifying salt (functional salt blend) may be an ingredient of the initial starter culture growth medium (column 4, lines 31 - 50).   Here, the initial starter culture growth medium is interpreted as being the same as the above "microbial starter".   The closest prior art, Anderson '158, discloses a culture media for producing bacterial starter cultures containing a citrate source (column 6, lines 5 - 21).   The citrate additive is a non-dairy ingredient.   Anderson '158 also discloses that citrates have been added to various

culture media to encourage bacterial growth (column 1, lines 9 - 21). Hargrove '248

discloses adding phosphates such as sodium phosphate to a starter medium (column 2,

lines 20 - 40). Phosphates are among the emulsifying salts disclosed in Dahlstrom '526

(column 12, lines 26 - 29). Mid-America '106 discloses a starter medium containing

whey, nonfat dry milk and lecithin (abstract). It is known that a starter medium is added

to milk in order to produce acidity and coagulation of the protein in milk to produce curds

(page 1, lines 15 - 30 in Mid-America '106). The term "bulk starter" is understood to

mean the same as "starter culture medium" since they both contain bacterial cultures.

Therefore, it would have been obvious to the person of ordinary skill in the art at the

time of the invention to add a cheese emulsifying salt and dairy ingredient or non-dairy

ingredient to a starter culture to the milk composition at the beginning of the process of

Rhodes '809, which must occur before "mechanically working the curd" because the

curd only forms after the addition of the starter culture.   The further limitations are

disclosed by Rhodes '809 at page 38 of the Comments by the TPR of July 3, 2002 and

are adopted.

    The TPR has added the reference of Bottazzi '76 for claim 114 to disclose

heating and stretching pasta filata curd without using water (Summary, 1.1 - 13, p. 323).

This is the TPR's position found at page 13 of the Comments by the TPR of July 3,

2002 and is adopted.   To be consistent, the examiner added this reference to the

rejection for claim 70 in the previous Office action of 16 February 2005. Even though

Bottazzi '76 used microwave energy to heat the cheese, the claim does not exclude this

type of heating. Rhodes '809 used heat provided by a water heater (column 15, lines 5

- 11).  There is no apparent patentable distinction between the two types of heating as they both heat the curd, which would make it more pliable.  Therefore, it would have been obvious to the person of ordinary skill in the art at the time of the invention to use a different type of heating in the process of Rhodes '809 in order to make the cheese stretch without the use of water, particularly since the claim does not require any particular type of heat.

Claims 71 - 73 and claims 76 - 86 correspond to claims 2 - 4, 7, 8, 11, 13, and 16 - 22.  Because the limitations of these claims have been disclosed by Rhodes '809, it would have been obvious to use them in the process of making cheese as claimed, as stated supra.

The limitations of claims 115, 116, and 119 - 120 have been discussed previously and are obvious for those reasons stated above.  Claims 115 and 116 correspond to claims 72 and 73 as above.  Claims 119 and 129 correspond to claims **76** and 77 as above.

Claim 121 requires that the salt composition if in dry form is mixed in an aqueous solution containing about (5 - 50) % by weight of the salt composition.  Rhodes '809 mixes the sodium aluminum phosphate and sodium citrate with water to yield an aqueous solution containing 6 lbs. of salts (sodium citrate and sodium aluminum phosphate) and 15 lbs. of water (which results in concentration of 40 wt %) ( column 26, line 65 - column 27, line 6).  This is the position of the TPR as set forth in the Comments of 03 July 2004 and is adopted.    Therefore, it would have been obvious to one of

ordinary skill in the art at the time of the invention to mix the salts with water to hydrate them before adding them to the curd.

Claim 122 requires that the non-dairy ingredient is added to the curd prior to mechanical working.  Mid-America '106 discloses that lecithin (a non-dairy ingredient) can be added to the starter culture.  As previously indicated, it is known to add starter cultures at the beginning of the cheese making process, since they help to develop the curd.  Therefore, it would have obvious to the person of ordinary skill in the art at the time of the invention to add a non-dairy ingredient, such as lecithin, to the curd prior to working as taught by Mid-America '106.  This is the position of the TPR as set forth in the Comments of 03 July 2004 and is adopted.

Claim 123 requires that the non-dairy ingredient be an anti-microbial agent. Rhodes '809 discloses that an enhancing agent, which can be an anti-microbial agent, can be added to the cheese curds before mechanically working (column 60, lines 1 - 20).  Therefore, it would have been obvious to add an anti-microbial agent to the composition before mechanical working.

XIV.   **Claims 125, 126 and 134 are rejected under 35 USC 103(a) as being unpatentable over Rhodes '809 in view of Anderson '158, Bottazzi '76 , Hargrove '248, and Mid-America '106 as applied to claims 70 - 73, 76 - 86, 114 - 116, 119 - 123 and 127 - 133 above, and further in view of Barz '625.**

The rejection of claims 125, 126 and 134 over Rhodes '809 in view of Anderson '158, Bottazzi '76, Hargrove '248 and Mid-America '106 and further in view of Barz '625

is adopted as proposed at pages 40 - 41 by the TPR in the Comments of July 3, 2002,
and is summarized below.

    Claim 125 depends from claim 114 and further requires that the dairy ingredients
can be various milk ingredients in variety of forms.  Barz '625 discloses that it is known
to add "nonfat dry milk" to mozzarella cheese as above for the function of firming the
cheese, binding water, improving the melt appearance of the cooked cheese and/or to
increase the blistering of the cooked cheese.  Therefore, it would have been obvious to
the person of ordinary skill in the art at the time of the invention to add known dairy
ingredients as taught by Barz' 625 to the curds of Rhodes '809 because Rhodes '809
invites the inclusion of numerous other enhancing agents and Barz '625 discloses the
benefits of adding nonfat dry milk to mozzarella cheese.

    Claim 126 depends from claim 125 and further requires that the dairy ingredient
be reconstituted to a particular weight.  Barz '625 discloses that the dairy ingredient can
be pre-mixed with water (column 4, lines 24 - 25).  Although no particular concentration
is mentioned, it would have been obvious to the person of ordinary skill in the art at the
time of the invention to use a concentration within the range of (5 - 50)% since Barz
'625 discloses precisely that range when pre-dissolving an emulsifying agent in water,
prior to adding it to the cheese (column 3, lines 23 - 27).   The optimization of a result
effective variable is within the skill of the person of ordinary ability in the art.  *In re
Boesch*, 617 f.2d 272, 205 USPQ 215 (CCPA 1980).  Therefore, it would have been
obvious to the person of ordinary skill in the art at the time of the invention to have

reconstituted a dairy ingredient when adding it to a cheese composition as shown by
Barz '625 in the process of Rhodes '809 and the combined references.

Claim 134 differs from Rhodes '809 in requiring that the cheese is formed into
either a circular, oval or rectangular cross-sectional shape of a particular size and width,
which is 0.25 inches to 15 inches in diameter or width, or both in a horizontal or vertical
plane. Rhodes '809 discloses a block of cheese of unknown size in Fig. 10. Barz '625
discloses that a continuous ribbon (of mozzarella cheese), which will preferably be
rectangular in cross section, may be cut into loaves, having a width of about (12 - 36)
inches and a height of about (0.5 to 2) inches and a length of about (14 - 24) inches
(column 7, lines 44 - 48). These dimensions are within the claimed range. Therefore, it
would have been obvious to the person or ordinary skill in the art at the time of the
invention to mold a cheese to a smaller size as taught by Barz '625 in the process of
Rhodes '809 who also uses a molding device.

**XV.   Claim 135 is rejected under 35 USC 103(a) as being unpatentable
over Rhodes '809 in view of Anderson '158, Bottazzi '76, Hargrove '248 and Mid-
America '106 as applied to claims 70 - 73, 76 - 86, 114 - 116, 119 - 123 above, and
further in view of Rizvi '398**

Claim 135 depends from independent claim 114 and further requires that the
cheese is formed into shape by being extruded directly into packaging.

Rhodes '809 discloses forming impregnated cheese curds into a desired form
(Figs. 4 and 5). Rhodes '809 does not show a forming apparatus, which extrudes the

cheese directly into the packaging as required by claim 135 (column 21, lines 22 - 29 and column 24, lines 24 - 35). The TPR states that Rizvi '398 discloses extruding processed mozzarella directly into sterilized containers (column 6, lines 40 - 42). Therefore, it would have been obvious to the person of ordinary skill in the art at the time of the invention to extrude the curds of Rhodes '809 into a package as shown by Rizvi '398 for the purpose of efficiency and sterility.

This is the position of the TPR as set forth at page 42 in the Comments of July 3, 2002 and is adopted.

**XVI.    Claim 136 is rejected under USC 103(a) as being unpatentable over Rhodes '809 in view of Anderson '158, Bottazzi '76, Hargrove '248, and Mid-America '106 as applied to claims 70 - 73, 76 - 86, 114 - 116, 119 - 123 above, and further in view of Yun '92 and Barbano '91.**

Claim 136 depends from independent claim 114 and further requires that the curd acidity is adjusted to a pH range of about 5.0 to 5.4.

Rhodes '809 discloses making the cheese curd, as set forth at pages 37 and 38 of the '003 TPR's comments of May 24, 2005, and heating the curd without aqueous immersion to an approximate temperature range of 130°F to 160°F, "mechanically working the curd" and forming the cheese into a selected shape. Rhodes '809 does not teach adjusting the acidity of the curd to a pH of about 5.0 to 5.4. However, Yun '92 teaches that "the optimal [curd] pH for stretching of mozzarella cheese (made with starter culture) is between 5.1 and 5.3" (page 3630, left column, lines 13 - 16). Barbano

'91 teaches that the "pH of the [mozzarella] curd at salting can be adjusted to achieve a range of desired pH at stretching" (page 2688, right column, third paragraph).  Therefore, it would have been obvious to the person of ordinary skill in the art at the time of the invention to adjust the pH of the curd an optimal pH of about 5.0 to 5.4 as taught by the Yun '92 and Barbano '91 in the process of  Rhodes '809 in view of Anderson '158, Bottazzi '76, Hargrove '248 and Mid-America '106.

This specific rejection of claim 136 <u>was created by the examiner</u> who added the Anderson '158 reference to the Rhodes '809 in view Bottazzi '76, Hargrove '248 and Mid-America '106 and further in view of  Barz '625 <u>is adopted</u> as proposed by the TPR in the Comments of TPR of July 3, 2002 at pages 37 - 38 and 42.

**XVII.   Claims 74, 75, 117, and 118 are rejected under 35 USC 103(a) as being unpatentable over Rhodes '809 in view of Anderson '158, Bottazzi '76, and Hargrove '248 and Mid-America '106 as applied to claims 70 - 73, 76 - 86, 114 - 116, 119 - 123, and 127 - 133 above, and further in view of Yee '943.**

Claims 74 and 117 depend from independent claims 70 and 114, respectively and further requires that the milk composition is recombined milk.  Claims 75 and 118 depend from claims 74 and 117, respectively, and further requires that the recombined milk is prepared from either protein concentration, acid casein, rennet casein, caseinates, nonfat dry milk, whey protein concentrate, whey protein, cream, or condensed milk.

Rhodes '809 discloses a process of making an enhanced cheese product by making a cheese curd, and mixing the cheese curd with enhancing agents using standardized Jersey milk (abstract and column 22, line 66 - column 23, line 1).  Rhodes '809 does not teach that the milk can be recombined milk.   Yee '943 discloses that the feedstock for making pasta filata-type cheese can be milk that is "synthesized by combining the necessary . . . reconstituting ingredients" (column 5, lines 40 - 46).  Mozzarella is a type of pasta-filata cheese (column 1, lines 18 - 30 of Yee '943).  Therefore, since it is known to use a recombined milk to make a mozzarella type cheese as taught by Yee '943, it would have been obvious to the person of ordinary skill in the art at the time of the invention to use recombined milk instead of regular milk in the process of Rhodes '809 who is also making a mozzarella type cheese.  No amendment was made to claims 74 and 75 by the Patentee and the TPR maintains this position at pages 43 - 45 in the '003 request of January 8, 2002 and at pages 30 and 39 in the Comments of July 3, 2002.  This position is adopted by the examiner.

**XVIII.  Claims 34 is rejected under 35 USC 103(a) as being unpatentable over Rhodes '809 in view of Lindgren (5,480,666).**

The position of the TPR as set forth in the *inter partes* '003 request in the Reply of July 3, 2002 at pages 4 and 5, part b and at pages 42 - 44 is adopted and summarized below.   Claim 34 depends from independent claim 26. Claim 34 requires forming the cheese into selected shapes by forming the cheese onto a chill roll or continuous belt.  Lindgren '666 discloses extruding a ribbon of warm pasta filata cheese onto a continuous belt, following which the cheese is stacked onto similar cheese

ribbons and formed into a selected shape (column 10, lines 1 - 51, column 11, lines 15 -

42; and Figs. 4 and 9).  As acknowledged at column 1, line 6, of the Dahlstrom '526

patent, mozzarella is a pasta filata cheese.  As acknowledged at column 1, line 6 of the

Dahlstrom '526 patent, mozzarella is a pasta filata cheese.  The extrusion of a "ribbon"

is interpreted to have been a matter of design choice in extruding a selected shape.

Therefore, it would have been obvious to the person of ordinary skill in the art at the

time of the invention to extrude the pasta filata cheese into selected shapes as taught

by Lindgren '666 in the process of Rhodes '809 because Rhodes '809 teaches

extrusion, and whether extrusion is used to make blocks or ribbons is a matter of

degree as the product is still extruded to form a selected shape (column 24, lines 26 -

36 of Rhodes '809).

   XIX.    Claims 25, 65, 89 - 92, and 95 - 101 are rejected under 35 USC 103(a)

as being unpatentable over Rhodes '809 in view of Yun '92, Barbano '91, and

Bottazzi '76.

   The TPR's position as set forth at pages 17, 28, and 33 - 35 of the Comments by

the TPR of July 3, 2002 is adopted and summarized below.

   Claim 25 depends from claim 1 and claim 65 depends from claim 64.  Claims 25

and 65 further requires that the pH of the curd is adjusted to between 5.0 and 5.4.

Rhodes '809 discloses making the cheese curd and heating the curd without aqueous

immersion to an approximate temperature range of 130° F to 160° F, "mechanically

working the curd" and forming the cheese into a selected shape.  Rhodes '809 does not

teach the adjustment of the pH of the curd to be between 5.0 and 5.4.   However, Yun

'92 does teach that "the optimal [curd] pH for stretching of Mozzarella cheese (made

with starter culture) is between 5.1 and 5.3" (page 3630, left column, lines 13 - 16).

Barbano '91 teaches that "the pH of the [mozzarella] curd at salting can be adjusted to

achieve a range of desired pH at stretching" (page 2688, right column, third paragraph).

Therefore, it would have been obvious to the person having ordinary skill in the art at

the time of the invention to have adjusted the curd of Rhodes '809 to the pH of 5.0 to

5.4 as taught by the Yun '92 and Barbano '91 in the process of Rhodes '809.

        Claim 89 is an independent claim which differs from the process of Rhodes '809

in the step of "adjusting pH of the curd to a range approximately 5.0 to 5.4 after the

whey is drained prior to mechanically working."    The limitations of claims 90 - 92 and

95 - 101 have been discussed in the 102(e) rejection over Rhodes '809 and at pages 32

- 33 of the Comments by the TPR filed May 24, 2005 are adopted and are obvious for

those reasons.  Therefore, as the pH for stretching of Mozzarella curd is known as

taught particularly by Yun '92, above, it would have been obvious to the person of

ordinary skill in the art at the time of the invention to adjust the pH of the curd in the

process of Rhodes '809 before mechanically working it in order to have the optimal pH

for the stretching of the curd.  Claim 89 also requires "heating the curd without aqueous

immersion."  The TPR has added the Bottazzi '76 reference to disclose heating and

stretching pasta filata curd without using water for claims 1 and 114.  (Summary, 1.1 -

13, p. 323).  The TPR's position with regard to the reference to Bottazzi '76 is found in

the Comments by the TPR of July 3, 2002, page 9.  To be consistent, the examiner has

added this reference to the rejection for claim 89. Even though Bottazzi '76 uses

microwave energy to heat the cheese, the claim does not exclude this type of heating.

Rhodes '809 uses heat provided by a water jacket (column 15, lines 5 - 11). No

patentable distinction is seen at this time between the two types of heating since they

both heat the curds, which would make them more pliable. Therefore, it would have

been obvious to the person of ordinary skill in the art at the time of the invention to use

a different type of heating as taught by Yun '92 in the process of Rhodes '809 in order to

make the cheese stretch without the use of water, especially because the claim does

not require any particular type of heat.

**XX.    Claim 102 is rejected under 35 USC 103(a) as being unpatentable**

**over Rhodes '809 in view of Yun '943 and Barbano as applied to claims 25, 65,**

**89 - 92, and 95 - 101 above, and further in view of Barz '625.**

Claims 102 depends from claim 100, which in turn, depends from independent

claim 89. Claim 102 further requires that the cheese is formed into various shapes with

a cross-sectional shape in a particular range. The TPR's position at page 54 of the '003

request and at page 35 of the Comments of July 3, 2002 is adopted and summarized

below.

Claim 102 differs from Rhodes '809 in forming the cheese into either a circular,

oval or a rectangular cross-sectional shape of a particular size and width, which is 0.25

inches to 15 inches in diameter or width, or both in a horizontal or vertical plane.

Rhodes '809 discloses a block of cheese of unknown size in Fig.10. Barz '625

discloses that a continuous ribbon (of mozzarella cheese) which will preferably be

rectangular in cross section, may be cut into loaves, having a width of about (12 - 36)

inches and a height of about (½ to 2) inches and a length of about (14 - 24) inches

(column 7, lines 44 - 48). These dimensions fall within the claimed range. Therefore, it

would have been obvious to the person of ordinary skill in the art at the time of the

invention to mold a cheese to a smaller size as taught by Barz '625 in the process of

Rhodes '809 who also uses a molding device in view of Yun '92 and Barbano '91.

**XXI.   Claim 88 is rejected under 335 USC 103(a) as being unpatentable
over Rhodes '809 as applied to claims 70 - 73, 76 - 86, 114 - 166, 119 - 123, and 127
- 133 above, and further in view of Anderson '158, Hargrove '248, and Mid-
America '106 and further in view of Rizvi '398.**

Claim 88 depends from claim 85, which, in turn, depends from independent claim

70.   Claim 88 further requires that the cheese is formed into shape by being extruded

directly into packaging. The position of the TPR as found at page 49 of the '003 request

is adopted and summarized below.

Rhodes '809 discloses forming impregnated cheese curds into a desired form

(Figs. 4 and 5). Rhodes '809 does not show a forming apparatus, which extrudes the

cheese directly into the packaging as in claim 88 (column 21, lines 22 - 29 and column

24, lines 24 - 35). The TPR states that Rizvi '398 discloses extruding processed

mozzarella directly into sterilized containers (column 6, lines 40 - 42).   Therefore, it

would have been obvious to the person of ordinary skill in the art at the time of the

invention to extrude the curds of Rhodes '809 into a package as shown by Rizvi '398 in

the process of the combined references (Anderson '158, Hargrove '248, and Mid-America '106) because Rhodes '809 requires that the impregnated cheese curds can be formed into a desired form. This desired form could have been the shape of the sterilized containers as taught by Rizvi '398.

**XXII.  Claim 103 is rejected under 35 USC 103(a) as being unpatentable over Rhodes '809 in view of Yun '943 and Barbano '91 as applied to claims 25, 65, 89 - 92 and 95 - 101 above, and further in view of Rizvi '398.**

Claim 103 depends from claim 100, which, in turn, depends from independent claim 89.  Claim 103 further requires that the cheese is formed into shape by being extruded directly into packaging.   The position of the TPR at pages 54 - 56 of the '003 request is adopted and is summarized below. The TPR states that Rizvi '398 discloses extruding processed mozzarella directly into sterilized containers (column 6, lines 40 - 42).   Therefore, it would have been obvious to the person of ordinary skill in the art at the time of the invention to extrude the curds of Rhodes '809 into a package as shown by Rizvi '398 in the process of the combined references (Yun 92' and Barbano '91) because Rhodes '809 teaches that the impregnated cheese curds can be formed into a desired form (Fig. 11).  This desired form could have been the shape of the sterilized container as disclosed by Rizvi '398 for the purpose of manufacturing efficiency and sterility.

**XXIII.  Claim 87 is rejected under 35 USC 103(a) as being unpatentable over Rhodes '809 in view of Anderson '158, Bottazzi, Hargrove '248, and Mid-America**

**'106 as applied to claims 70 - 73, 76 - 86, 114 - 116, 119 - 123, and 127 - 133 above, and further in view of Barz '625.**

Claim 87 depends from claim 85, which in turn, depends from independent claim 70. Claim 87 further requires that the cheese is formed in particular shapes and sizes. Rhodes '809 discloses a block of cheese of unknown size in Fig. 10. Barz '625 discloses that a continuous ribbon (of mozzarella cheese), which will preferably be rectangular in cross section, may be cut into loaves, having a width of about (12 - 36) inches and a height of about (½ to 2) inches and a length of about (14 - 24) inches (column 7, lines 44 - 48). These dimensions fall within the claimed range. Therefore, it would have been obvious to the person of ordinary skill in the art of the time of the invention to mold a cheese to a smaller size as taught by Barz '625 in the process of Rhodes '809 who also uses a molding device in view of the combined references of Bottazzi '76, Hargrove '248, and Mid-America '106. This rejection of claim 87 was proposed by the TPR at page 49 of the '003 request and at page 32 of the Comments by the TPR of July 3, 2002. The addition of the reference to Anderson '158 was put forth by the examiner to meet the limitations of base claim 70. The reference to Anderson '158 is found at page 44 in the '003 request of January 8, 2002.

The position of the TPR as set forth in their Comments of July 3, 2002, in *inter partes* reexam '003, on pages 3 and 4, part A, last paragraph is adopted as to Hargrove '248 and Mid-America '106 and summarized above.

The position of the TPR as set forth in their Reply Statement of November 27, 2002, in the '6317 reexam at page 15 with respect to Bottazzi '76 has also been fully considered and is found persuasive.

**XXIV. Claim 1 is rejected under 35 USC 103(a) as being unpatentable over Rhodes '809 in view of Bottazzi.**

The TPR has added the reference to Bottazzi '76 for claim 1 to teach heating and stretching pasta filata curd without using water (Summary. 1.1 - 13, page 323). This is the TPR's position found at page 13 in the Comments by the TPR of July 3, 2002 and is adopted and is summarized below. Even though Bottazzi '76 used microwave energy to heat the cheese, the claim does not exclude this type of heating. Rhodes '809 uses heat provided by a water heater (column 15, lines 5 - 11). There is no patentable distinction between the two types of heating as they both heat the curds, which would make the curds more pliable. Therefore, it would have been obvious to the person of ordinary skill in the art at the time of the invention to use a different type of heating in the process of Rhodes '809 in order to make the cheese stretch without the use of water, particularly as the claim does not require any particular type of heat.

### Response to Arguments

**I.   Examiner's Position Regarding the Anticipation of Claim 1 under 35 USC 102(e) over Rhodes '809**

The Examiner adopts the arguments of the TPR with respect to the rejection of

Claim 1 as being anticipated under 35 USC 102(e) by Rhodes '809 because the TPR's

explanation of the interpretation of the phrases "prior to mechanical working" and

"without aqueous immersion" is deemed persuasive.

I.   **Third Party Requester's Arguments In Support of the Rejection of Claim 1
      As Being Anticipated by Rhodes '809** (Respondent's Brief of Aug. 20, 2009 at page 1,
      line 5 through page 11, line 7)

      The TPR respectfully submits that claim 1 is anticipated by U. S. Patent 6,120,809 to
Rhodes (hereinafter the "Rhodes '809" patent). The Patent Owner frames the issue of
anticipation on the construction of two limitations in claim 1: (1) "prior to mechanical working"
and (2) "without aqueous immersion." The TPR has proposed, and the Examiner has adopted,
reasonable constructions of these terms that are consistent with both their ordinary meaning as
they would be understood by one of ordinary skill in the art, and the Specification of the
Dahlstrom '526 Patent. In view of the claim construction, the Rhodes '809 Patent clearly
discloses these and the rest of the limitations of claim 1, necessitating the rejection.

      A.   PRIOR MECHANICAL WORKING

      The Examiner has adopted the TPR's position that the limitation in claim 1 of adding a
cheese emulsifying salt or a dairy ingredient or both "prior to mechanical working" is taught by
the Rhodes '809 Patent.  See Examiner's April 1, 2008, Inter Parte Reexamination
Communication issuing a Right of Appeal Notice (hereinafter called the Examiner's "RAN
Communication"), pp. 109 - 114. The Patent Owner argues the Examiner erred because
introducing ingredients to the curd while it is rotating in the Rhodes infuser at 4 rpm and 115°F
describes adding those ingredients *after*--not *prior to*--mechanical working.  See Resubmitted
Appellant's Brief, p. 13, ll. 14 - 28.  In fact, the Patent Owner's argument is errant because it
contradicts the most reasonable interpretation of the term "mechanical working" offered by the
Patent Owner's own patent.
      The Rhodes '809 Patent describes processes and equipment that cut curds into small
pieces before sending them into a rotating container called an infuser.  Rhodes '809, col. 11, ll.
10 - 14, and Figs. 13 & 14 for pictures of the infuser.  The curds are turned at a slow 4 rpm
rotation speed for the express purpose of preventing them from matting and clumping as the
ingredients are being added.  See Rhodes '809, col. 23, ll. 31 - 38. After the ingredients are
added the rotation speed is doubled to 8 rpm and the temperature increased to 155°F, resulting in
the curd being converted from small particles to fibrous strands that stretched across the flights
of the infuser.  See Rhodes '809, col. 23, line 62 to col. 24, line 4.  It is clear from this
description in the Rhodes '809 patent that the curd does not develop into a fibrous mass until
after the rotation speed and temperature of the infuser have been raised, and until after the
ingredients have been added to the tumbling curd particles.  As discussed below, it is also from
the Dahlstrom '526 patent that mechanical working is only meant to cover those mechanical
actions that convert the curd into a fibrous mass.  Thus, the Rhodes '809 Patent describes the

limitation in claim 1 of "adding a cheese emulsifying salt or dairy ingredient or both **prior to** mechanical working."

While the Dahlstrom '526 patent does not provide an explicit definition of "mechanical working," it does offer a definition of "working:"

> By working is meant that the curd is heated and then
> mechanically kneaded and stretched to a viscous
> molten state wherein the curd develops into a fibrous
> mass. Dahlstrom '526 patent, col. 5, ll. 11 - 14.

From this explicit definition, the TPR construed the claim limitation of "adding . . . prior to mechanical working" to mean adding something to the curd before the curd has been heated, kneaded, and stretched into a fibrous mass. See, e.g., TPR's Response to the Statement of the Patent Owner filed November 27, 2002, p. 12, ll. 11 - 13.

The Patent Owner argues this construction of "prior to mechanical working" is wrong because it ignores a distinction between "working" and "mechanical working." See Resubmitted Appellant's Brief, p. 12, ll. 22 - 31. While the Patent Owner agrees that "working" requires heating and then mechanically kneading and stretching the curd, "mechanical working" only includes the mechanical steps without heating. See *Id.* According to the Patent Owner, adding a cheese emulsifying salt or a dairy ingredient or both "prior to mechanical working" should mean adding these ingredients prior to any mechanical action on the curd, including tumbling the curd at 4 rpm. See Resubmitted Appellant's Brief, p. 13, ll. 23 - 30. The Patent Owner's construction of "mechanical working" is inconsistent with the written description and claims of the Patent Owner's Patent for several reasons.

First, the Patent Owner's interpretation of "mechanical working" conveniently ignores that in the definition of working above, the mechanical kneading and stretching performed converts the curd into a fibrous mass. See Patent Owner's Patent, col. 5, ll. 11 - 14. Thus, if the "working" is to carry any weight at all in "mechanical working" the phrase must at least be limited to those type of mechanical actions that convert curd into a fibrous mass. Other types of mechanical actions that do not convert the curd into a fibrous mass, such as tumbling the curd at 4 rpm at moderate temperatures, cannot be considered "mechanical working."

Second, claim 1 itself explicitly describes the result of "mechanical working" the curd as turning the curd into a fibrous mass. See Dahlstrom '526 patent, claim 1, line 13 ("mechanically working the curd into a fibrous mass"). There is no ambiguity in the claims themselves that "mechanically working" the curd is to develop the curd to a fibrous mass. A definition of mechanical working that does not develop the curd into a fibrous mass contradicts the literal language of the claims.

Furthermore, a definition of mechanical working the requires the curd to develop into a fibrous mass is completely consistent with the rest of claim 1. This definition does not deprive the separate heating step in claim 1 of patentable weight because the heating step limits the claimed process to a specific temperature range (i.e., 130° F to 160° F). Moreover, the definition does not require the claimed process to add ingredients *between* the step of (1) heating and (2) mechanically working the curd. While claim 1 recites the adding ingredients step between the heating and mechanically working steps, well-established principles of claim

construction allow different ordering of these steps provided the sequence is consistent with the
specification and the claim as a whole. See, e.g., *Interactive Gift Express, Inc. v. Compuserve,
Inc.*, 256 F.3d 1323, 1343 (Fed. Cir. 2001). Reordering the steps to add ingredients before
heating and mechanically working the curd is actually encouraged by the Dahlstrom '526 patent,
which describes adding Generally Recognized As Safe (GRAS) ingredients to cheese curd
**before** subsequent heating and kneading step.

> The addition of GRAS (Generally Recognized As Safe) ingredients
> may be done in a temperature range of between 20° F and 160° F.
> The blending of such ingredients can be done in a twin screw auger
> type mixer in which the augers overlap thereby insuring thorough
> mixing. The preferred capacity of such blending equipment is that
> it holds at least one batch of fresh curd plus the GRAS ingredients.
> A number of such blenders may be required to insure that the flow
> of the cheese curd is continuous to **the subsequent heating and
> kneading steps**. The number of blenders required is determined by
> dwell time in the blenders that is required to adequately mix all
> the ingredients and the through put required in **the subsequent
> heating and kneading steps.** Dahlstom '526, col. 5, ll. 39 - 51
> (emphasis added).

In this passage, the mechanical mixing of ingredients with the fresh curd in the twin
screw auger is distinguished from the subsequent kneading step that mechanically works the
heated curd into a fibrous mass. If "mechanical working" were to include actions like mixing the
ingredients and curd with the twin screw auger, then the Dahlstrom '526 patent itself would fail
to show the addition of ingredients prior to mechanical working. Passages like the one above
clearly indicate that mechanical mixing of ingredients into the curd is done prior to *mechanically
working* the heater curd and ingredients into a fibrous mass.

Third, throughout the specification and claims, the mechanical working of the curd
always follows heating the curd, and the result of the mechanical working is always to convert
the curd into a fibrous mass. See, e.g., Dahlstrom '526 patent, Abstract ("The curd is then heated
preferably in a liquid-free environment and mechanically worked until the curd forms a fibrous
mass.") There is nothing in the Dahlstrom '526 patent that supports or even remotely suggests
that "mechanically working" the curd covers mechanical actions other than those that convert
heated curd into a fibrous mass.

Because the terms "working" and "mechanical working" both result in curd being
converted into a fibrous mass, the Patent Owner is at best making a distinction without a
difference when comparing the "prior to mechanical working" limitation to the teaching of the
Rhodes '809 Patent. As noted above, Example 1 in the Rhodes '809 Patent for instance
describes adding ingredients to un-worked curds turning in an infuser at 4 rpm and 115° F to
keep the curds from matting and clumping. See Rhodes '809, col. 23, ll. 51 - 55. Only after
ingredients are added is the infuser speed increased to 8 rpm and the temperature increased to
155° F so the curd could be converted into fibrous strands. See Rhodes '809, col. 24, ll. 2 - 4
("When the cheese curd reached a temperature of 128° F, the cheese began to form fibrous

strands that stretched from the bottom to the top on each of the internal flights."). The curds
rotating in the infuser at 4 rpm were neither being "worked" nor "mechanically worked" when
the ingredients were added.

For at least these reasons, the Examiner's interpretation of the "prior to mechanical
working" limitation and finding that limitation disclosed in the Rhodes '809 Patent
is entirely consistent with both the Dahlstrom '526 and Rhodes '809 patents. Respondent
respectfully urges the Examiner's construction and findings are reasonable, and they be adopted
by the Board.


B.    HEATING THE CURD WITHOUT AQUEOUS IMMERSION

The Examiner has adopted the TPR's position that the limitations in claim 1 of heating
the curd "without aqueous immersion"--as that term is defined by the written description and
example of the Dahlstrom '526 Patent--is taught by the Rhodes '809 Patent. See first RAN
Communication, pp. 103 - 109. The Patent Owner argues that Examiner erred because the water
accompanying the ingredients added to the curd in Rhodes is enough to aqueously immerse the
curds. See Resubmitted Appellant's Brief, p. 16, ll. 12 - 13. This argument attempts to equate
the addition of relatively small amounts of water in dissolved ingredients with traditional
methods of heating the curd in a bath of hot water.   However, the amount of water added to the
curd in the Rhodes '809 Patent does not reach the level of aqueously immersing the curd any
more than the water added through direct culinary steam injection immerses the curd in the
Dahlstrom '526 patent.

The Dahlstrom  '526 patent makes clear that heating the curd without aqueous immersion
does not mean the complete absence of water when heating the curd:

> The curd does have water entrapped without and may have surface
> wetness, but such moisture content is insufficient to be considered
> immersion. Dahlstrom '526 patent, col. 3, ll. 8 - 15.

In fact, the Dahlstrom '526 patent describes heating the curd using "direct culinary steam
injection" which, in one of the described examples, added about 53.7 lbs. of water to 600 lbs. of
curd, making the water to curd weight ratio about 1:11. See Dahlstrom '526 patent, Example II,
col. 7, ll. 24 - 64.  While the water is rapidly introduced as gaseous steam over a brief 60 second
period, it quickly condenses to liquid water at the 99° F to 150° F temperature range of the
heated curd since these temperatures are well below the 212° F boiling point of water. The
Dahlstrom '526 patent is adds liquid water by condensation of the injected steam, just not
enough water to place the curd in an "aqueous immersion."

The Dahlstrom '526 patent does not precisely define how much water is needed for the
curd to be heated in an aqueous immersion, but does offer a comparison with traditional cheese
making processes where the curd is submerged in hot water.

> Traditional manufacturing processes for making such cheese varieties
> [mozzarella] and [provolone] are characterized by the fact that after

the whey is drained off, the curd is **immersed** in hot water or hot whey and the **submerged** curd is worked and stretched while it is in a plastic condition to impart into the curd, the fibrous texture that characterizes such cheese varieties. Dahlstrom '526, col. 3, ll. 1 - 7 (emphasis added.)

Based on this statement from the Dahlstrom '526 patent which conflates the words "immersion" and "submersion," the TPR has suggested--and the Examiner adopted--a construction of the "without aqueous immersion" limitation as requiring that the curd be heated without being submerged in an aqueous liquid. See first RAN Communication, p. 107 - 108. Using this construction, it's clear that the Rhodes '809 Patent describes heating curd without aqueous immersion.

Like the Dahlstrom '526 patent, the Rhodes '809 Patent avoids using a hot water bath that submerges the curd in hot water. Instead, Rhodes '809 Patent heats the curd in an infuser 186 that has a jacket shell through which hot water flows. See, e.g., Rhodes '809, col. 15, ll. 7 - 11. Like the Dahlstrom '526 patent, the Rhodes '809 Patent touts advantages like increasing cheese yield and avoiding the loss of fat and solids to the hot water that occurs with a hot water cooker. Cf. Dahlstrom '526 patent, col. 1, ll. 13 - 15 and Rhodes '809, col. 24 ll. 20 - 22. There is no ambiguity that the Rhodes '809 Patent avoids using a bath of hot water to heat the curd.

The only question remaining is whether Rhodes' technique for heating the curd is done "without aqueous immersion" like the technique described in the Dahlstrom '526 patent. As noted above, Rhodes' heats curd in an infuser that flows hot water through a jacket shell. While heat from the water is transferred to the curd in the infuser, this water never makes direct contact with the curd. However, the Patent Owner argues that a relatively small amount of water (when compared to the amount of curd) used to dilute the concentration of a whey protein added as an ingredient to the curd constitutes heating the curd in an aqueous immersion. See Rhodes '809, col. 26, ll. 33 - 45. The Rhodes '809 Patent even provides an example that quantifies the ratio of water to curd at about 1:10 by adding 105 pounds of water in the ingredients to 1000 lbs. of curd. Comparing this to the only slightly different 1:11 weight ratio of added water to curd resulting from "liquid free" steam injection technique described in the Dahlstrom '526 patent, it is extremely difficult to conclude that Rhodes' achieves aqueous immersion of the curd while the Patent Owner's technique, by definition, does not. The Examiner concluded that Rhodes '809 describes heating curd "without aqueous immersion" as that term is construed from the Patent Owner's Patent.

The Patent Owner attempts to cast doubt on the conclusion that curd mixtures with similar ratios of water to curd have similar degrees of "aqueous immersion" by imagining hypotheticals where mixing the curd and whey protein isolate ingredients might still possible result in an aqueous immersion of the curd. The Patent Owner hypothesizes the liquid ingredient in the Rhodes '809 Patent remaining "in the bottom of the infuser while the flights carry the curd out of the liquid to a height where the curd pieces tumble back into the liquid. The small cut curd pieces are cyclically immersed into the liquid and subsequently removed from the liquid with the rotating flights." See Resubmitted Appellant's Brief, p. 16, ll. 8 - 14. However, the Patent Owner offers no citation or support for this description from the Patent. This is nothing

more than speculation by the Patent Owner, unsupported by any test data or the teaching of the Rhodes '809 Patent.

One can imagine equally plausible hypotheticals where the curds draw in liquid ingredients that coat the curd instead of "aqueously immersing" the curd. For example, when the curds in the Rhodes '809 Patent are subjected to a vacuum, the vacuum draws liquid out of the curd, creating a capacity to absorb the coated liquid ingredients. This is analogous to a wet sponge being wrung out by the vacuum and then absorbing new liquid coming in contact with the sponge. Of course, one cannot wring out a sponge (or curd) that is submerged in water, so the curds cannot be aqueously immersed.

These competing hypotheticals only serve as a distraction from what the Dahlstrom '526 patent actually means by the phrase "without aqueous immersion." In the context of the Specification, it is clear that the claim limitation of "heating the curd without aqueous immersion" was intended to distinguish the claimed heating process from traditional heating processes where the curd is submerged in hot water (see, e.g., Dahlstrom '526 patent, col. 3, ll. 1- 7). While Rhodes' heating process differs from that described in the Dahlstrom's '526 patent, it also avoids traditional processes of submerging the curd in hot water. Thus, the Rhodes '809 Patent clearly teaches the claimed step of heating the curd *without aqueous* immersion.

Finally, the TPR cannot leave unanswered the Patent Owner's attacks [on] the findings and conclusions from the first Declaration of Dr. Richard Merrill dated November 27, 2002, with yet more unsupported hypotheticals about how the whey protein isolate is absorbed into the curd. The Patent Owner attempts to raise doubts about Dr. Merrill's documented findings that the whey protein isolate forms a pudding-like consistency at the temperatures and concentrations described in the Rhodes '809 Patent, by questioning how an ingredient with such consistency could be absorbed into the curd. Even if this unsupported speculation were true, the Appellant still has not proven how these absorbed ingredients rise to the level of heating the curd with "aqueous immersion" as that term is used in the Dahlstrom '526 Patent.

For at least these reasons, the Examiner's interpretation of the "without aqueous immersion" limitation and finding that limitation disclosed in the Rhodes '809 Patent is entirely consistent with both the Dahlstrom '526 Patent and Rhodes '809 Patent. TPR respectfully urges the Examiner's construction and findings are reasonable, and that they be adopted by the Board.

C.    CONCLUSION

For the reasons stated above, the Rhodes '809 Patent describes heating a curd without aqueous immersion to an approximate temperature range of 130°F to 160°F, and adding a cheese emulsifying salt or a dairy ingredient prior to mechanical working. Because these and all the other limitations of claim 1 are described by Rhodes '809, claim 1 is anticipated under 35 U.S.C. 102(e) by Rhodes '809 and the rejection should be upheld.

I.    **Patent Owner's Arguments Traversing the Rejection of Claim 1 As Being Anticipated under 35 USC 102(e) by Rhodes '809** (Resubmitted Appeal Brief dated April 22, 2009 at pages 10 - 17)

The Examiner erroneously alleged that independent claim 1 is anticipated by the Rhodes
'809 patent. A claim is anticipated only if each and every element as set forth in the claim is
found, either expressly or inherently described, in a single prior art reference. *Verdegaal Bros.
V. Union Oil of California*, 814 F. 2d 628, 631, 2 USPQ2d 1051, 1053 (Fed. Cir. 1987). The
identical invention must be shown in as complete detail as is contained in the claim. *Richardson
v. Suzuki Motor Co.*, 868 F.2d 1226, 1236, 9 USPQ2d 1913, 1920 (Fed. Cir. 1989). The
elements must be arranged as required by the claim. *In re Bond*, 910 F.2d, 15 USPQ2d 1566,
(Fed. Cir. 1990). Claim 1 is reproduced below.

> 1.      A process of manufacturing, a pasta filata cheese or a mozzarella-like
> cheese comprising:
>> providing a milk composition having a selected protein and fat
>>> composition;
>> pasteurizing the milk composition;
>> forming a coagulum from the milk composition;
>> cutting the coagulum to separate curd and whey;
>> draining the whey from the curd;
>> heating the curd **without aqueous immersion** to an
>>> approximate temperature range of 130° F to
>>> 160° F;
>> adding a cheese emulsifying salt or a dairy ingredient
>>> or both **prior to mechanical working**;
>> mechanically working the curd into a fibrous mass; and
>> forming the cheese into a shape.   (Emphasis added.)

The Rhodes '809 patent fails to disclose either the claimed elements of heating the curd
without aqueous immersion to an approximate temperature range of 130°F to 160°F or adding
cheese emulsifying salt or a dairy ingredient or both prior to mechanically working for the
reasons set forth below. Therefore, the Examiner erroneously rejected claim 1 as being
anticipated by the Rhodes '809 patent. Reversal of the rejection of claim 1 is respectfully
requested.


A.      PRIOR TO MECHANICAL WORKING

In the Inter Partes Reexamination Communication dated April 1, 2008, the Examiner
erroneously accepted the Third Party Requester (TRP) interpretation of the meaning of the claim
term "prior to mechanical working." The Examiner explicitly adopted the TPR's interpretation
of "mechanically working the curd" at the last paragraph of page 14 of the Communication.

Specifically, the Examiner stated that mechanical working of the curd begins when the
temperature of the curd is raised to 155°F and the speed of the infuser is increased to 8 rpm. The
Examiner erroneously stated that operating the infuser at 4 rpm at a temperature of 115° F, while
introducing a variety of non-dairy ingredients, is not considered to be "mechanical working of
the curd." (See page 15, first paragraph of April 1, 2008 communication)

Of note, the Examiner paraphrased a portion of the Dahlstrom '526 patent as defining working the curd as heating, kneading and stretching a clumped-together mass of curd, so as to make it fibrous and references the Dahlstrom '526 patent at col. 5, lines 11 - 14. Patent Owner respectfully disagrees with the paraphrasing of this passage which defines the term "working." The definition of working in the Dahlstrom '526 patent is reproduced below.

> "By working is meant that the curd is **heated** and then **mechanically kneaded and stretched** to a viscous molten state wherein the curd develops into a fibrous mass." Dahlstrom '526, col. 5, lines 11 - 14 (emphasis added.)

An applicant is entitled to be his or her own lexicographer. See *In re Paulsen*, 30 F.3d 1475, 1480, 31 USPQ2d 1671, 1674 (Fed. Cir. 1994). Where an explicit definition is provided by the applicant for a term, that definition will control interpretation of the term as it is used in the claim. *Toro Co. v. White Consolidated Industries, Inc.*, 199 F.3d 1295, 1301, 53 USPQ2d 1065, 1069 (Fed. Cir. 1999).

The Dahlstrom '526 patent defines working as a two-step process where the curd is first heated and then mechanically kneaded and stretched. Having provided a definition of the term "working," this definition must be used in interpreting the claim terms. Therefore, the Dahlstrom '526 patent requires both a thermal component and a mechanical component to be included in the term "working" the curd.

However, "mechanical working of the curd" is not the same as "working the curd" as alleged, as mechanical working of the curd is a component of working of the curd as defined in the Dahlstrom '526 patent. Therefore, a curd can be "mechanically worked" while the curd is not "worked" due to a lower than required temperature of the curd, i.e., the thermal component is lacking for "working" to occur. This is the exact situation that is disclosed in the Rhodes '809 patent when the enhancing agents are infused into the curd.

It is undisputed that the Rhodes '809 patent discloses utilizing a single piece of equipment, the infuser, to process the curd into mozzarella cheese. Each and every example in the Rhodes '809 discloses that the infuser is rotating when the mozzarella curd is added to the infuser.

> "The mozzarella curd was added to the infuser while it was turning at a 4 RPM. The infuser is preferably turning while the cheese is added as it will mat and clump if the infuser is stopped."

Rhodes '809 patent, col. 23, lines 31 - 34.

Example 4 in column 34, lines 29 - 30 states:

> "The infuser must be turning while the diced cheese is added as it will mat and clump if the infuser is stopped."

Rhodes '809 patent, col. 34, lines 29 - 30.

Similarly, Example 13 states that "the infuser should be turning while the diced cheese curd is added, or some other mechanism provided to prevent matting and clumping of [sic] the infuser is stopped." (Rhodes '809 patent, col. 57, lines 29 - 30). Each of the examples in the Rhodes '809 patent relating to mozzarella cheese specifically state that the mozzarella curd was added to the infuser while the infuser was turning at 4 rpm.

No ingredients are added to the curd prior to mechanical working. In Example 1, this is stated at column 23, lines 31 - 32. Example 2 states that the whey protein isolate mixture was in the infuser at the time the curd was added. See col. 26, lines 33 - 53. Example 2 also states in column 26, lines 23 - 24 that the infuser was turning at 4 rpm when the pizza curd was added. It cannot be said that this is a disclosure of additives prior to mechanical working.

Therefore, it is not disputed that when the cheese curd is added to the infuser, the infuser is already rotating. The only dispute is whether the curd is being mechanically worked at the rotation of 4 rpm.

The Examiner is attempting to allege that mechanical working can only occur at an elevated temperature of 155°F and at a speed of 8 rpm and that mechanical work of the curd does not occur at a speed of 4 rpm and 115°F. As such the Examiner is attempting to incorporate the thermal component of "working the curd" into the claimed element of mechanical working. This is an erroneous reading of both the Dahlstrom '526 patent as well as the Rhodes '809 patent.

Clearly, the curd is being mechanically worked at 4 rpm just as the curd is being worked at 8 rpm. The mechanical work being performed on the curd at 4 rpm prevents the curd from clumping and matting. To state that the curd is not being mechanically worked at 4 rpm is contrary to the assertion that the curd is being mechanically worked at 8 rpm. While curd may not be mechanically worked as vigorously during the infusion process, the same equipment that is alleged to perform mechanical work at 8 rpm is also performing mechanical work at 4 rpm.

At 4 rpm, the infuser is performing the same action as at 8 rpm, but at a lower temperature. If the curd is mechanically worked at 8 rpm, then the curd must also be mechanically worked at 4 rpm, irrespective of the temperature of the curd. The flights in the infuser do not change configuration when the rotation is increased from 4 rpm to 8 rpm. Rather, the curd is subjected to the same processing which creates mozzarella cheese at 4 rpm and 8 rpm. The fact that an optimum rotation of 8 rpm at 155° F is disclosed does not preclude the fact that mechanical work on the curd is performed at 4 rpm at 115° F. It is erroneous to state that mechanical work is not being performed on a curd at 4 rpm while mechanical work is being performed on the curd at 8 rpm as the equipment is the same.

Patent Owner would also like to address statements made in Argument section of Communication mailed on April 1, 2008, at the beginning at page 109 and ending at the top of page 113. The Examiner states that there is no evidence shown that turning the infuser at 4 rpm "works the curd" at the last sentence of page 109. Patent Owner agrees that rotating the infuser at 4 rpm at a temperature of 115° F does not "work the curd." The curd is not worked due to the lack of the required temperature of 115 F to "work the curd" as defined in the Dahlstrom '526 patent. However, rotating the infuser at 4 rpm does "mechanically work" the curd just as it mechanically works the curd at 8 rpm.

The Examiner also adopted the TPR's statement that the specification of the Dahlstrom '526 patent does not mention any benefit from adding the ingredients prior to working, as opposed to after that step, and no criticality is recognized in adding ingredients to the curd before

mechanical working. The Patent Owner respectfully does not understand this statement. First, it is undisputed that working the curd creates a fibrous mass. Once the curd is a fibrous mass, it would be difficult to uniformly distribute the cheese emulsifying salts and dairy ingredients into the fibrous mass. Therefore, adding the ingredients during the working stage would produce an inferior pasta filata cheese as compared to adding the ingredients prior to mechanical working as claimed.

The Examiner also adopted the TPR's inconsistent argument that (1) "adding . . . prior to mechanical working" as meaning that the auger screws have not started turning until the curd and additives are placed in the machine and the "2) "adding . . . prior to mechanical working includes blending the additive with the curd, before the curd has been heated, kneaded, and stretched into a fibrous mass. See page 111 - 112 of the April 1, 2008 communication.

Patent Owner does not understand the Examiner's position regarding "adding . . . prior to mechanical working." Patent Owner has disclosed utilizing screw type auger mixers that have a sufficient capacity to hold both a batch of GRAS ingredients and a batch of fresh curd. Dahlstrom '526, col. 5, lines 43 - 45. Patent Owner also disclosed that the curd and GRAS ingredients are added prior to mechanical working, i.e., the screws are not turned. It is clear that no mechanical work is done when the screws are stationary. Therefore, Patent Owner agrees with the first proposed meaning of "adding . . . prior to mechanical working." Patent Owner does not understand how a position could be taken that "prior to mechanical working" includes a twenty minute blend time where the same machine is both utilized to blend the curd and ingredients as well as heat and mechanically work the curd into pasta filata cheese. Clearly, if the screws are turning, the curd is being mechanically worked. Therefore, Examiner position is erroneous.

Patent Owner separately claimed the thermal component and the mechanical component of working the curd in claim 1. Further, Patent Owner claimed that a cheese emulsifying salt or a dairy ingredient or both are added to the curd prior to mechanical working. The addition of a cheese emulsifying salt or dairy ingredient or both to the curd prior to mechanical working is not explicitly disclosed or suggested in the Rhodes '809 patent for the above stated reasons. In fact, the Rhodes '809 patent explicitly teaches away from adding the curd to a non-rotating infuser because the cut curd will not form a mat or clump.

Therefore, for at least the reasons provided in the present section, claim 1 is allowable over the Rhodes '809 patent. Reversal of the anticipation rejection of claim 1 is respectfully requested.

B.     HEATING THE CURD WITHOUT AQUEOUS IMMERSION

In the Inter Partes Reexamination Communication dated April 1 2008, the Examiner erroneously accepted the TPR's interpretation of the meaning of the claim term "heating the curd without aqueous immersion." The Examiner explicitly adopted the TPR's interpretation of "heating the curd in an aqueous free environment" at the first paragraph of page 17 of the Communication. The Examiner at page 104 erroneously states that there is not enough water in the curds for them to be considered "immersed" because most of the whey that has been removed from the curds is put into the infuser. Rhodes '809 patent, col. 23, line 20 - 30. The Examiner also replied upon the First Merrill Declaration to state that the ratio of water to whey protein

isolate disclosed in Rhodes '809 discloses a pudding-like consistency due to the denaturing of the whey protein isolate.

The Examiner at page 104 erroneously states that there is not enough water in the curds from them to be considered "immersed" because most of the whey that has been removed from the curds is put into the infuser. Rhodes '809 patent, col. 23, lines 20 - 30. The Examiner also relied upon the first Merrill Declaration to state that the ratio of water to whey protein isolate in the Rhodes '809 patent discloses a pudding-like consistency due to the denaturing of the whey protein isolate.

Patent Owner respectfully submits that the Rhodes '809 patent relates to an infusion process where surface area of the curd is critical to the infusion rate. Rhodes '809 patent , col. 23, lines 31 - 38. The curd is typically cut into small pieces, such as one-quarter inch cubes, and then added to the infuser. Rhodes '809 patent, col. 343, lines 24 - 25. A liquid, such as water, containing the enhancing agents or ingredients is added to the  infuser and then the infuser is subjected to a vacuum. The liquid remains in the bottom of the infuser while the flights carry the curd out of the liquid to a height where the curd pieces tumble back into the liquid. The small cut curd pieces are cyclically immersed into the liquid and subsequently removed from the liquid with the rotating flights. When the cut curd pieces are removed from the liquid, they are coated with and absorb the liquid. This is how the curd pieces are infused, subjecting the curd pieces to a vacuum which expands the pores of the curd and immersing the curd into a liquid. Therefore, the curd pieces are submerged during the process, otherwise the infusion would not occur.

Further, Patent Owner does not understand how a pudding-like substance could be infused into the cheese curd. While Dr. Merrill's declaration states so, it is unclear whether the small cut cheese curds would remain on the surface of the pudding-like substance or whether they would be immersed into the pudding-like substance. Dr. Merrill's declaration is unclear regarding this fact. If the cheese curd pieces were on the surface, it is unclear how the flights could effectively raise the curd pieces as the flights would not contract the curd pieces. If the curd pieces would not submerge into the pudding like substance then there could be no infusion of the curd pieces.

Also a question remains whether a pudding-like substance would have sufficient viscosity to travel up the flights of the infuser as the infuser is rotated. If the pudding-like substance traveled up the flights then there would be no pool of liquid into which the cut curd would fall into which would impair the infusion process.

Also, Dr. Merrill's conclusion regarding the pudding-like substance is contrary to the disclosure of the Rhodes '809 patent. The Rhodes '809 patent refers to the whey protein concentrate as a liquid in examples 1 and 13. See col. 23, lines 51 - 53 and col. 58, lines 4 - 6. Dr. Merrill's experiment was conducted using the date from example 2. However, the weight percent of whey protein isolate in the solution in example 2 was 34.3 and the weight percent of whey protein isolate in example 13 was 35.5. The Rhodes '809 patent refers to the solution in example 13 as a liquid. Therefore, a similar solution disclosed in example 2 should also be a liquid. A pudding-like substance is not a liquid. Therefore, the reliance on the Merrill declaration is contrary to the disclosure of the Rhodes '809 patent and therefore should not have been given the evidentiary weight so given.

A cheese curd will sink into a water-based solution. Therefore, the cut curd pieces are submerged in the Rhodes '809 patent, contrary to the assertions in the Communication. As such,

claim 1 is not anticipated by the Rhodes '809 patent.  Reversal of the anticipated rejection is respectfully requested.

### C.    CONCLUSION

For the above stated reasons, the Rhodes '809 patent does not disclose heating the curd without aqueous immersion to an appropriate temperature range of 130 F to 160 F or adding a cheese emulsifying salt or dairy ingredient or both prior to mechanical working as claimed.  Therefore, the rejection of claim 1 as being anticipated by the Rhodes '809 patent is erroneous and the reversal of the anticipated rejection is respectfully requested.

## II.    Examiner's Position with Respect to the Rejection of Claim 26 As Being Anticipated by Rhodes '809

The Examiner adopts the arguments of the TPR with regard to the anticipation of

claim 26 by Rhodes '809 because the TPR's interpretation of "prior to mechanical

working " is deemed persuasive (Section I above).

### II.    Third Party Requester's Arguments Supporting Rejection of Claim 26 As Being Anticipated by Rhodes '809

The Patent Owner argues that the Examiner erroneously rejected claims 26, 36, and 52 as being anticipated by the Rhodes '809 Patent because the Office has an incorrect interpretation of the claim term "prior to mechanical working."  See Resubmitted Appellant's Brief, Sections II - IV.  The TPR explained in Section I(A) above where the Rhodes '809 Patent teaches adding ingredients prior to mechanical working, and respectfully urges the Examiner's construction and findings be adopted by the Board.

### II.    Patent Owner's Arguments Traversing the Rejection of Claim 26 As Being Anticipated by Rhodes '809

The Communication erroneously rejected claim 26 as being anticipated by the Rhodes '809 patent.  An element of claim 26 includes adding phosphate or citrate emulsifying salts or combination thereof to the curd prior to mechanical working.  For the reasons stated in Section I(A) of this appeal brief with respect to claim 1, there is no disclosure of adding salts to the curd prior to mechanical working.  Therefore, the rejection of claim 26 is erroneous and Appellant respectfully requests that the anticipation rejection of claim 26 be reversed.

## III.    Examiner's Position with Respect to the Rejection of Claim 36 As Being Anticipated by Rhodes '809

The Examiner <u>adopts</u> the arguments of the TPR with regard to the anticipation of

claim 36 by Rhodes '809 because the TPR's interpretation of the critical phrase "prior to

mechanical working" is deemed persuasive.

### III.   Third Party Requester's Arguments Supporting the Rejection of Claim 36 As Being Anticipated by Rhodes '809

The Patent Owner argues that the Examiner erroneously rejected claims 26, 36, and 52 as being anticipated by the Rhodes '809 Patent because the Office has an incorrect interpretation of the claim term "prior to mechanical working." See Resubmitted Appellant's Brief, Sections II - IV. The TPR explained in Section I(A) above where the Rhodes '809 Patent teaches adding ingredients prior to mechanical working, and respectfully urges the Examiner's construction and findings be adopted by the Board.

### III.   Patent Owner's Traversal of the Rejection of Claim 36 As Being Anticipated by Rhodes '809

The Communication erroneously rejected claim 36 as being anticipated by the Rhodes '809 patent. An element of claim 36 includes adding generally recognized as safe ingredients into the curd prior to mechanical working. For the reasons stated in Section I(A) of this appeal brief with respect to claim 1, there is no disclosure of adding the generally recognized as safe ingredients into the curd prior to mechanical working. Therefore, the rejection of claim 36 is erroneous and Patent Owner respectfully requests that the anticipation rejection of claim 36 be reversed.

### IV.   Examiner's Position with Respect to the Rejection of Claim 52 As Being Anticipated by Rhodes '809

The Examiner <u>adopts</u> the arguments of the TPR with regard to the anticipation of

claim 52 by the Rhodes '809 patent.  The critical issue with respect to claim 52 is the

TPR's interpretation of phrase "prior to mechanical working," which is deemed

persuasive (Section I above).

### IV.   Third Party Requester's Arguments Supporting the Rejection of Claim 52 As Being Anticipated by Rhodes '809

The Patent Owner argues that the Examiner erroneously rejected claims 26, 36, and 52 as being anticipated by the Rhodes '809 Patent because the Office has an incorrect interpretation of the claim term "prior to mechanical working."  See Resubmitted Appellant's Brief, Sections II -

IV.  The TPR explained in Section I(A) above where the Rhodes '809 Patent teaches adding ingredients prior to mechanical working, and respectfully urges the Examiner's construction and findings be adopted by the Board.

### IV.     Patent Owner's Arguments Traversing the Rejection of Claim 52 As Being Anticipated by Rhodes '809

The Communication erroneously rejected claim 52 as being anticipated by the Rhodes '809 patent.  An element of claim 52 includes adding phosphate or citrate emulsifying salts or a combination thereof to the curd prior to mechanical working.  For the reasons stated in Section I(A) of this appeal brief with respect to claim 1, there is no disclosure of adding phosphate or citrate emulsifying salts or a combination thereof to the curd prior to mechanical working.  Therefore, the rejection of claim 52 is erroneous and Appellant respectfully requests that the anticipation rejection of claim 52 be reversed.

### V.     Examiner's Position with Respect to the Rejection of Claim 62 As Being Anticipated by Rhodes '809

The Examiner <u>adopts</u> the arguments of the TPR with regard to the anticipation of

claim 62 by Rhodes '809 because the TPR's interpretation of the phrases "without

aqueous immersion" and "aqueous free environment" is deemed persuasive.

### V.     Third Party Requester's Arguments Supporting the Rejection of Claim 62 As Being Anticipated by Rhodes '809

The Patent Owner argues that the Examiner erroneously rejected claim 62 as being anticipated by Rhodes '809 Patent because claim 62 includes heating the curd in "an aqueous free environment" to an approximate range of 130° F to 160° F.   See Resubmitted Appellant's Brief, Section V.  The Patent Owner argues that Rhodes '809 does not disclose heating the curd in an aqueous free environment for the reasons stated in Section 1(B) of the Resubmitted Appellant's Brief.  As TPR has explained in the Section I(B) of the Resubmitted Appellant Brief, the Rhodes '809 patent in fact does teach heating the curd "without aqueous immersion." Based on the language in the specification of the Patent Owner's Patent, the "without aqueous immersion" and "aqueous free environment" limitations are equivalent:

> The working of the curd occurs in a substantial liquid-free environment.  By liquid-free is meant that the curd is not immersed in a liquid such as water or whey.  The curd does have water entrapped within and may have some surface wetness, but such moisture content is insufficient to be considered immersion.  Patent Owner's Patent, col. 3, ll. 10 - 15.

Thus, the "aqueous free environment" limitation in claim 62 is taught by the Rhodes '809 Patent for the same reasons as the "without aqueous immersion" limitation described in Section I(B) of the Resubmitted Appellant's Brief.  For at least these reasons, the Respondent urges that the rejection of claim 62 as being anticipated by the Rhodes '809 Patent be adopted by the Board.

The Patent Owner raises an additional issue regarding the rejection of claim 62 that the Examiner erred by relying on a passage in the Rhodes '809 Patent about the cooker water being eliminated.  The TPR's discussion of Rhodes' teaching of the "without aqueous immersion" limitation in Section 1(B) above does not rely on this passage from Rhodes, so even if the Examiner made an error in citing the passage on the cooker water being eliminated, it does not change the outcome that claim 62 is anticipated by the Rhodes '809 patent.

V.     **Patent Owner's Arguments Traversing the Rejection of Claim 62 As Being Anticipated by Rhodes '809**

The Communication erroneously rejected claim 62 as being anticipated by the Rhodes '809 patent.  An element of claim 62 includes heating the curd in an aqueous free environment to an approximate range of 130° F to 160° F.  For the reasons stated in Section I(B) of the appeal brief with respect to claim 1, there is no disclosure of heating the curd in an aqueous free environment.  Further, the Examiner at page 40 is relying upon the passage in the Rhodes '809 patent that "the cooker water was eliminated."  However, this position is contrary to the position taken by the Examiner on pages 104 - 105 of the April 1, 2008 Communication.  Therefore, the rejection of claim 62 is erroneous and Patent Owner respectfully requests that the participation rejection of claim 62 be reversed.

VI.    **Examiner's Position Regarding the Rejection of Claim 70 As Being Obvious Over the Combination of the Rhodes '809 Patent in view of the Anderson '158 Patent, the Bottazzi '76 Article, the Hargrove '359 Patent and Mid-America '106 PCT International Publication**

The Examiner adopts the arguments of the TPR with regard to the rejection of

claim 70 over Rhodes '809 Patent in view of the Anderson '158 Patent, the Bottazzi '76

Article, the Hargrove '359 Patent and Mid-America '106 PCT International Publication.

VI.    **Third Party Requester's Arguments Supporting the Rejection of Claim 70 As Being Obvious over Rhodes '809 in view of Anderson '158, Bottazzi '76 Article, Hargrove '248, and the Mid-America '106 PCT International Publication.**

The Patent Owner argues that the Examiner erroneously rejected claim 70 as obvious over the combination of the Rhodes '809 Patent in view of the Anderson '158 Patent, the Bottazzi '76 Article, the Hargrove '248 Patent, and the Mid-America '106 PCT Application,

because the starter culture medium does not have to be added directly to the milk composition
prior to the formation of the curd. See Resubmitted Appellant's Brief, Section VI.

        Claim 70 includes the limitation of "adding a cheese emulsifying, salt composition, a
non-dairy ingredient, a dairy ingredient or any combination thereof <u>via a starter culture
medium</u>." Because there is no statement in the claim that the starter culture medium is being
added to the curd instead of the milk composition that forms the curd, one of skill in the art must
look to the specification of the Patent Owner's Patent to understand when a starter culture
medium would be added in the process of claim 70. The specification describes a starter culture
growth medium in a passage describing an alternative to adding a functional salt blend to the
curd.

            Alternatively, this functional salt blend may be an ingredient of
            the initial <u>starter culture growth medium</u>. Inclusion of such a
            salt combination in the prior production of starter would serve
            to: (1) control bacteriophage proliferation, (2) buffer developed
            lactic acidity maximizing potential starter cell density, (3) select
            for desired microbial populations (inhibit cellular reproduction
            of salt sensitive microbes) and/or (4) as a method of ionic chemical
            control of ripened starter. Appellant's Patent, col. 4, ll. 39 - 47
            (emphasis added.)

        This passage suggests that the salts being added to the starter culture growth medium
serve to control processes that occur when the starter culture helps form the curd from a milk
composition. This interpretation is also consistent with the addition of the salts to the starter
culture growth medium being an alternative to adding the salts directly to the curd. Thus,
construing the limitation of adding ingredients via a starter culture medium in a way that is
consistent with the description of a starter culture growth medium in the specification of the
Appellant's Patent involves adding the starter culture and ingredients to the milk composition
instead of the curd.

        In the Resubmitted Appellant's Brief, the Patent Owner conveniently ignores this
description of a starter culture growth medium in the Appellant's own patent and instead argues
without any citation or support that the starter culture is added to the curd to adjust the flavor.
See Resubmitted Appellant's Brief, p. 19, ll. 3 - 4. Even if this could be an additional use of the
starter culture, it does not negate the written description of the Patent Owner's Patent which
clearly suggests that a starter culture growth medium is used to generate a starter culture added to
milk to form the curd. For at least these reasons, the TPR respectfully urges the Examiner's
rejection of claim 70 as being obvious over the cited references be adopted by the Board.

**VI.      Patent Owner's Arguments Traversing the Rejection of Claim 70 As Being Obvious
           Over the Combination of the Rhodes '809 Patent in view of the Anderson '158
           Patent, the Bottazzi '76 Article, the Hargrove '248 Patent and Mid-America '106
           PCT International Publication**

The Communication erroneously alleged that claim 70 is made obvious over the combination of the Rhodes '809 patent in view of the Anderson '158 patent, the Bottazzi '76 article, the Hargrove '248 patent and the Mid-America '106 PCT International Publication. The Communication also relies upon the claim interpretation section at pages 13 and 14 to erroneously allege that the starter culture medium must be added directly to the milk composition prior to the formation of the curd and that the culture medium creates the curd from the starter milk. Therefore, the Communication's erroneous conclusion was that adding a starter culture medium to the curd is illogical and is thus excluded from a reasonable interpretation of claim 70.

Patent Owner respectfully disagrees that adding a starter culture to the curd is illogical. In fact, Dr. Merrill in his second declaration stated in footnote 1 that cultures are added to curds, but that it would not make sense to add a starter culture to a curd. This argument is merely semantics. Clearly, Patent Owner had possession of the claimed invention including the use of a culture medium, whether termed a starter culture or some other term, as it claimed the use of a starter culture medium in at least claims 15 and 70. Whether labeled a starter culture or another name, the culture is added to the curd to adjust the flavor. Also it should be noted that the same culture can be utilized as a starter to form the curd as well as add flavor once the curd is formed. Therefore, the claim as presented is logical, contrary to the allegations contained in the Communication. It is respectfully submitted that the Examiner's analysis is erroneous and the obviousness rejection should be reversed.

## VII.   Examiner's Position Regarding the Rejection of Claim 89 As Being Anticipated by Rhodes '809

The Examiner <u>adopts</u> the arguments of the TPR with respect to the rejection of

claim 89 as being anticipated by Rhodes '809 because the TPR's interpretation of "prior

to mechanically working the curd" and "without aqueous immersion" is deemed

persuasive (Section I).

## VII.   Third Party Requester's Arguments Supporting the Rejection of Claim 89 As Being Anticipated by Rhodes '809

The Patent Owner argues that the Examiner erroneously rejected claims 2 - 4, 7 - 14, 16 - 22, 25, 27 - 29, 31, 32, 35, 38, 40 - 48, 51, 63 - 69, **89**, 90 - 92, 95 - 102 and 114 as being anticipated by the Rhodes '809 Patent because the Office has an incorrect interpretation of the claim terms. See Resubmitted Appellant's Brief, Sections VII - IX. The TPR explained in Section I above how the Rhodes '809 Patent teaches the disputed claim terms, and respectfully urges the Examiner's construction and findings be adopted by the Board.

## VII.   Patent Owner's Arguments Traversing the Rejection of Claim 89 As Being Anticipated by Rhodes '809

The Communication erroneously rejected claim 89 as being anticipated by the Rhodes '809 patent. An element of claim 89 includes adjusting pH of the curd to a range approximately 5.0 to 5.4 after the whey is drained prior to mechanical working. For the reasons stated in Section I(A) of this brief with respect to claim 1, the pH of the curd is not in the range of approximately 5.0 to 5.4 after the whey is drained prior to mechanical working. Rather, the curd is continuously mechanically worked to prevent clumping and matting once placed in the infuser. The infuser is rotated during the pH adjustment period disclosed in the Rhodes '809 patent. Therefore, the rejection of claim 89 is erroneous and Patent Owner respectfully requests that the anticipation rejection of claim 89 be reversed.

## VIII.   Examiner's Position Regarding the Rejection of claim 114 as Being Obvious by the Combination of the Rhodes '809 Patent in view of Anderson '158 Patent, the Bottazzi '76 Article, the Hargrove '248 Patent and the Mid-America '106 PCT International Publication

The Examiner adopts the position of the TPR with respect to the rejection of

claim 114 as obvious over Rhodes '809 in view of the above-identified references

because the TPR's interpretation of the phrases "prior to mechanical working" and

"without aqueous immersion" is deemed persuasive (Section I above).

## VIII.   Third Party Requester's Arguments Supporting the Rejection of Claim 114 as Being Obvious over the Combination of the Rhodes '809 Patent in view of Anderson '158 Patent, the Bottazzi '76 Article, the Hargrove '248 Patent and the Mid-America '106 PCT International Publication

Sections VIII and X - XXXII of the Resubmitted Appellant's Brief argue that the Examiner erroneously rejected the claims as being obvious over the combination of the Rhodes '809 Patent in combination with various additional references. The Patent Owner does not offer any new substantive arguments in Sections VIII and X - XXXII about why these claims should be patentable over the references. Instead the Patent Owner argues that the claims should be patentable for the reasons first articulated in Section I of the Resubmitted Appellant's Brief challenging the Examiner's interpretation of the claim terms "prior to mechanical working" and "heating the curd without aqueous immersion." For the reasons discussed in Section I of the Resubmitted Respondent's Brief, the Examiner's interpretation of these claim terms is correct, and the TPR respectfully urges the Examiner's obviousness rejections over the Rhodes '809 patent in combination with the additional references be adopted by the Board.

## VIII.   Patent Owner's Arguments Traversing the Rejection of Claim 114 as Being Obvious by the Combination of the Rhodes '809 Patent in view of Anderson '158 Patent, the Bottazzi '76 Article, the Hargrove '248 Patent and the Mid-America '106 PCT International Publication

The Communication erroneously rejected claim 114 as being obvious over the above-identified combination. An element of claim 114 includes adding a cheese emulsifying salt or a dairy ingredient or both or a non-dairy via a starter culture prior to mechanical working. For the reasons stated in Section I(A) of this appeal brief presented above with respect to claim 1, there is no disclosure of adding a cheese emulsifying salt or a dairy ingredient or both or a non-dairy ingredient via a starter culture medium prior to mechanical working. Further, for the reasons stated with respect to claim 70, the use of a starter culture medium is logical and appropriate for claim 114. Therefore, the rejection of claim 114 is erroneous and Patent Owner respectfully requests that the anticipation rejection of claim 114 be reversed.

## IX.    Examiner's position with regarding the rejection of claims 2 - 4, 7 - 14, 16 - 22, 25, 27 - 29, 31, 32, 35, 38, 40 - 48, 51, 63 - 69, 90 - 92 and 95 - 102 as being anticipated by Rhodes '809 Patent

The Examiner <u>adopts</u> the position of the TPR with respect to the rejection of

claims 2 - 4, 7 - 14, 16 - 22, 25, 27 - 29, 31, 32, 35, 38, 40 - 48, 51, 63 - 69, 90 - 92 and

95 - 102 as being anticipated by Rhodes '809 in view of the above-identified references

because the TPR's interpretation of the phrases "prior to mechanical working" and

"without aqueous immersion" is deemed persuasive (Section I above).

## IX.    Third Party Requester's Arguments Supporting the Rejection of Claims 2 - 4, 7 - 14, 16 - 22, 25, 27 - 29, 31, 32, 38, 40 - 48, 51, 63 - 69, 90 - 92 and 95 - 102 as anticipated by Rhodes '809

The Appellant argues that the Examiner erroneously rejected claims 2 - 4, 7 - 14, 16 - 22, 25, 27 - 29, 31, 32, 35, 38, 40 - 48, 51, 63 - 69, 89, 90 - 92, 95 - 102 and 114 as being anticipated by the Rhodes '809 Patent because the Office has an incorrect interpretation of the claim terms. See Resubmitted Appellant's Brief, Sections VII - IX. The TPR explained in Section I above how the Rhodes '809 Patent teaches the disputed claim terms, and respectfully urges the Examiner's construction and findings be adopted by the Board.

## IX.    Patent Owner's Arguments Traversing the Rejection of Claims 2 - 4, 7 - 14, 16 - 22, 25, 27 - 29, 31, 32, 38, 40 - 48, 51, 63 - 69, 90 - 92 and 95 - 102 as anticipated by Rhodes '809

The Communication also erroneously rejected dependent claims 2 - 4, 7 - 14, 16 - 22, 26, 27 - 29, 31, 32, 35, 38, 40 - 48, 51, 63 - 69 90 - 92 and 95 - 102 as being anticipated by the Rhodes '809 patent. Patent Owner submits that the anticipation rejection of these dependent claims is erroneous due to the fact that the dependent claims further define the invention in allowable independent claims. Since the rejection of the independent claims is erroneous and

therefore, the independent claims are believed to be in allowable form, it follows that dependent claims 2 - 4, 7 - 14, 16 - 22, 25, 27 - 29, 31, 32, 35 38, 40 - 48, 51, 63 - 69, 90 - 92 and 95 - 102 are also in allowable form. As such the anticipation rejection based upon the Rhodes '809 patent is erroneous. Patent Owner respectfully requests reversal of the anticipation rejections of claims 2 - 4, 7 - 14, 16 - 22, 25, 27 - 29, 31, 32, 35, 38, 40 - 48, 51, 63 - 69, 90 - 92 and 95 - 102.

## X.    Examiner's Position Regarding the Rejection of Claims 5, 6, 93, and 94 as Obvious over Rhodes '809 in view of Yee '903

The Examiner adopts the position of the TPR with respect to the rejection of

claims 5, 6, 93, and 94 as being obvious over Rhodes '809 in view of Yee '903

because the TPR's interpretation of the phrases "prior to mechanical working" and

" without aqueous immersion" is deemed persuasive (Section I above).

## X.    Third Party Requester's Arguments Supporting the Rejection of Claims 5, 6, 93 and 94 as being obvious over Rhodes '809 in view of Yee '903

Sections VIII and X - XXXII of the Resubmitted Appellant's Brief argue that the Examiner erroneously rejected the claims as being obvious over the combination of the Rhodes '809 Patent in combination with various additional references. The Patent Owner does not offer any new substantive arguments in Sections VIII and X - XXXII about why these claims should be patentable over the references. Instead the Patent Owner argues that the claims should be patentable for the reasons first articulated in Section I of the Resubmitted Appellant's Brief challenging the Examiner's interpretation of the claim terms "prior to mechanical working" and "heating the curd without aqueous immersion." For the reasons discussed in Section I of the Resubmitted Respondent's Brief, the Examiner's interpretation of these claim terms is correct, and the TPR respectfully urges the Examiner's obviousness rejections over the Rhodes '809 patent in combination with the additional references be adopted by the Board.

## X.    Patent Owner's Arguments Traversing the Rejection of claims 5, 6, 93, and 94 as being obvious over Rhodes '809 in view of Yee '903

The Communication erroneously rejected dependent claims 5, 6, 93, and 94 as being obvious over the combination of Rhodes '809 and the Yee '903 patent. Claims 5, and 6 depend from independent claim 1, and claims 93 and 94 depend from independent claim 89. As discussed above with respect to the anticipation rejection based on Rhodes '809 patent of independent claims 1 and 89, and for the same reasons as discussed with respect to the patentability of claims 1 and 89, the combination of Rhodes '809 patent with Yee '903 patent neither teaches nor suggests the claimed method. In view of this, it is respectfully requested that the rejection under 35 U.S.C. 103(a) over the combination of Rhodes '809 patent in view of Yee '903 patent be reversed as erroneous.

**XI.   Examiner's Position Regarding the Rejection of Claims 13, 14, 23, 45 - 47, 49 and 68 as Being Obvious over Rhodes '809 in view of Barz '625.**

The Examiner <u>adopts</u> the position of the TPR with respect to the rejection of

claims 13, 14, 23, 45 - 47, 49 and 68 over Rhodes '809 in view of Barz '625 because

the TPR's interpretation of "mechanically working the curd" and "without aqueous

immersion" are deemed persuasive. See Section I above.

**XI.   Third Party Requester's Arguments Supporting the Rejection of Claims 13, 14, 23, 45 - 47, 49 and 68 as Being Obvious over Rhodes '809 in view of the Barz '625**

Sections VIII and X - XXXII of the Resubmitted Appellant's Brief argue that the Examiner erroneously rejected the claims as being obvious over the combination of the Rhodes '809 Patent in combination with various additional references. The Patent Owner does not offer any new substantive arguments in Sections VIII and X - XXXII about why these claims should be patentable over the references. Instead the Patent Owner argues that the claims should be patentable for the reasons first articulated in Section I of the Resubmitted Appellant's Brief challenging the Examiner's interpretation of the claim terms "prior to mechanical working" and "heating the curd without aqueous immersion." For the reasons discussed in Section I of the Resubmitted Respondent's Brief, the Examiner's interpretation of these claim terms is correct, and the TPR respectfully urges the Examiner's obviousness rejections over the Rhodes '809 patent in combination with the additional references be adopted by the Board.

**XI.   Patent Owner's Arguments Traversing the Rejection of Claim 13, 14, 23, 45 - 47, 49 and 68 as Being Obvious over Rhodes '809 in view of Barz '625**

The Communication erroneously rejected dependent claims 13, 14, 23, 45 - 47, 49, and 68 as being obvious over the combination of the Rhodes patent and Barz '625 patent. The Barz '625 patent was cited to allege that pasta filata cheese could be made with additional non fat dry milk which firms the cheese, binds water, improves melt appearance and increases blistering. However, the Barz '625 patent does not cure the deficiencies of the Rhodes '809 with respect to claim 1, 36, or 62. Therefore, by virtue of the dependency of claims 13, 14, 23, 45 - 47, 49 and 68, the obviousness rejection of claims 13, 14, 23, 45 - 47, 49, and 68 are erroneous. Reversal of the obviousness rejection of claims 13, 14, 23, 45 - 47, 49 and 68 are respectfully requested.

**XII.   Examiner's Position Regarding the Rejection of Claims 24, 33, 39 and 50 as Being Obvious over Rhodes '809 in view of the Rizvi '398 patent.**

The Examiner <u>adopts</u> the position of the TPR with respect to the rejection of

claims 24, 33, 39, and 50 over Rhodes '809 in view of Rizvi '398 patent because the

TPR's interpretation of "mechanically working the curd" and "without aqueous

immersion" are deemed persuasive.  See Section I above.

**XII.    Third Party Requester's Arguments Supporting the Rejection of Claims 24, 33, 39 and 50 as Obvious over Rhodes '809 in view of Rizvi '398 patent.**

  Sections VIII and X - XXXII of the Resubmitted Appellant's Brief argue that the Examiner erroneously rejected the claims as being obvious over the combination of the Rhodes '809 Patent in combination with various additional references.  The Patent Owner does not offer any new substantive arguments in Sections VIII and X - XXXII about why these claims should be patentable over the references.  Instead the Patent Owner argues that the claims should be patentable for the reasons first articulated in Section I of the Resubmitted Appellant's Brief challenging the Examiner's interpretation of the claim terms "prior to mechanical working" and "heating the curd without aqueous immersion."  For the reasons discussed in Section I of the Resubmitted Respondent's Brief, the Examiner's interpretation of these claim terms is correct, and the TPR respectfully urges the Examiner's obviousness rejections over the Rhodes '809 patent in combination with the additional references be adopted by the Board.

**XII.    Patent Owner's Arguments Traversing the Rejection of Claims 23, 33, 39, and 50 as Being Obvious over Rhodes '809 in view of the Rizvi '398 patent.**

  The Communication erroneously rejected claims 23, 33, 39 and 50 as being obvious over the combination of the Rhodes '809 patent and the Rizvi '398 patent.  The Rizvi '398 patent was cited to allege that pasta filata cheese could be made by extruding the processed mozzarella cheese directly into sterilized containers.  However, the Rizvi '398 patent does not cure the deficiencies of claims 24, 44, 39, and 50 from claims 1, 26 and 36, the obviousness rejection of claims 24, 33, 39 and 50 is erroneous.  Reversal of this obviousness rejection of claims 24, 33 39, and 50 are respectfully requested.

**XIII.   Examiner's Position Regarding the Rejection of Claim 30 as Being Obvious over Rhodes '809 patent in view of Rizvi '398 and the Barz '625 patent.**

The Examiner <u>adopts</u> the arguments of the TPR as set forth below with respect

to the rejection of claim 30 as being obvious over Rhodes '809 in view of Rizvi '398

patent and the Barz '625 patent because the TPR's interpretation of "mechanically

working the curd" is deemed persuasive.  See Section I above.

**XIII.   Third Party Requester's Arguments Supporting the Rejection of Claim 30 as Being Obvious over Rhodes '809 in view of Rizvi '398 and the Barz '625 patents.**

Application/Control Number: 95/000,003; 90/006,317                      Page 104
Art Unit: 3991

Sections VIII and X - XXXII of the Resubmitted Appellant's Brief argue that the Examiner erroneously rejected the claims as being obvious over the combination of the Rhodes '809 Patent in combination with various additional references. The Patent Owner does not offer any new substantive arguments in Sections VIII and X - XXXII about why these claims should be patentable over the references. Instead the Patent Owner argues that the claims should be patentable for the reasons first articulated in Section I of the Resubmitted Appellant's Brief challenging the Examiner's interpretation of the claim terms "prior to mechanical working" and "heating the curd without aqueous immersion." For the reasons discussed in Section I of the Resubmitted Respondent's Brief, the Examiner's interpretation of these claim terms is correct, and the TPR respectfully urges the Examiner's obviousness rejections over the Rhodes '809 patent in combination with the additional references be adopted by the Board.

**XIII.   Patent Owner's Arguments Traversing the Rejection of Claim 30 as Being Obvious over Rhodes '809 in view of Rizvi '398 and Barz '625**

The Communication erroneously rejected claim 30 as being obvious over the combination of the Rhodes '809 patent, the Rizvi '398 and the Barz '625 patent do not cure the deficiencies of the Rhodes '809 patent with respect to claim 26. Therefore, by virtue of the dependency of claim 30 from claim 26, the obviousness rejection of claim 30 is erroneous. Reversal of the obviousness rejection of claim 30 is respectfully requested.

**XIV.   Examiner's Position Regarding the Rejection of Claim 37 as Being Obvious over Rhodes '809 in view of Pontecorvo '241**

The Examiner adopts the arguments below of the TPR with respect to the

rejection of claim 30 as being obvious over Rhodes '809 in view of Pontecorvo '241

because the Patent Owner only argues the patentability of the independent claim 26,

which has already been shown to be anticipated by the Rhodes '809 Patent. The

critical issue in claims 26 and 30 is the interpretation of the phrase: "prior to

mechanically working the curd." The TPR's explanation of the interpretation of this

phrase found in Section I

is deemed persuasive.

**XIV.   Third Party Requester's Arguments Supporting the Rejection of Claim 37 as Being Obvious over the Rhodes '809 Patent in view of the Pontocorvo '241 Patent**

Sections VIII and X - XXXII of the Resubmitted Appellant's Brief argue that the Examiner erroneously rejected the claims as being obvious over the combination of the Rhodes '809 Patent in combination with various additional references.  The Patent Owner does not offer any new substantive arguments in Sections VIII and X - XXXII about why these claims should be patentable over the references.  Instead the Patent Owner argues that the claims should be patentable for the reasons first articulated in Section I of the Resubmitted Appellant's Brief challenging the Examiner's interpretation of the claim terms "prior to mechanical working" and "heating the curd without aqueous immersion."  For the reasons discussed in Section I of the Resubmitted Respondent's Brief, the Examiner's interpretation of these claim terms is correct, and the TPR respectfully urges the Examiner's obviousness rejections over the Rhodes '809 patent in combination with the additional references be adopted by the Board.

**XIV.   Patent Owner's Arguments Traversing the Rejection of claims 37 as Being Obvious over the Rhodes '809 Patent in view of the Pontecorvo '241 Patent**

The Communication erroneously rejected claim 37 as being obvious over the combination of the Rhodes '809 patent in view of the Pontecorvo '241  However, the Pontecorvo '241 patent does not cure the deficiencies of the Rhodes '809 patent with respect to claim 36.  Therefore, by virtue of the dependency of claim 37 from claim 36, the obviousness rejection of claim 37 is erroneous.  Reversal of the obviousness rejection of claim 37 is respectfully requested.

**XV.   Examiner's Position Regarding the Rejection of Claims 52 - 56, 58 and 61 as Being Obvious over Rhodes '809 in view of Dansco '398 EP Publication**

The Examiner adopts the arguments below of the TPR with respect to the

rejection of claims 52 - 56, 58 and 61 as being obvious over Rhodes '809 in view of

Dansco '398 because the Patent Owner only argues the patentability of the independent

claim 26, which has already been shown to be anticipated by the Rhodes '809 Patent.

The critical issue in claims 52 - 56, 58 and 61 is the interpretation of the phrase:  "prior

to mechanically working the curd."  The TPR's explanation of the interpretation of this

phrase found in Section I is deemed persuasive.

XV.   **Third Party Requester's Arguments Supporting the Rejection of Claims 52 - 56, 58 and 61 as Being Obvious over the Rhodes '809 Patent in view of Dansco '398 EP Publication**

Sections VIII and X - XXXII of the Resubmitted Appellant's Brief argue that the Examiner erroneously rejected the claims as being obvious over the combination of the Rhodes '809 Patent in combination with various additional references. The Patent Owner does not offer any new substantive arguments in Sections VIII and X - XXXII about why these claims should be patentable over the references. Instead the Patent Owner argues that the claims should be patentable for the reasons first articulated in Section I of the Resubmitted Appellant's Brief challenging the Examiner's interpretation of the claim terms "prior to mechanical working" and "heating the curd without aqueous immersion." For the reasons discussed in Section I of the Resubmitted Respondent's Brief, the Examiner's interpretation of these claim terms is correct, and the TPR respectfully urges the Examiner's obviousness rejections over the Rhodes '809 patent in combination with the additional references be adopted by the Board.

XV.   **Patent Owner's Arguments Traversing the Rejection of Claims 52 - 56, 58 and 61 as Being Obvious over Rhodes '809 in view of Dansco '398.**

The Communication erroneously rejected claims 52 - 56, 61, 105 - 108 and 110 as being obvious over the combination of the Rhodes '809 patent in view of Dansco '398 EP publication. However, independent claims 52 is in allowable form for the previously stated reasons. Therefore, by virtue of the dependency of claims 53 - 56, 58 and 61 from claim 52, the obviousness rejection of claims 53 - 56, 58, and 61 is erroneous. Reversal of the obviousness rejection of claims 53 - 56, 58 and 61 is respectfully requested.

XVI.  **Examiner's Position with Regard to the Rejection of Claim 60 as Being Obvious over Rhodes '809 in view of Dansco '398 as applied to claims 52 - 56, 58, 61, 104 - 108 and 110, and further in view of Lindgren '666**
The Examiner adopts the TPR's arguments with regard to the rejection of claim

60 as being obvious over Rhodes '809 in view of Dansco '398 as applied to claims 52 -

56, 58, 61, 104 - 108 and 110, and further in view of Lindgren '666. The explanation of

the anticipation of the independent claim 52 has been presented in Sections I, III, and V

where the key issue is the interpretation of the phrases "prior to mechanically working

the curd" and "without aqueous immersion," which constructs the Examiner finds

persuasive.

XVI.   **Third Party Requester's Arguments Supporting the Rejection of Claim
60 as Being Obvious over the Rhodes '809 Patent in view Dansco '359
as applied to claims 52 - 56, 58, 61, 104 - 108 and 110, and further in view
of Lindgren '666**

Sections VIII and X - XXXII of the Resubmitted Appellant's Brief argue that the
Examiner erroneously rejected the claims as being obvious over the combination of the Rhodes
'809 Patent in combination with various additional references.  The Patent Owner does not offer
any new substantive arguments in Sections VIII and X - XXXII about why these claims should
be patentable over the references.  Instead the Appellant argues that the claims should be
patentable for the reasons first articulated in Section I of the Resubmitted Appellant's Brief
challenging the Examiner's interpretation of the claim terms "prior to mechanical working" and
"heating the curd without aqueous immersion."  For the reasons discussed in Section I of the
Resubmitted Respondent's Brief, the Examiner's interpretation of these claim terms is correct,
and the TPR respectfully urges the Examiner's obviousness rejections over the Rhodes '809
patent in combination with the additional references be adopted by the Board.

XVI.   **Patent Owner's Arguments Traversing the Rejection of Claim 60 as Being Obvious
over the Rhodes '809 patent in view of Dansco '359 as applied to claims 52 - 56, 58,
61, 104 - 108 and 110 and further in view of Lindgren '666**

The Communication erroneously rejected claim 60 as being obvious over the
combination of Rhodes '809 in view of Dansco '359 EP publication and Lindgren '666.
However, independent claim 52 is in allowable form for the previously stated reasons. Therefore,
by virtue of the dependency of claim 60 from claim 52, the obviousness rejection of claim 60 is
erroneous.  Reversal of the obviousness rejection of claim 60 is respectfully requested.

XVII.  **Examiner's Position Regarding the Rejection of Claim 57 as Obvious over
Rhodes '809 in view Dansco '359 EP publication, Rizvi '398, and Barz '625**

The Examiner adopts the arguments of the TPR with respect to the rejection of

claim 57 as being obvious over Rhodes '809 in view of Dansco '359, Rizvi '398 and

Barz '625.  The key issue in independent claim 26 from which claim 30 depends is the

meaning of the phrase "mechanically working the curd," which has been discussed fully

by the TPR in Section I and has been found persuasive by the Examiner.

XVII.  **Third Party Requester's Arguments Supporting the Rejection of Claim 57 as
Obvious over the Combination of the Rhodes '809 Patent in view Dansco '359,
Rizvi '398 and Barz '625**

Sections VIII and X - XXXII of the Resubmitted Appellant's Brief argue that the Examiner erroneously rejected the claims as being obvious over the combination of the Rhodes '809 Patent in combination with various additional references. The Patent Owner does not offer any new substantive arguments in Sections VIII and X - XXXII about why these claims should be patentable over the references. Instead the Patent Owner argues that the claims should be patentable for the reasons first articulated in Section I of the Resubmitted Appellant's Brief challenging the Examiner's interpretation of the claim terms "prior to mechanical working" and "heating the curd without aqueous immersion." For the reasons discussed in Section I of the Resubmitted Respondent's Brief, the Examiner's interpretation of these claim terms is correct, and the TPR respectfully urges the Examiner's obviousness rejections over the Rhodes '809 patent in combination with the additional references be adopted by the Board.

**XVII.   Patent Owner's Arguments Traversing the Rejection of Claim 57 as Obvious over the Rhodes '809 patent in view of Dansco '359, the Rizvi '398 patent and the Barz '625 patent**

The Communication erroneously rejected claim 57 as being obvious over the Rhodes '809 patent in view of Dansco '359, the Rizvi '398 patent, and the Barz '625 patent. However, the Dansco '359, Rizvi '398 patent and the Barz '625 patent do not cure the deficiencies of the Rhodes '809 patent with respect to claim 26. Therefore, by virtue of the dependency of claim 57 from claim 52, the obviousness rejection of claim 57 is erroneous. Reversal of the obviousness rejection of claim 30 is respectfully requested.

**XVIII.   Examiner's Position Regarding the Rejection of Claim 59 as Obvious over Rhodes '809 in view of Dansco '359 EP Publication and Rizvi '398**

The Examiner <u>adopts</u> the arguments of the TPR with respect to the rejection of claim 59 as being obvious over Rhodes '809 in view of Dansco '359 EP Publication and Rizvi '398. The critical issue in the rejection of claim 52 from which claim 59 depends is the meaning of the phrase "mechanically working the curd," which has been fully discussed by the TPR in Section I above and is deemed persuasive.

**XVIII.   Third Party Requester's Arguments Supporting the Rejection of Claim 59 as Obvious over the Rhodes '809 Patent in view of Dansco '359 EP Publication and Rizvi '398**

Sections VIII and X - XXXII of the Resubmitted Appellant's Brief argue that the Examiner erroneously rejected the claims as being obvious over the combination of the Rhodes '809 Patent in combination with various additional references. The Patent Owner does not offer any new substantive arguments in Sections VIII and X - XXXII about why these claims should

be patentable over the references.  Instead the Patent Owner argues that the claims should be
patentable for the reasons first articulated in Section I of the Resubmitted Appellant's Brief
challenging the Examiner's interpretation of the claim terms "prior to mechanical working" and
"heating the curd without aqueous immersion."  For the reasons discussed in Section I of the
Resubmitted Respondent's Brief, the Examiner's interpretation of these claim terms is correct,
and the TPR respectfully urges the Examiner's obviousness rejections over the Rhodes '809
patent in combination with the additional references be adopted by the Board.

**XVIII.**   **Patent Owner's Arguments Traversing the Rejection of Claim 59 as Obvious
over the Rhodes '809 Patent in view of Dansco '359 EP Publication and Rizvi
'398**

The Communication erroneously rejected claim 59 as being obvious over the
combination of the Rhodes '809 patent in view of Dansco '359 and Rizvi '398.  However,
independent claim 52 is in allowable form for the previously stated reasons.  Therefore, by virtue
of the dependency of claim 59 from claim 52, the obviousness rejection of claim 59 is erroneous.
Reversal of the obviousness rejection of claim 59 is respectfully requested.

**XIX.**   **Examiner's Position Regarding the Rejection of Claim 10 as Being
Obvious over Rhodes '809 in view of Barz '625 or Rizvi '398**

The Examiner <u>adopts</u> the arguments of the TPR with regard to the rejection of

claim 10 as being obvious over Rhodes '809 in view of Barz '625 or Rizvi '398.  Since

claim 10 depends from claim 1 and the Patent Owner only argues the patentability of

this independent claim 1, the crucial limitations of the dependent claims are the same as

those of independent claim 1.  The central issue in the patentability determination of

claim 1 is the interpretation of "mechanically working the curd" and "without aqueous

immersion."  The TPR has discussed the meaning of these phrases fully in Section I

and this explanation is deemed persuasive.

**XIX.**   **Third Party Requester's Arguments Supporting the Rejection of Claim 10 as
Obvious over the Rhodes '809 Patent in view of Barz '625 or Rizvi '398**

Sections VIII and X - XXXII of the Resubmitted Appellant's Brief argue that the
Examiner erroneously rejected the claims as being obvious over the combination of the Rhodes
'809 Patent in combination with various additional references.  The Patent Owner does not offer

any new substantive arguments in Sections VIII and X - XXXII about why these claims should
be patentable over the references.  Instead the Patent Owner argues that the claims should be
patentable for the reasons first articulated in Section I of the Resubmitted Appellant's Brief
challenging the Examiner's interpretation of the claim terms "prior to mechanical working" and
"heating the curd without aqueous immersion."  For the reasons discussed in Section I of the
Resubmitted Respondent's Brief, the Examiner's interpretation of these claim terms is correct,
and the TPR respectfully urges the Examiner's obviousness rejections over the Rhodes '809
patent in combination with the additional references be adopted by the Board.

## XIX.   Patent Owner's Arguments Traversing the Rejection of Claim 10 as Obvious over the Rhodes '809 Patent in view Barz '625 or Rizvi '398

The Communication erroneously rejected claim 10 as being obvious over the
combination of the Rhodes '809 patent in view of Barz '625 or Rizvi '359.  Independent claim 1
is in allowable form for the previously stated reasons.  Therefore, by virtue of the dependency
of claim 10 from claim 1, the obviousness rejection of claim 10 is erroneous.  Reversal of the
obviousness rejection of claim 10 is respectfully requested.

## XX.   Examiner's Position Regarding the Rejection of Claim 12 as obvious over the Rhodes '809 Patent in view of Rizvi '398

The Examiner adopts the arguments of the TPR with respect to the rejection of

claim 12 as obvious over the Rhodes '809 Patent in view of Rizvi '398 because claim 10

depends from claim 1 and the Patent Owner only argues the patentability of this

independent claim 1 and the crucial limitations of the dependent claims are the same as

those of independent claim 1.  The central issue in the patentability determination of

claim 1 is the interpretation of "mechanically working the curd" and "without aqueous

immersion."  The TPR has discussed the meaning of these phrases fully in Section I

and this explanation is deemed persuasive.

## XX.   Third Party Requester Arguments Supporting the Rejection of Claim 12 as obvious over the Rhodes '809 Patent in view of Rizvi '398

Sections VIII and X - XXXII of the Resubmitted Appellant's Brief argue that the
Examiner erroneously rejected the claims as being obvious over the combination of the Rhodes
'809 Patent in combination with various additional references.  The Patent Owner does not offer
any new substantive arguments in Sections VIII and X - XXXII about why these claims should

be patentable over the references. Instead the Patent Owner argues that the claims should be patentable for the reasons first articulated in Section I of the Resubmitted Appellant's Brief challenging the Examiner's interpretation of the claim terms "prior to mechanical working" and "heating the curd without aqueous immersion." For the reasons discussed in Section I of the Resubmitted Respondent's Brief, the Examiner's interpretation of these claim terms is correct, and the TPR respectfully urges the Examiner's obviousness rejections over the Rhodes '809 patent in combination with the additional references be adopted by the Board.

### XX.   Patent Owner's Arguments Traversing the Rejection of Claim 12 as obvious over the Rhodes '809 in view of Rizvi '398

The Communication erroneously rejected claim 12 as being obvious over the combination of the Rhodes '809 patent in view of the Rizvi '398. However, independent claim 1 is in allowable form for the previously stated reasons. Therefore, by virtue of the dependency of claim 12 from claim 1, the obviousness rejection of claim 12 is erroneous. Reversal of the obviousness rejection is respectfully requested.

With respect to claims 112, 147 - 150, 152, 154, 156 - 159, 161, and 163, Appellant attempted to amend claims 104, 146, and 166 in an Amendment on April 25, 2005. The Amendment filed on April 25, 2005 was not entered or considered for purposes of this appeal. Patent Owner believes that the claims as amended in the April 25, 2005 Amendment are patentable over the prior art. However, filed along with the Appeal Brief is a Petition to have the amended claims entered and examined. Appellant respectfully requests that the Board delay in determining the patentability of claims 112, 147 - 150, 152, 154, 156 - 159, 161, and 163 until after a Decision on the Petition is rendered because if the Petition is granted, Patent Owner submits that the current rejections of claims 112, 147 - 150, 152, 154, 156 - 159, 161 and 163 will be moot.

### XXI.   Examiner's Position Regarding the Rejection of Claims 70 - 73, 76 - 86, 115, 116, 119 - 124 and 127 - 134 as obvious over the Combination of Rhodes '809 in view of the Andersen '158 patent, the Bottazzi '76 article, the Hargrove '248 patent, and the Mid-America '106 PCT International publication

The Examiner <u>adopts</u> the arguments of the TPR with respect to the rejection of

claims 70 - 73, 76 - 86, 115, 116, 119 - 124 and 127 - 134 as obvious over the Rhodes

'809 patent in view of the Andersen '158 patent, the Bottazzi '76 article, the Hargrove

'248 patent, and the Mid-America '106 PCT International publication because the

central issue in the patentability determination of independent claims 70 and 114 is the

interpretation of "mechanically working the curd" and "without aqueous immersion." The

TPR has discussed the meaning of these phrases fully in Section I and this explanation

is deemed persuasive.

**XXI.  Third Party Requester's Arguments Supporting the Rejection of Claims 70 - 73, 76 - 86, 115, 116, 119 - 124 and 127 - 134 as obvious over the Combination of Rhodes '809 in view of the Andersen '158 patent, the Bottazzi '76 article, the Hargrove '248 patent, and the Mid-America '106 PCT International publication**

Sections VIII and X - XXXII of the Resubmitted Appellant's Brief argue that the Examiner erroneously rejected the claims as being obvious over the combination of the Rhodes '809 Patent in combination with various additional references.  The Patent Owner does not offer any new substantive arguments in Sections VIII and X - XXXII about why these claims should be patentable over the references.  Instead the Appellant argues that the claims should be patentable for the reasons first articulated in Section I of the Resubmitted Appellant's Brief challenging the Examiner's interpretation of the claim terms "prior to mechanical working" and "heating the curd without aqueous immersion."  For the reasons discussed in Section I of the Resubmitted Respondent's Brief, the Examiner's interpretation of these claim terms is correct, and the TPR respectfully urges the Examiner's obviousness rejections over the Rhodes '809 patent in combination with the additional references be adopted by the Board.

**XXI.  Patent Owner's Arguments Traversing the Rejection of 70 - 73, 76 - 86, 115, 116, 119 - 124 and 127 - 134 as obvious over the Combination of Rhodes '809 in view of the Andersen '158 patent, the Bottazzi '76 article, the Hargrove '248 patent, and the Mid-America '106 PCT International publication**

The Communication erroneously rejected claims 70 - 73, 76 - 86, 115, 116, 119 - 124 and 127 - 134 as obvious over the Combination of Rhodes '809 in view of the Andersen '158 patent, the Bottazzi '76 article, the Hargrove '248 patent, and the Mid-America '106 PCT International publication.  However, independent claims 70 and 114 are in allowable form for the previously stated reasons.  Therefore, by virtue of dependency of claims 70 - 73 and 76 - 86 from claim 70 and claims 115, 116, 119 - 124, and 127 - 134 from claim 114, the obviousness rejection of claims 71 - 73, 76 - 86, 115, 116, 119 - 124, and 127 - 134 is erroneous.  Reversal of the obviousness rejection of claims 70 - 73, 76 - 86, 115, 116, 119 - 124, and 127 - 134 is respectfully requested.

**XXII.  Examiner's Position Regarding the Rejection of Claims 125, 126 and 134 as Being Obvious over the Rhodes '809 Patent in view of the Anderson '158 patent, the Bottazzi '76 article, the Hargrove '248 patent, and the Mid-America '106 International publication as applied to claims 70 - 73, 76 - 86, 114 - 116, 119 - 124, and 127 - 133, and further in view of the Barz '625 patent**

The Examiner adopts the arguments of the TPR with regard to the rejection of

claims  as being obvious over the Rhodes '809 patent in view of the Anderson '158

patent, the Bottazzi '76 article, the Hargrove '248 patent, and the Mid-America '106

International publication as applied to claims 70 - 73, 76 - 86, 114 - 116, 119 - 124 and

127 - 133, and further in view of the Barz '625 patent because the central issue in the

patentability determination of independent 114 is the interpretation of "mechanically

working the curd" and "without aqueous immersion."  The TPR has discussed the

meaning of these phrases fully in Section I and this explanation is deemed persuasive.

**XXII. Third Party Requester's Arguments Supporting the Rejection of Claims 125, 126
and 134 as Being Obvious over the Rhodes '809 Patent in view of the Anderson '158
patent, the Bottazzi '76 article, the Hargrove '248 patent, and the Mid-America
'106 International publication as applied to claims 70 - 73, 76 - 86, 114 - 116,
119 - 124 and 127 - 133, and further in view of the Barz '625 patent**

Sections VIII and X - XXXII of the Resubmitted Appellant's Brief argue that the
Examiner erroneously rejected the claims as being obvious over the combination of the Rhodes
'809 Patent in combination with various additional references.  The Patent Owner does not offer
any new substantive arguments in Sections VIII and X - XXXII about why these claims should
be patentable over the references.  Instead the Patent Owner argues that the claims should be
patentable for the reasons first articulated in Section I of the Resubmitted Appellant's Brief
challenging the Examiner's interpretation of the claim terms "prior to mechanical working" and
"heating the curd without aqueous immersion."  For the reasons discussed in Section I of the
Resubmitted Respondent's Brief, the Examiner's interpretation of these claim terms is correct,
and the TPR respectfully urges the Examiner's obviousness rejections over the Rhodes '809
patent in combination with the additional references be adopted by the Board.

**XXII. Patent Owner's Arguments Traversing the Rejection of Claims 125, 126
and 134 as Being Obvious over the Rhodes '809 Patent in view of the
Anderson '158 patent, the Bottazzi '76 article, the Hargrove '248 patent,
and the Mid-America '106 International publication as applied to claims
70 - 73, 76 - 86, 114 - 116, 119 - 124 and 127 - 133 and further in view
of the Barz '625 patent**

The Communication erroneously rejected claims 125, 126 and 134 as Being Obvious over the Rhodes '809 Patent in view of the Anderson '158 patent, the Bottazzi '76 article, the Hargrove '248 patent, and the Mid-America '106 International publication, and further in view of the Barz '625 patent. However, independent claim 114 is in allowable form for the previously stated reasons. Therefore, by virtue of the dependency of claims 125, 126 and 134 from claim 114, the obviousness rejection of claims 125, 126 and 134 is erroneous. Reversal of the obviousness rejection of claims 125, 126, and 134 is respectfully requested.

**XXIII.    Examiner's Position Regarding the Rejection of Claim 135 as Obvious over the Rhodes '809 Patent in view of the Anderson '158 patent, the Bottazzi '76 article, the Hargrove '248 patent, and the Mid-America '106 International publication as applied to claims 70 - 73, 76 - 86, 114 - 116, 119 - 124 and 127 - 133 and further in view of the Barz '625 patent**

The Examiner <u>adopts</u> the TPR's arguments with respect to the rejection of

claim 135 as being obvious over the combination of the Rhodes '809 patent in view of

the Anderson '158 patent, the Bottazzi '76 article, the Hargrove '248 patent, and the

Mid-America '106 International publication as applied to claims 70 - 73, 76 - 86, 114 -

116, 119 - 124 and 127 - 133, and further in view of the Barz '625 patent.  Claim 135

depends from claim 114 which is anticipated by the Rhodes '809 patent.  The critical

issue in claim 114 is the interpretation of "without aqueous immersion" and "prior to

mechanically working the curd," which has been fully explained by the TPR in Section 1

above.

**XXIII.    Third Party Requester's Arguments Supporting the Rejection of Claim 135 as Being Obvious over the Rhodes '809 Patent in view of the Anderson '158 patent, the Bottazzi '76 article, the Hargrove '248 patent, and the Mid-America '106 International publication as applied to claims 70 - 73, 76 - 86, 114 - 116, 119 - 124 and 127 - 133 and further in view of the Barz '625 patent**

Sections VIII and X - XXXII of the Resubmitted Appellant's Brief argue that the Examiner erroneously rejected the claims as being obvious over the combination of the Rhodes '809 Patent in combination with various additional references.  The Patent Owner does not offer any new substantive arguments in Sections VIII and X - XXXII about why these claims should

be patentable over the references.  Instead the Patent Owner argues that the claims should be
patentable for the reasons first articulated in Section I of the Resubmitted Appellant's Brief
challenging the Examiner's interpretation of the claim terms "prior to mechanical working" and
"heating the curd without aqueous immersion."  For the reasons discussed in Section I of the
Resubmitted Respondent's Brief, the Examiner's interpretation of these claim terms is correct,
and the TPR respectfully urges the Examiner's obviousness rejections over the Rhodes '809
patent in combination with the additional references be adopted by the Board.

**XXIII.**   **Patent Owner's Arguments Traversing the Rejection of Claim 135 as Obvious
over the Rhodes '809 Patent in view of the Anderson '158 patent, the Bottazzi
'76 article, the Hargrove '248 patent, and the Mid-America '106 International
Publication as applied to claims 70 - 73, 76 - 86, 114 - 116, 119 - 124 and 127 -
133 and further in view of the Barz '625 patent.**

The Communication erroneously rejected claim 135 as being obvious over the
combination of the Rhodes '809 Patent in view of the Rhodes '809 Patent in view of the
Anderson '158 patent, the Bottazzi '76 article, the Hargrove '248 patent, and the Mid-America
'106 International publication, and further in view of the Barz '625 patent.  However, indepen-
dent claim 114 is in allowable form for the previously stated reasons.  Therefore, by virtue of the
dependency of claim 135 from claim 114, the obviousness rejection of claim 135 is erroneous.
Reversal of the obviousness rejection of claim 135 is respectfully requested.

**XXIV.**   **Examiner's Position Regarding the Rejection of Claim 136 as Obvious
over the Rhodes '809 Patent in view of the Anderson '158 patent, the
Bottazzi '76 article, the Hargrove '248 patent, and the Mid-America '106
International publication, as applied to claims 70 - 73, 76 - 86, 115, 116,
119 - 124 and 127 - 134, and further in view of Yun '92 and Barbano
'91 articles.**

The Examiner <u>adopts</u> the arguments of the TRP with respect to the rejection of

claim 136 as being obvious over the Rhodes '809 Patent in view of the Anderson '158

patent, the Bottazzi '76 article, the Hargrove '248 patent, and the Mid-America '106

International publication, and further in view of the Yun '92 and Barbano '91 articles.

The critical issue in independent claim 114 is the interpretation of "without aqueous

immersion" and "prior to mechanically working the curd" which has been fully explained

by the TPR in Section 1 above.

**XXIV.    Third Party Requester's Arguments Supporting the Rejection of Claim 136 as Obvious over Rhodes '809 in view of the Anderson '158 patent, the Bottazzi '76 article, the Hargrove '248 patent, and the Mid-America '106 International publication as applied to claims 70 - 73, 76 - 86, 115, 116, 119 - 124 and 127 - 134, and further in view of the Yun '92 and Barbano '91 articles.**

Sections VIII and X - XXXII of the Resubmitted Appellant's Brief argue that the Examiner erroneously rejected the claims as being obvious over the combination of the Rhodes '809 Patent in combination with various additional references.  The Patent Owner does not offer any new substantive arguments in Sections VIII and X - XXXII about why these claims should be patentable over the references.  Instead the Patent Owner argues that the claims should be patentable for the reasons first articulated in Section I of the Resubmitted Appellant's Brief challenging the Examiner's interpretation of the claim terms "prior to mechanical working" and "heating the curd without aqueous immersion."  For the reasons discussed in Section I of the Resubmitted Respondent's Brief, the Examiner's interpretation of these claim terms is correct, and the TPR respectfully urges the Examiner's obviousness rejections over the Rhodes '809 patent in combination with the additional references be adopted by the Board.

**XXIV.    Patent Owner's Arguments Traversing the Rejection of Claim 136 as Being Over the Rhodes '809 Patent in view of the Anderson '158 patent, the Bottazzi '76 article, the Hargrove '248 patent, and the Mid-America '106 International publication as applied to claims 70 - 73, 76 - 86, 115, 116, 119 - 124 and 127 - 134 and further in view of Yun '92 and Barbano '91 articles.**

The Communication erroneously rejected claim 136 as being obvious over the combination of the Rhodes '809 patent in view of the Anderson '158 patent, the Bottazzi '76 article, the Hargrove '248 patent, and the Mid-America '106 International publication as applied to claims 70 - 73, 76 - 86, 115, 116, 119 - 124 and 127 - 133, and further in view of Yun '92 and Barbano '91 articles.  However, independent claim 114 is in allowable form for the previously stated reasons.  Therefore, by virtue of the dependency of claim 136 form claim 114, the obviousness rejection of claims 136 is erroneous.  Reversal of the obviousness rejection of claim 136 is respectfully requested.

**XXV.    Examiner's Position Regarding the Rejection of Claims 74, 75, 117 and 118 as Obvious over the Combination of the Rhodes '809 Patent in view of the Anderson '158 Patent, the Bottazzi '76 Article, the Hargrove '248 Patent, and the Mid-America '106 PCT Publication as applied to claims 70 - 73, 76 - 86, 115, 116, 119 - 124 and 127 - 134, and further in view of Yee '943 Patent.**

The Examiner adopts the arguments of the TPR with respect to the rejection of

claim 136 as obvious over the combination of the Rhodes '809 patent in view of the

Anderson '158 patent, the Bottazzi '76 Article, the Hargrove '248 patent, and the Mid-

America '106 PCT publication as applied to claims 70 - 73, 76 - 86, 115, 116, 119 - 124 and

127 - 134, and further in view of Yee '943 Patent. The critical issue in claim 114 is the

interpretation of "without aqueous immersion" and "prior to mechanically working the curd"

which has been fully explained by the TPR in Section 1 above.

**XXV.    Third Party Requester's Arguments Supporting the Rejection of Claims 74, 75, 117
and 118 as Obvious over the Combination of the Rhodes '809 Patent in view of the
Anderson '158 Patent, the Bottazzi '76 Article, the Hargrove '248 Patent, and the
Mid-America '106 PCT Publication as applied to claims 70 - 73, 76 - 86, 115, 116,
119 - 124 and 127 - 134, and further in view of Yee '943 Patent.**

Sections VIII and X - XXXII of the Resubmitted Appellant's Brief argue that the
Examiner erroneously rejected the claims as being obvious over the combination of the Rhodes
'809 Patent in combination with various additional references.  The Patent Owner does not offer
any new substantive arguments in Sections VIII and X - XXXII about why these claims should
be patentable over the references.  Instead the Patent Owner argues that the claims should be
patentable for the reasons first articulated in Section I of the Resubmitted Appellant's Brief
challenging the Examiner's interpretation of the claim terms "prior to mechanical working" and
"heating the curd without aqueous immersion."  For the reasons discussed in Section I of the
Resubmitted Respondent's Brief, the Examiner's interpretation of these claim terms is correct,
and the TPR respectfully urges the Examiner's obviousness rejections over the Rhodes '809
patent in combination with the additional references be adopted by the Board.

**XXV.    Patent Owner's Arguments Traversing the Rejection of Claims 74, 75, 117
and 118 as Obvious over the Combination of the Rhodes '809 Patent in view of the
Anderson '158 Patent, the Bottazzi '76 Article, the Hargrove '248 Patent, and the
Mid-America '106 PCT Publication as applied to claims 70 - 73, 76 - 86, 115, 116,
119 - 124 and 127 - 134, and further in view of the Yee '943 Patent.**

The Communication erroneously rejected claims 74, 75, 117 and 118 as obvious over the
combination of the Rhodes '809 Patent in view of the Anderson '158 Patent, the Bottazzi '76
Article, the Hargrove '248 Patent, and the Mid-America '106 PCT Publication as applied to
claims 70 - 73, 76 - 86, 115, 116, 119 - 124 and 127 - 134, and further in view of Yee '943
patent.   However, independent claims 70 and 115 are in allowable form for the previously
stated reasons.  Therefore, by virtue of the dependency of claims 74 and 75 from claim 70, and
claims 117 and 118 from 115, the obviousness rejection of claims 74, 75, 117 and 118 is
erroneous.  Reversal of the obviousness rejection is respectfully requested.

**XXVI.   Examiner's Position Regarding the Rejection of Claim 34 as
        Obvious over the Rhodes '809 Patent in view of Lindgren '666.**

The Examiner adopts the arguments of the TPR with respect to the rejection of

claim 34 as being obvious over the Rhodes '809 Patent in view of Lindgren '666.  The

Patent Owner only argues that the independent claim 26 is allowable.  The critical issue

in claim 26 is the meaning of the phrase "prior to mechanically working" which phrase is

fully explained by the TPR in Section I above.  Therefore, the rejection of 34 is

maintained.

**XXVI.   Third Party Requester's Arguments Supporting the Rejection of Claim 34
        as obvious over the Rhodes '809 Patent in view of Lindgren '666.**

Sections VIII and X - XXXII of the Resubmitted Appellant's Brief argue that the
Examiner erroneously rejected the claims as being obvious over the combination of the Rhodes
'809 Patent in combination with various additional references.  The Patent Owner does not offer
any new substantive arguments in Sections VIII and X - XXXII about why these claims should
be patentable over the references.  Instead the Appellant argues that the claims should be
patentable for the reasons first articulated in Section I of the Resubmitted Appellant's Brief
challenging the Examiner's interpretation of the claim terms "prior to mechanical working" and
"heating the curd without aqueous immersion."  For the reasons discussed in Section I of the
Resubmitted Respondent's Brief, the Examiner's interpretation of these claim terms is correct,
and the TPR respectfully urges the Examiner's obviousness rejections over the Rhodes '809
patent in combination with the additional references be adopted by the Board.

**XXVI.   Patent Owner's Arguments Traversing the Rejection of Claim 34 as Obvious
over the Rhodes '809 Patent in view of the Lindgren '666.**

The Communication erroneously alleged that claim 34 is made obvious over the
combination of the Rhodes '809 Patent in view of the Lindgren'666.  However, independent
claims 26 is in allowable form for the previously stated reasons.  Therefore, by virtue of the
dependency of claim 34 from claim 26, the obviousness rejection of claim 34 is erroneous.
Reversal of the obviousness rejection of claim 34 is respectfully requested.

**XXVII.  Examiner's Position Regarding the Rejection of Claims 25, 65, 90 - 92
        and 95 - 101 as Being Obvious over the Rhodes '809 Patent in view of
        the Yun '92, Barbano '91 and Bottazzi '76 articles.**

The Examiner adopts the arguments of the TPR with respect to the rejection of

claims 25, 65, 90 - 92 and 95 - 101 as being obvious over the Rhodes '809 patent in

view of the Yun '92, Barbano '91 and Bottazzi '76 articles.  The Patent Owner only

argues that independent claims 1, 62 and 89 are allowable.  The critical issue in claims

1, 62, and 89 is the meaning of the interpretation of the phrases "prior to mechanically

working" and "without aqueous immersion," which phrases are fully explained by the

TPR in Section I above.

## XXVII. Third Party Requester's Arguments Supporting the Rejection of claim 25, 65, 90 - 92 and 95 - 101 as Being Obvious over the Rhodes '809 Patent in view of Yun '92, Barbano '91 and Bottazzi '76 articles.

Sections VIII and X - XXXII of the Resubmitted Appellant's Brief argue that the
Examiner erroneously rejected the claims as being obvious over the combination of the Rhodes
'809 Patent in combination with various additional references.  The Patent Owner does not offer
any new substantive arguments in Sections VIII and X - XXXII about why these claims should
be patentable over the references.  Instead the Patent Owner argues that the claims should be
patentable for the reasons first articulated in Section I of the Resubmitted Appellant's Brief
challenging the Examiner's interpretation of the claim terms "prior to mechanical working" and
"heating the curd without aqueous immersion."  For the reasons discussed in Section I of the
Resubmitted Respondent's Brief, the Examiner's interpretation of these claim terms is correct,
and the TPR respectfully urges the Examiner's obviousness rejections over the Rhodes '809
patent in combination with the additional references be adopted by the Board.

## XXVII. Patent Owner's Arguments Traversing the Rejection of claim 25, 65, 90 - 92 and 95 - 101 as Being Obvious over the Rhodes '809 Patent in view of Yun '92, Barbano '91 and Bottazzi '76 articles.

The Communication erroneously alleged that claims 25, 65, 90 - 92 and 95 - 101 are
made obvious over the combination of the Rhodes '809 patent in view of Yun '92, Barbano '91
and Bottazzi '76 articles.  However, independent claims 1, 62 and 89 are in allowable form for
the previously stated reasons.  Therefore, by virtue of the dependency of claim 25 from claim 1,
claim 65 from claim 62 and claims 90 - 92 and 95 - 101 from claim 89, the obviousness rejection
of claims 25, 65, 90 - 92 and 95 - 101 is erroneous.  Reversal of the obviousness rejection of
claims 25, 65, 90 - 92 and 95 - 101 is respectfully requested.

### XXVIII.   Examiner's Position Regarding the Rejection of claim 102 *as* Being Obvious over the Rhodes '809 Patent in view of Yun '92 and Barbano '91 as applied to claims 25, 65, 89 - 92 and 95 - 101, and further in view of Barz '625

The Examiner <u>adopts</u> the arguments of the TPR with respect to the rejection of

claim 102 as being obvious over the Rhodes '809 Patent in view of Yun '92 and

Barbano '91, as applied to claims 25, 65, 89 - 92 and 95 - 101, and further in view of

Barz '625.  The same issues of claim interpretation occur in dependent claim 102 as in

independent claim 89:  the meaning of "without aqueous immersion" and "prior to

mechanically working the curd."  These issues have been fully discussed by the TPR in

the Section I above.

### XXVIII.   Third Party Requester's Arguments Supporting the Rejection of Claim 102 as Being Obvious over the Rhodes '809 Patent in view of Yun '92 and Barbano '91 as applied to claims 25, 65, 89 - 92 and 95 - 101, and further in view of Barz '625.

Sections VIII and X - XXXII of the Resubmitted Appellant's Brief argue that the
Examiner erroneously rejected the claims as being obvious over the combination of the Rhodes
'809 Patent in combination with various additional references.  The Patent Owner does not offer
any new substantive arguments in Sections VIII and X - XXXII about why these claims should
be patentable over the references.  Instead the Patent Owner argues that the claims should be
patentable for the reasons first articulated in Section I of the Resubmitted Appellant's Brief
challenging the Examiner's interpretation of the claim terms "prior to mechanical working" and
"heating the curd without aqueous immersion."  For the reasons discussed in Section I of the
Resubmitted Respondent's Brief, the Examiner's interpretation of these claim terms is correct,
and the TPR respectfully urges the Examiner's obviousness rejections over the Rhodes '809
patent in combination with the additional references be adopted by the Board.

### XXVIII. Patent Owner's Arguments Traversing the Rejection of Claim 102 as Being Obvious over the Rhodes '809 Patent in view of Yun '92 and Barbano '91 Articles as applied to claims 25, 65, 89 - 92 and 95 - 101, and further in view of Barz '625.

The Communication erroneously rejected claim 102 is made obvious over the
combination of the Rhodes '809 patent in view of the Yun '92 and Barbano '91 Article as
applied to claims 25, 65, 89 - 92 and 95 - 101, and further in view of Barz '625.  However,
independent claim 89 is in allowable form for the previously stated reasons.  Therefore, by

virtue of the dependency of claim 102 from claim 89, the obviousness rejection of claim 102
is erroneous.  Reversal of the obviousness rejection is respectfully requested.

**XXIX.   Examiner's Position Regarding the Rejection of Claim 88 by the
Combination of the Rhodes '809 Patent in view of the Anderson '158 Patent, the
Hargrove '248 Patent, the Mid-America '106 PCT International Publication as
applied to claims 70 - 73, 76 - 86, 114, 116, 119 - 124 and 127 - 133, and further in
view of the Rizvi '398 patent.**

The Examiner adopts the arguments of the TPR with regard to the rejection of

claim 88 by the combination of the Rhodes '809 patent in view of the Anderson '158

Patent, the Hargrove '248 patent, and the Mid-America '106 PCT International

publication as applied to claims 70 - 73, 76 - 86, 114, 116, 119 - 124 and 127 - 133 and

further in view of Rizvi '398 patent.  The central issues in this rejection is the

interpretation of the two phrases:  "without aqueous immersion" and "mechanical

working of the curd" which have been fully discussed by the TPR in Section I above.

**XXIX.   Third Party Requester's Arguments Supporting the Rejection of Claim 88 by the
Combination of the Rhodes '809 Patent in view of the Anderson '158 Patent, the Hargrove
'248 patent, and the Mid-America '106 PCT International Publication as applied to claims
70 - 73, 76 - 86, 114, 116, 119 - 124 and 127 - 133, and further in view of Rizvi '398 patent.**

Sections VIII and X - XXXII of the Resubmitted Appellant's Brief argue that the
Examiner erroneously rejected the claims as being obvious over the combination of the Rhodes
'809 Patent in combination with various additional references.  The Patent Owner does not offer
any new substantive arguments in Sections VIII and X - XXXII about why these claims should
be patentable over the references.  Instead the Patent Owner argues that the claims should be
patentable for the reasons first articulated in Section I of the Resubmitted Appellant's Brief
challenging the Examiner's interpretation of the claim terms "prior to mechanical working" and
"heating the curd without aqueous immersion."  For the reasons discussed in Section I of the
Resubmitted Respondent's Brief, the Examiner's interpretation of these claim terms is correct,
and the TPR respectfully urges the Examiner's obviousness rejections over the Rhodes '809
patent in combination with the additional references be adopted by the Board.

**XXIX.   Patent Owner's Arguments Traversing the Rejection of Claim 88 over a
combination of the Rhodes '809 Patent in view of the Anderson '158 Patent, the Hargrove**

'248 Patent, the Mid-America '106 PCT International Publication as applied to claims 70 -
73, 76 - 86, 114, 116, 119 -124 and 127 - 133 and further in view of Rizvi '398 Patent.

The Communication erroneously rejected claim 102 [sic] as being obvious over the
combination of Rhodes '809 in view of the Anderson '158 patent, the Hargrove '248 patent,
Mid-American '106 international publication as applied to claims 70 - 73, 76 - 86, 114, 116, 119-
124 and 127 - 133, and further in view of the Rizvi '398 patent. However, independent claim 70
is in allowable form for the previously stated reasons. Therefore, by virtue of the dependency of
claim 88 from claim 70, the obviousness rejection of claim 88 is erroneous. Reversal of the
obviousness rejection of claim 88 is respectfully requested.

XXX.    **Examiner's Position Regarding the Rejection of Claim 103 over the
        Combination of the Rhodes '809 Patent in view of the Yun '92 article,
        the Barbano '91 article, as applied to claims 25, 65, 89 - 92 and 95 - 101,
        and further in view of the Rizvi '398 patent.**

The Examiner adopts the arguments of the TPR regarding the rejection of claim

103 over the combination of the Rhodes '809 patent in view of the Yun '92 article,

Barbano '91 article and the Rizvi '398 patent.  The central issue in this rejection is the

same as that in the rejection of claim 89: the interpretation of the phrase "prior to

mechanically working the curd," which phrases have been fully discussed by the TPR in

Section I above.

XXX.    **Third Party's Requester's Arguments Supporting the Rejection of Claim 103
        over the Combination of the Rhodes '809 Patent in view of the Yun '92
        article, the Barbano '91 article as applied to claims 26, 65, 89 - 92 and 95 - 101,
        and further in view of the Rizvi '398 patent.**

Sections VIII and X - XXXII of the Resubmitted Appellant's Brief argue that the
Examiner erroneously rejected the claims as being obvious over the combination of the Rhodes
'809 Patent in combination with various additional references.  The Patent Owner does not offer
any new substantive arguments in Sections VIII and X - XXXII about why these claims should
be patentable over the references.  Instead the Patent Owner argues that the claims should be
patentable for the reasons first articulated in Section I of the Resubmitted Appellant's Brief
challenging the Examiner's interpretation of the claim terms "prior to mechanical working" and
"heating the curd without aqueous immersion."  For the reasons discussed in Section I of the
Resubmitted Respondent's Brief, the Examiner's interpretation of these claim terms is correct,
and the TPR respectfully urges the Examiner's obviousness rejections over the Rhodes '809
patent in combination with the additional references be adopted by the Board.

XXX.   Patent Owner's Arguments Traversing the Rejection of Claim 103 as Obvious over the Combination of the Rhodes '809 in view of the the Yun '92 article, the Barbano '91 article as applied to claims 25, 65, 89 - 92 and 95 - 101, and further in view of the Rizvi '398 patent.

The Communication erroneously rejected claim 88 as being obvious over the combination of Rhodes '809 in view of the Yun '92 article, the Barbano '91 article, and the Rizvi '398 patent. However, independent claims 89 is in allowable form for the previously stated reasons. Therefore, by virtue of the dependency of claim 103 from claim 89, the obviousness rejected of claim 103 is erroneous. Reversal of the obviousness rejection of claim 103 is respectfully requested.

XXXI.  Examiner's Position Regarding the Rejection of Claim 87 as Being Obvious over the Rhodes '809 Patent in view of the Anderson '158 Patent, the Hargrove '248 Patent, Mid-America '106 PCT International publication and the Barz '625 patent.

The Examiner adopts the arguments of the TPR with regard to the rejection of claim 103 as being obvious over the Rhodes '809 patent in view of the Anderson '158 Patent, the Hargrove '248 Patent, Mid-America '106 PCT international publication and the Barz '625 patent. The central issues in this rejection is the interpretation of the phrase "without aqueous immersion." This issue has been fully discussed in Section I Therefore, the obviousness rejection should be sustained.

XXXI.  Third Party Requester's Argument Supporting the Rejection of Claim 87 as Being Obvious over the Rhodes '809 Patent in view of the Anderson '158 Patent, the Hargrove '248 Patent, Mid-America '106 PCT International publication and the Barz '625 patent.

Sections VIII and X - XXXII of the Resubmitted Appellant's Brief argue that the Examiner erroneously rejected the claims as being obvious over the combination of the Rhodes '809 Patent in combination with various additional references. The Patent Owner does not offer any new substantive arguments in Sections VIII and X - XXXII about why these claims should be patentable over the references. Instead the Patent Owner argues that the claims should be patentable for the reasons first articulated in Section I of the Resubmitted Appellant's Brief challenging the Examiner's interpretation of the claim terms "prior to mechanical working" and "heating the curd without aqueous immersion." For the reasons discussed in Section I of the Resubmitted Respondent's Brief, the Examiner's interpretation of these claim terms is correct,

and the Respondent respectfully urges the Examiner's obviousness rejections over the Rhodes '809 patent in combination with the additional references be adopted by the Board.

**XXXI. Patent Owner's Arguments Traversing the Rejection of Claim 87 as Being Obvious over the Rhodes '809 Patent in view of the Anderson '158 Patent, the Hargrove '248 Patent, Mid-America '106 PCT International publication and the Barz '625 patent.**

The Communication erroneously rejected claim 87 as being obvious over the combination of the Rhodes '809 patent in view of the Anderson '158 Patent, the Hargrove '248 Patent, Mid-America '106 PCT International publication and the Barz '625 patent. However, independent claim 70 is in allowable form for the previously stated reasons. Therefore, by virtue of the dependency of claim 87 form claim 70, the obviousness rejection of claim 87 is erroneous. Reversal of the obviousness rejection of claim 87 is respectfully requested.

**XXXII. Examiner's Position Regarding the Rejection of Claim 1 as Being Obvious Over the Combination of the Rhodes '809 Patent in View of the Bottazzi '76 article.**

The Examiner adopts the arguments of the TPR with respect to the rejection of

claim 1 as being obvious over the combination of the Rhodes '809 patent in view of the

Bottazzi '76 article.

**XXXII. Third Party Requester's Arguments Supporting the Rejection of Claim 1 as Being Obvious Over the Combination of the Rhodes '809 Patent in View of the Botazzi '76 Article.**

The Appellant argues that the Examiner erroneously rejected claim 1 as being obvious over the combination of the Rhodes '809 Patent in view of the Bottazzi '76 article because using a 2400 MHz microwave heating technique would cause undesired inactivation of bacteria that would require substantial testing to mitigate. See Resubmitted Appellant's Brief, p. 26, ll. 27 - 33. However, the Bottazzi '76 Article notes that the use of microwaves under suitable conditions can actually extend the shelf life of some past filata cheeses by inactivating a sufficient amount of bacteria. In addition, the reference touts the substitution of microwave energy for traditional water based heating techniques that have considerable disadvantages. See Bottazzi '76, Abstract. The explicit advantages described in Botazzi '76 for using microwave energy for heating curd to make pasta filata cheese outweigh the Patent Owner's speculative disadvantages of using microwave energy instead of the hot water plus jacket heating technique described in the Rhodes '809 Patent. For at least this reason the TPR respectfully urges the Examiner's rejection of claim 1 as being obvious over the combination of Rhodes '809 Patent in view of the Bottazzi '76 Article by adopted by the Board.

### XXXII.   Patent Owner's Arguments Traversing the Rejection of Claim 1 as being Obvious Over the Combination of the Rhodes '809 Patent in View of the Bottazzi '398 Patent [sic].

The Communication erroneously rejected claim 1 as being obvious over the combination of Rhodes '809 in view of the Bottazzi '398 patent [sic].  The Communication states that the Bottazzi '398 [sic] patent teaches heating and stretching pasta filata cheese without using water by utilizing microwave energy.

Patent Owner respectfully submits that the combination of Rhodes '809 of references is improper.  Specifically, the Bottazzi '398 patent [sic] discloses "the aim of the present research is to verify the possibility of a practical alternative, able to obtain a correct technological result with stretching (sic) without using water."  Summary, lines 6 - 8.  However, the Bottazzi '398 patent [sic] employs a 2400 MHz microwave heating technique, which inactivates bacteria.  Not al inactivation of bacteria is desirable in the cheese making process.  To avoid undesired inactivation of bacteria during the ripening process, use of the microwave heating would require substantial testing (note that the Rhodes '809 patent specifically teaches maintaining a temperature of the curd at 115° F to allow the curd to continue to ripen -- See col. 26, lines 48 - 52).  If a microwave were substituted for the Rhodes '809 patent "hot water plus jacket technique," the microwaves may inactivate the bacteria, preventing the curd from continuing to ripen.

Additionally, mozzarella and pasta filata cheeses have specific requirements relating to taste, stretchability, melt properties, water content, and the like.  Moreover in order to meet these specific requirements, cheese manufacturers control for control for "**viable microbial count**, fat content, moisture, salt content, acidity, refrigerated shelf stability," and the like.  See Dahlstrom '526 patent, col. 1, line 31 - col. 2, line 50.  The Bottazzi '398 patent [sic] disclosure is insufficient to determine whether the technique would produce the proper taste, stretch, melt properties, and water content required to be mozzarella or past filata cheese.  As disclosed in the Dahlstrom '526 patent.

> "It is even possible to have variations within a vat because of ongoing
> acid and protein changes during fermentation by viable microbial starters."
> > Dahlstrom '526 patent, col. 2, lines 40 - 42.

It is submitted that microwave heating without further refinement of the cheese making process would cause even greater variation, stunt microbial activity, and alter the taste and texture of the final product.

Additionally, microwave heating is likely to impact the texture, independent of microbial inactivation.  Specifically, microwaves generally work by exciting molecules, and specifically water molecules.  The molecular excitement is then passed by conduction to the surrounding curd and then by convection into the air, within the microwave fairly rapidly.  Traditional water heating operates in the opposite direction, by warming the surface first and then the rest of the curd mass via conduction over a longer period of time.  This surface heating generally leads to a plastic-like, smooth surface texture and a fibrous texture characteristic of mozzarella.  By changing the warming/heating process from a water immersion/jacket heating process to a

microwave heating process, not only would the bacterial/microbial starters be inactivated, but the surface properties and the texture of the curd would also be adversely affected.

The Examiner's adopted the combination is nothing more than a hindsight reconstruction. As previously discussed, the combination of a microwave that inactivates bacteria with a reference that warms the curd in order to foster ripening (i.e. bacterial activity) is inappropriate. There is no suggestion to combine the microwave heating of the Bottazzi '398 patent [sic] with the vacuum infuser of the Rhodes '809 patent. Moreover, to do so, the infuser of Rhodes '809 patent would need to be made microwave safe. Additionally, the Rhodes '809 patent ripening process would need to be altered to take into account bacterial inactivation due to the microwave energy. Finally, the Rhodes '809 teaches away from the Bottazzi '398 patent [sic] by requiring water and water-based solution throughout the process in order to achieve the pasta filata cheese product, whereas the Bottazzi '398 patent [sic] is directed to producing such cheese without water. Thus, not only would the combination of the Bottazzi '398 patent [sic] with the Rhodes '809 patent require substantial modification and testing, but the combination is inappropriate because they teach conflicting processes.

Finally, even if the combination was proper, which it is not, the combination of the Rhodes '809 patent and the Bottazzi '398 patent [sic] fail to teach or suggest the claimed element of adding a cheese emulsifying salt or dairy ingredient or both prior to mechanical working. "Prior to mechanical working" is discussed in detail with respect to the alleged anticipation rejection of claim 1 Section I(A) of this brief.

Therefore, the Examiner erroneously rejected claim 1 as obvious. Reversal of the obviousness rejection of claim 1 is respectfully requested. Patent Owner respectfully requests reversal of the rejections of claim 1 - 14, 16 - 103 and 114 - 135 based upon the prior art. Patent Owner respectfully requests that the Board delay rendering a decision on the patentability of claims 104 - 113, 124, and 137-163 because if the Petition is granted the rejections of claims 104-113, 124, and 137-163 will be moot.

## Conclusion

**Claims 1 - 14, 16 - 103, 114 - 123 and 125 - 136** are rejected.  Claims 15, 104 - 113, 124, and 137 - 163 are cancelled.

## Correspondence

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

unpublished applications my be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

Application/Control Number: 95/000,003; 90/006,317          Page 127
Art Unit: 3991

For more information about the PAIR system, see http://pair-direct.uspto.gov.  Should

you have questions about access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free).

All correspondence relating to this Inter Partes Reexamination proceeding should
be directed to:

By Electronic Filing System (EFS):

Registered users may submit via the electronic filing system EPS-Web at
https://sportal.uspto.gov/authenticate/authenticateuserlocalepf.html

By Mail to:

    Attn: Mail Stop "Inter Partes Reexam"
    Central Reexamination Unit
    Commissioner of Patents
    P.O. Box 1450
    Alexandria, VA  22313-1450

By FAX to:

    (571) 273-9900
    Central Reexamination Unit

By hand to:

    Customer Service Window
    Randolph Building
    401 Dulany Street
    Alexandria VA  22314

Gary L. Kunz
Primary Examiner
Art Unit 3991

Conferee: _____          Conferee: _____
          DWAYNE C. JONES                          DEBORAH D. JONES
          PRIMARY EXAMINER                          CRU SPE-AU 3991
            CRU - AU 3991



| | | | |
|---|---|---|---|
| **Index of Claims** | **Application/Control No.**<br>95000003 ; 90/006,317 | **Applicant(s)/Patent Under Reexamination**<br>6319526 | |
| | **Examiner**<br>Kunz, Gary L | **Art Unit**<br>3991 | |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

☐ Claims renumbered in the same order as presented by applicant   ☐ CPA   ☐ T.D.   ☐ R.1.47

| CLAIM | | DATE | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 02/12/2008 | 07/18/2008 | 12/15/2009 | 04/21/2010 | | | | |
| | 1 | ✓ | - | ✓ | ✓ | | | | |
| | 2 | ✓ | - | ✓ | ✓ | | | | |
| | 3 | ✓ | - | ✓ | ✓ | | | | |
| | 4 | ✓ | - | ✓ | ✓ | | | | |
| | 5 | ✓ | - | ✓ | ✓ | | | | |
| | 6 | ✓ | - | ✓ | ✓ | | | | |
| | 7 | ✓ | - | ✓ | ✓ | | | | |
| | 8 | ✓ | - | ✓ | ✓ | | | | |
| | 9 | ✓ | - | ✓ | ✓ | | | | |
| | 10 | ✓ | - | ✓ | ✓ | | | | |
| | 11 | ✓ | - | ✓ | ✓ | | | | |
| | 12 | ✓ | - | ✓ | ✓ | | | | |
| | 13 | ✓ | - | ✓ | ✓ | | | | |
| | 14 | ✓ | - | ✓ | ✓ | | | | |
| | 15 | ✓ | - | - | - | | | | |
| | 16 | ✓ | - | ✓ | ✓ | | | | |
| | 17 | ✓ | - | ✓ | ✓ | | | | |
| | 18 | ✓ | - | ✓ | ✓ | | | | |
| | 19 | ✓ | - | ✓ | ✓ | | | | |
| | 20 | ✓ | - | ✓ | ✓ | | | | |
| | 21 | ✓ | - | ✓ | ✓ | | | | |
| | 22 | ✓ | - | ✓ | ✓ | | | | |
| | 23 | ✓ | - | ✓ | ✓ | | | | |
| | 24 | ✓ | - | ✓ | ✓ | | | | |
| | 25 | ✓ | - | ✓ | ✓ | | | | |
| | 26 | ✓ | - | ✓ | ✓ | | | | |
| | 27 | ✓ | - | ✓ | ✓ | | | | |
| | 28 | ✓ | - | ✓ | ✓ | | | | |
| | 29 | ✓ | - | ✓ | ✓ | | | | |
| | 30 | ✓ | - | ✓ | ✓ | | | | |
| | 31 | ✓ | - | ✓ | ✓ | | | | |
| | 32 | ✓ | - | ✓ | ✓ | | | | |
| | 33 | ✓ | - | ✓ | ✓ | | | | |
| | 34 | ✓ | - | ✓ | ✓ | | | | |
| | 35 | ✓ | - | ✓ | ✓ | | | | |
| | 36 | ✓ | - | ✓ | ✓ | | | | |

Part of Paper No. :  20091210-A



| Index of Claims | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 95000003 ; 90/006,317 | 6319526 |
| | **Examiner** | **Art Unit** |
| | Kunz, Gary L | 3991 |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

| ☐ Claims renumbered in the same order as presented by applicant | ☐ CPA | ☐ T.D. | ☐ R.1.47 |
|---|---|---|---|

| CLAIM | | DATE | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 02/12/2008 | 07/18/2008 | 12/15/2009 | 04/21/2010 | | | | |
| | 37 | ✓ | - | ✓ | ✓ | | | | |
| | 38 | ✓ | - | ✓ | ✓ | | | | |
| | 39 | ✓ | - | ✓ | ✓ | | | | |
| | 40 | ✓ | - | ✓ | ✓ | | | | |
| | 41 | ✓ | - | ✓ | ✓ | | | | |
| | 42 | ✓ | - | ✓ | ✓ | | | | |
| | 43 | ✓ | - | ✓ | ✓ | | | | |
| | 44 | ✓ | - | ✓ | ✓ | | | | |
| | 45 | ✓ | - | ✓ | ✓ | | | | |
| | 46 | ✓ | - | ✓ | ✓ | | | | |
| | 47 | ✓ | - | ✓ | ✓ | | | | |
| | 48 | ✓ | - | ✓ | ✓ | | | | |
| | 49 | ✓ | - | ✓ | ✓ | | | | |
| | 50 | ✓ | - | ✓ | ✓ | | | | |
| | 51 | ✓ | - | ✓ | ✓ | | | | |
| | 52 | ✓ | - | ✓ | ✓ | | | | |
| | 53 | ✓ | - | ✓ | ✓ | | | | |
| | 54 | ✓ | - | ✓ | ✓ | | | | |
| | 55 | ✓ | - | ✓ | ✓ | | | | |
| | 56 | ✓ | - | ✓ | ✓ | | | | |
| | 57 | ✓ | - | ✓ | ✓ | | | | |
| | 58 | ✓ | - | ✓ | ✓ | | | | |
| | 59 | ✓ | - | ✓ | ✓ | | | | |
| | 60 | ✓ | - | ✓ | ✓ | | | | |
| | 61 | ✓ | - | ✓ | ✓ | | | | |
| | 62 | ✓ | - | ✓ | ✓ | | | | |
| | 63 | ✓ | - | ✓ | ✓ | | | | |
| | 64 | ✓ | - | ✓ | ✓ | | | | |
| | 65 | ✓ | - | ✓ | ✓ | | | | |
| | 66 | ✓ | - | ✓ | ✓ | | | | |
| | 67 | ✓ | - | ✓ | ✓ | | | | |
| | 68 | ✓ | - | ✓ | ✓ | | | | |
| | 69 | ✓ | - | ✓ | ✓ | | | | |
| | 70 | ✓ | - | ✓ | ✓ | | | | |
| | 71 | ✓ | - | ✓ | ✓ | | | | |
| | 72 | ✓ | - | ✓ | ✓ | | | | |

Part of Paper No. :  20091210-A



| | | |
|---|---|---|
| **Index of Claims** | Application/Control No.<br><br>95000003 ; 90/006,317 | Applicant(s)/Patent Under Reexamination<br>6319526 |
| | Examiner<br><br>Kunz, Gary L | Art Unit<br><br>3991 |

| ✓ | **Rejected** | - | **Cancelled** | N | **Non-Elected** | A | **Appeal** |
|---|---|---|---|---|---|---|---|
| = | **Allowed** | ÷ | **Restricted** | I | **Interference** | O | **Objected** |

☐ Claims renumbered in the same order as presented by applicant    ☐ CPA    ☐ T.D.    ☐ R.1.47

| CLAIM | | DATE | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 02/12/2008 | 07/18/2008 | 12/15/2009 | 04/21/2010 | | | | |
| | 73 | ✓ | - | ✓ | ✓ | | | | |
| | 74 | ✓ | - | ✓ | ✓ | | | | |
| | 75 | ✓ | - | ✓ | ✓ | | | | |
| | 76 | ✓ | - | ✓ | ✓ | | | | |
| | 77 | ✓ | - | ✓ | ✓ | | | | |
| | 78 | ✓ | - | ✓ | ✓ | | | | |
| | 79 | ✓ | - | ✓ | ✓ | | | | |
| | 80 | ✓ | - | ✓ | ✓ | | | | |
| | 81 | ✓ | - | ✓ | ✓ | | | | |
| | 82 | ✓ | - | ✓ | ✓ | | | | |
| | 83 | ✓ | - | ✓ | ✓ | | | | |
| | 84 | ✓ | - | ✓ | ✓ | | | | |
| | 85 | ✓ | - | ✓ | ✓ | | | | |
| | 86 | ✓ | - | ✓ | ✓ | | | | |
| | 87 | ✓ | - | ✓ | ✓ | | | | |
| | 88 | ✓ | - | ✓ | ✓ | | | | |
| | 89 | ✓ | - | ✓ | ✓ | | | | |
| | 90 | ✓ | - | ✓ | ✓ | | | | |
| | 91 | ✓ | - | ✓ | ✓ | | | | |
| | 92 | ✓ | - | ✓ | ✓ | | | | |
| | 93 | ✓ | - | ✓ | ✓ | | | | |
| | 94 | ✓ | - | ✓ | ✓ | | | | |
| | 95 | ✓ | - | ✓ | ✓ | | | | |
| | 96 | ✓ | - | ✓ | ✓ | | | | |
| | 97 | ✓ | - | ✓ | ✓ | | | | |
| | 98 | ✓ | - | ✓ | ✓ | | | | |
| | 99 | ✓ | - | ✓ | ✓ | | | | |
| | 100 | ✓ | - | ✓ | ✓ | | | | |
| | 101 | ✓ | - | ✓ | ✓ | | | | |
| | 102 | ✓ | - | ✓ | ✓ | | | | |
| | 103 | ✓ | - | ✓ | ✓ | | | | |
| | 104 | ✓ | - | - | - | | | | |
| | 105 | ✓ | - | - | - | | | | |
| | 106 | ✓ | - | - | - | | | | |
| | 107 | ✓ | - | - | - | | | | |
| | 108 | ✓ | - | - | - | | | | |

U.S. Patent and Trademark Office

Part of Paper No. : 20091210-A



| Index of Claims | Application/Control No. 95000003 ; 90/006,317 | Applicant(s)/Patent Under Reexamination 6319526 |
|---|---|---|
| | Examiner Kunz, Gary L | Art Unit 3991 |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

☐ Claims renumbered in the same order as presented by applicant    ☐ CPA    ☐ T.D.    ☐ R.1.47

| CLAIM | | DATE | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Final | Original | 02/12/2008 | 07/18/2008 | 12/15/2009 | 04/21/2010 | | | |
| | 109 | ✓ | - | - | - | | | |
| | 110 | ✓ | - | - | - | | | |
| | 111 | ✓ | - | - | - | | | |
| | 112 | ✓ | - | - | - | | | |
| | 113 | ✓ | - | - | - | | | |
| | 114 | ✓ | - | ✓ | ✓ | | | |
| | 115 | ✓ | - | ✓ | ✓ | | | |
| | 116 | ✓ | - | ✓ | ✓ | | | |
| | 117 | ✓ | - | ✓ | ✓ | | | |
| | 118 | ✓ | - | ✓ | ✓ | | | |
| | 119 | ✓ | - | ✓ | ✓ | | | |
| | 120 | ✓ | - | ✓ | ✓ | | | |
| | 121 | ✓ | - | ✓ | ✓ | | | |
| | 122 | ✓ | - | ✓ | ✓ | | | |
| | 123 | ✓ | - | ✓ | ✓ | | | |
| | 124 | ✓ | - | - | - | | | |
| | 125 | ✓ | - | ✓ | ✓ | | | |
| | 126 | ✓ | - | ✓ | ✓ | | | |
| | 127 | ✓ | - | ✓ | ✓ | | | |
| | 128 | ✓ | - | ✓ | ✓ | | | |
| | 129 | ✓ | - | ✓ | ✓ | | | |
| | 130 | ✓ | - | ✓ | ✓ | | | |
| | 131 | ✓ | - | ✓ | ✓ | | | |
| | 132 | ✓ | - | ✓ | ✓ | | | |
| | 133 | ✓ | - | ✓ | ✓ | | | |
| | 134 | ✓ | - | ✓ | ✓ | | | |
| | 135 | ✓ | - | ✓ | ✓ | | | |
| | 136 | ✓ | - | ✓ | ✓ | | | |
| | 137 | ✓ | - | - | - | | | |
| | 138 | ✓ | - | - | - | | | |
| | 139 | ✓ | - | - | - | | | |
| | 140 | ✓ | - | - | - | | | |
| | 141 | ✓ | - | - | - | | | |
| | 142 | ✓ | - | - | - | | | |
| | 143 | ✓ | - | - | - | | | |
| | 144 | ✓ | - | - | - | | | |

U.S. Patent and Trademark Office                                    Part of Paper No. : 20091210-A



| | Index of Claims | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|
| | | 95000003; 90/008,317 | 6319526 |
| | | Examiner | Art Unit |
| | | Kunz, Gary L | 3991 |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

| ☐ Claims renumbered in the same order as presented by applicant | | | | | ☐ CPA | ☐ T.D. | ☐ R.1.47 |
|---|---|---|---|---|---|---|---|

| CLAIM | | DATE | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 02/12/2008 | 07/18/2008 | 12/15/2009 | 04/21/2010 | | | | |
| | 145 | ✓ | - | - | - | | | | |
| | 146 | ✓ | - | - | - | | | | |
| | 147 | ✓ | - | - | - | | | | |
| | 148 | ✓ | - | - | - | | | | |
| | 149 | ✓ | - | - | - | | | | |
| | 150 | ✓ | - | - | - | | | | |
| | 151 | ✓ | - | - | - | | | | |
| | 152 | ✓ | - | - | - | | | | |
| | 153 | ✓ | - | - | - | | | | |
| | 154 | ✓ | - | - | - | | | | |
| | 155 | ✓ | - | - | - | | | | |
| | 156 | ✓ | - | - | - | | | | |
| | 157 | ✓ | - | - | - | | | | |
| | 158 | ✓ | - | - | - | | | | |
| | 159 | ✓ | - | - | - | | | | |
| | 160 | ✓ | - | - | - | | | | |
| | 161 | ✓ | - | - | - | | | | |
| | 162 | ✓ | - | - | - | | | | |
| | 163 | ✓ | - | - | - | | | | |

| **Search Notes** | Application/Control No. 95000003 ; 90/006,317 | Applicant(s)/Patent Under Reexamination 6319526 |
|---|---|---|
| | Examiner Kunz, Gary L | Art Unit 3991 |

| **SEARCHED** | | | |
|---|---|---|---|
| **Class** | **Subclass** | **Date** | **Examiner** |
| | | | |

| **SEARCH NOTES** | | |
|---|---|---|
| **Search Notes** | **Date** | **Examiner** |
| Performed Litigation Search | July 31, 2006 | KUNZ |
| Performed Litigation Search | February 21, 2008 | KUNZ |
| Performed Litigation Search Update | December 11, 2009 | KUNZ |

| **INTERFERENCE SEARCH** | | | |
|---|---|---|---|
| **Class** | **Subclass** | **Date** | **Examiner** |
| | | | |

| | |
|---|---|
| | |

U.S. Patent and Trademark Office

Part of Paper No. : 20091210-A

-1-

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| First Named Inventor  :        Donald D. Dahlstrom | Technology Center: 3900 |
| Inter Partes and Ex Parte Reexamination | |
| Control Nos.:      95/000,003 and 90/006,317 | |
| Filing date:        January 8, 2002 | Confirmation No.: 4575 |
| Patent No:         6,319,526 | Group Art Unit:  3991 |
| For      :            PASTA FILATA CHEESE | Examiner: Gary L. Kunz |
| Docket Nos.:      L111.18-0023 | |

## PETITION UNDER 37 C.F.R. § 1.181

**Via Online Filing**

Mail Stop Petitions
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

Pursuant to 37 C.F.R. § 1.181 Patent Owner respectfully petitions the Director have the declarations of Donald Dahlstrom, William Aimutis and James Wiegand under 37 C.F.R. § 1.131 ("131 Declaration") submitted on January 29, 2010 entered onto the record and to be considered by the Examiner.  In a Right of Appeal Notice ("RAN") mailed on April 29, 2010, the Examiner refused to enter the 131 Declaration onto the record for reasons in direct conflict with the Office of Petition's interpretation of 37 C.F.R. § 1.131 and the guidelines set forth at least in MPEP § 2673.01(II).  The relevant portion of 37 C.F.R. § 1.181(a)(1) is reproduced below.

Petition may be taken to the Director:

(1) From any action or requirement of any examiner in the ex parte prosecution of an application, or in ex parte or inter partes prosecution of a reexamination proceeding which is not subject to appeal to the Board of Patent Appeals and Interferences or to the court.

-2-

This petition is proper as the RAN was mailed on April 29, 2010 and a Notice of Appeal has not been filed prior to this submission. It should be noted that Patent Owner does plan to file the Notice of Appeal on May 29, 2010 in the event that a decision on this Petition has not been rendered. Further, the action that is the subject of this Petition is a direct result of the actions of the Examiner in this proceeding. Therefore, the present Petition has been timely filed regarding the subject matter detailed in 37 C.F.R. § 1.181(a)(1). Patent Owner respectfully request consideration of the present Petition and the relief requested below.

## STATEMENT OF FACTS

Patent Owner filed a Petition under 37 C.F.R. § 1.183 to have the Declaration of Clint Garoutte Under 37 C.F.R. § 1.131 ("Garoutte Declaration") considered on August 31, 2009. The Office of Petitions granted Patent Owner's Petition to have the Garoutte Declaration entered on November 4, 2009. Third Party Requester ("TPR") filed objections to the sufficiency of the Garoutte declaration on November 11, 2009. The Examiner issued an Action Closing Prosecution ("ACP") on December 17, 2009 in which it adopted the TPR's allegations regarding the sufficiency of the Garoutte Declaration. In the ACP, the Examiner alleged that the Garoutte declaration failed to (1) state that the named inventors conceived or reduced to practice the claimed invention; (2) explain how the submitted evidence demonstrates the claimed methods were reduced to practice prior to the effective date of the Rhodes '809 Patent; and (3) show the named inventors are unavailable or unwilling to make a Rule 131 Declaration. ACP at pages 6-10.

Patent Owner timely filed a Response to the ACP on January 29, 2010. The Response included the 131 Declaration that addressed each of the alleged deficiencies stated in the ACP. Included with the 131 Declaration was a claim chart that correlated previously submitted Exhibits A-P to the claim element by exhibit and page number. Due to the number of claims and Exhibits, the claim chart exceeded one hundred pages. However, the claim chart did not introduce any new evidence, but merely correlated in table form the previously submitted textual evidence to the claim elements.

Patent Owner also contacted each of the three inventors, Wiegand, Dahlstrom and Aimutis, to determine whether they would cooperate in reviewing and signing the declaration to